IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH GEORGIA
COLUMBUS DIVISION

Case No: 4:23-cv-00032

| | |
|---|---|
| TERRY LAMAR TALLEY,<br><br>     Plaintiff,<br><br>vs.<br><br>CITY OF LAGRANGE, GEORGIA; LGPD Investigator BARBARA PRICE, in her Individual Capacity; GBI Special Agent ROY OLINGER, in his Individual Capacity; GBI Forensic Analyst BENNY BLANKENSHIP, in his Individual Capacity; LGPD Investigator OTIS FURGERSON, in his Individual Capacity; LGPD Investigator GEORGE YATES, in his Individual Capacity; LGPD Investigator CECIL BARENTINE, in his Individual Capacity; and JOHN and JANE DOES 1-10, in their Individual Capacities,<br><br>     Defendants. | **COMPLAINT**<br><br>**(Jury Trial Demanded)** |

Plaintiff Terry Lamar Talley (hereafter "Talley" or "Plaintiff"), by and through undersigned counsel, complains of Defendants City of LaGrange, Barbara Price, Roy Olinger, Benny Blankenship, Otis Furgerson, George Yates, Cecil Barentine, and John and Jane Does 1-10, (hereafter "Defendants") as follows:

## INTRODUCTION

1.      On February 23, 2021, following a re-investigation by the LaGrange Police Department, Terry Talley was exonerated of the rape charges for which he spent nearly four decades

– more than fourteen thousand (14,000) days – in the Georgia prison system.[1]

2.      Mr. Talley's prolonged nightmare arising from his wrongful conviction and almost half-century of incarceration was not the result of mere negligence or mistake by special agents of the Georgia Bureau of Investigation ("GBI") and the detectives of the LaGrange Police Department ("LGPD") who investigated the case.

3.      Rather, agents of the GBI and detectives of the LGPD chose to protect a fellow law enforcement officer, Jack Lovelace, and the reputation of the LGPD, regarding a series of horrific sexual assaults that occurred in LaGrange between February and July 1981.

4.      During that time, despite being the subject of numerous complaints of grossly inappropriate and shocking conduct involving female students, which complaints were known to the LGPD, Officer Jack Lovelace had been assigned by the LGPD to work "rape prevention duty" at LaGrange College.

5.      Lovelace had a key to the dormitory where the first two attacks occurred. Following the second attack, an LGPD sergeant investigating the incident identified black gloves left at the scene by the assailant as belonging to Lovelace.

6.      Lovelace, however, was never investigated in connection with the sexual assaults that occurred in the locked LaGrange College dorms to which he had access, despite physical evidence directly linking him to one of those attacks.

---

[1]  Plaintiff acknowledges, as the Georgia Innocence Project ("GIP") properly did, that the culture and practices of the LaGrange Police Department ("LGPD") during the 2000s were markedly different and much improved than those in place at the time of the underlying investigation in 1981. It is noteworthy and commendable that the leadership of LGPD in recent years, including but not limited to former Chief of Police Lou Dekmar and Sergeant William Nelson, were instrumental in helping ensure that a thorough investigation of the cases involving Terry Talley was undertaken and in fully supporting his exoneration. They were a model of how such cases should be handled by current law enforcement when law enforcement misconduct has occurred in the past.

7.    Lovelace was terminated by the LGPD in mid-March 1981. After Lovelace's termination, the sexual assaults on the college campus ceased, but additional assaults were reported in the vicinity of LaGrange College which bore a striking resemblance to those that occurred in the college dormitory. As with the college sexual assaults, Lovelace was never investigated for these subsequent attacks in the surrounding neighborhood.

8.    Instead, beginning July 21, 1981, GBI Special Agent Roy Olinger ("Olinger") and LGPD Detective Barbara Price ("Price"), who were the lead investigators at that time, focused on Terry Talley despite the absence of evidence connecting Talley to the crimes.

9.    Olinger and Price orchestrated suggestive lineups through which victims and witnesses identified Talley as the assailant or as someone who had been in the vicinity of the rapes and assaults at the relevant times.

10.    On November 9, 1981, less than four months after his arrest, Talley was tried and convicted for rape and assault after a one-day trial. The following day, on November 10, Talley was tried for a second rape and was again convicted. For each conviction he was sentenced to life imprisonment, plus an additional ten years.

11.    In 2009, on the basis of DNA evidence, Talley was proven innocent, leading to his exoneration in 2021.

12.    Whether intentional or reckless, the desire to protect Lovelace and/or the reputation of the police department that had assigned him as a "rape prevention officer" at LaGrange College, by concealing evidence from the District Attorney that tended to implicate Lovelace and/or exculpate Talley, makes this case especially egregious.

## SUMMARY OF THE CASE

13.     During February 1981, two violent sexual assaults were committed at LaGrange college in Georgia.

14.     On February 7, a student was attacked in her dorm room and choked until she lost consciousness. When she awoke, she had a pillowcase over her head, and her attacker was still in the room with her. Before fleeing, he threatened to kill her if she told anyone about the attack. She waited ten days before reporting it to the police.

15.     Two weeks later, on February 21, another student was attacked in her room in the same dormitory. She was strangled, beaten, and sodomized. The attacker struck her in the head, bloodying her face and dislocating her jaw.

16.     One week after the second assault, another student received a handwritten note stating, "You're next," followed by threatening phone calls. The police made no arrests.

17.     Less than two months later, in April 1981, a 64-year-old woman who lived nearby was bound and raped. Two more women were assaulted in June, the first being attacked in the basement of a church, where she was strangled, bound, and raped. The second was assaulted at the local hospital, where she was pulled into a room and threatened with rape. The college and the entire community was gripped by fear and panic.

18.     Most of the incidents had some relation to LaGrange College, either occurring on campus in a women's dormitory or involving students or former students at the college, or neighbors who lived in the area.

19.     Local law enforcement officials believed the crimes were committed by a serial rapist. The assaults garnered a great deal of media and public interest and evoked widespread fear.

20. The crimes were originally investigated by lead investigator Barbara Price of the LGPD. In early July 1981, however, after months of continuing rapes and assaults, the Chief of Police of the LGPD requested the assistance of the GBI with the investigation, citing that the department was receiving "a lot of pressure from the community," but was no closer to making an arrest.

21. Upon information and belief, as a result of this request, Special Agent Olinger of the GBI Regional Investigative Office located in or near Columbus, Georgia, was assigned to the matter and began working hand in hand with Detective Price of the LGPD on the investigation.

22. Substantial evidence suggested that Jack Lovelace, an LGPD police officer, was involved in the crimes.

23. Following a number of complaints of aggressive, threatening, and inappropriate conduct directed toward young women at the college, Lovelace was fired by the LGPD in March 1981. After he was fired and lost his access to the dorms, there were no other incidents on campus, and the focus of the attacks shifted to the surrounding neighborhood.

24. Much of the evidence implicating Lovelace in the series of rapes and assaults in LaGrange would remain undisclosed and hidden for many years. Some of the evidence implicating Lovelace vanished entirely. The gloves identified by an LGPD sergeant as belonging to Lovelace, for example, as well as all the other physical evidence in the case most closely linked to Lovelace, disappeared without explanation after being in the possession of the LGPD and the GBI crime lab.

25. If Lovelace was ever investigated in connection with the crimes, records of such investigation either were not kept or were destroyed.

26.     In late July 1981, Special Agent Olinger and Detective Price instead focused the investigation on Talley. No physical evidence linked Talley to the assaults or the victims. His name had never been uttered as a possible suspect.

27.     Talley was a millworker and laborer with limited education. Nothing about him suggested that he had orchestrated a series of targeted attacks. His criminal history consisted of relatively minor theft and property crimes. He had never been convicted nor arrested for any type of sexual assault. He had no connection with LaGrange College, and no special access to the locked dorms where first two attacks had occurred.

28.     On July 21, 1981, Talley was arrested for simple battery in connection with a previous incident in which he had gone to a woman's house and offered her money for sex. When the woman declined his offer, Talley placed his hand on the woman's arm because he thought there was a communication issue due to a language barrier. When it was clear that she did not want to have sex with him, Talley left. The woman did not report the incident to the police at the time.

29.     This incident bore no resemblance whatsoever to the series of premeditated, vicious, and violent assaults that had occurred beginning in February 1981. The serial rapist had repeatedly attacked women from behind, bound and gagged them, and threatened to kill them with a knife. He dragged women across floors and struck them with his fists.

30.     When Agent Olinger and Detective Price questioned Talley about the solicitation episode, he freely admitted to his interactions with the woman. He voluntarily provided hair and bodily fluid samples and *passed a polygraph*. Talley truthfully denied that he had assaulted or raped anyone. Nonetheless, Agent Olinger and Detective Price decided to focus on Talley as the alleged serial rapist.

6

31.    Lacking probable cause to arrest him for the series of attacks, Olinger and Price orchestrated a series of suggestive lineups through which victims and witnesses identified Talley as the assailant or as someone who had been in the vicinity of the rapes and assaults at the relevant times. Olinger and Price would bury evidence that these same victims and witnesses had earlier identified someone else.

32.    Talley went through this charade of an investigation without the benefit of counsel. Only after Olinger and Price had in essence manufactured a case against him would Talley meet with a court-appointed lawyer. A single lineup was conducted after Talley was represented by counsel, and the victim who participated in that lineup had seen media coverage of Talley's arrest.

33.    The die was cast as a result of Olinger and Price's suggestive lineups and concealment of exculpatory and impeachment evidence regarding those lineups. The prosecution would hinge on the identification testimony. There was no other evidence against Talley. There was no other evidence of guilt.

34.    A jury would never hear about the alternative suspects or that one of them had been identified by victims and witnesses long before Talley's arrest. A jury would not know about the "You're next" note and the threatening phone calls to the LaGrange College student. They certainly would never learn that Talley's fingerprints had been compared to latent lifts from that note and found not to match.

35.    A jury would also never know that gloves left by the assailant at the site of one rape were affirmatively identified by a LGPD Sergeant as belonging to LGPD Rape Prevention Officer Jack Lovelace. There was no testimony about Lovelace's subsequent termination from the LGPD for threatening and inappropriately sexualized conduct, because investigators kept that evidence hidden from the prosecution, Talley, his trial counsel, and the judge and jury.

36.     Talley went to trial on the first rape charge just four months after his arrest. The evidence against Talley consisted of the victim's identification testimony and Detective Price's perjured testimony bolstering the credibility and accuracy of the victim's identification of Talley. Olinger and Price concealed the exculpatory evidence that the victim had previously identified another man as her assailant, and that she was extremely intoxicated at the time of her assault.

37.     A mostly white jury deliberated only 15 minutes before finding Talley guilty. He was sentenced to life in prison, plus ten years. The very next day, Talley's trial on the next rape case began.  The accuracy of victim and witness identifications was once again the critical issue.

38.     Again, all exculpatory or impeachment evidence was unlawfully concealed by Olinger and Price from the prosecutor, Talley, the judge, and the jury. Talley was quickly found guilty and sentenced to another term of life imprisonment, plus ten years.

39.     Following this second conviction, wanting to spare his family the heartache of further trials and believing his situation to be hopeless, Talley pled guilty to the remaining charges and received two more life sentences for two rapes, for which he was exonerated in 2021, and two ten-year sentences for two other assaults.[2]

40.     Talley did not commit any of the sexual assaults and there was no reason to suspect him of those crimes. He would not have been convicted but for Olinger and Price, and the other Defendants, subjecting him to unfair and misleading identification procedures and withholding critical exculpatory and impeachment evidence which they were bound to disclose to the prosecutor pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963).

41.     No appeal was filed on Talley's behalf and he languished in prison. Only years later – after Talley had spent decades in prison as an innocent man – did the true facts begin to emerge.

---

[2]  Talley had served these assault sentences by 2021, so they were not vacated at the time of his exoneration with respect to the rape charges. Plaintiff intends to file a motion to vacate these convictions as well.

42.     Indeed, Talley likely would have died in prison had it not been for the hard work and dedication of the Georgia Innocence Project ("GIP"). In 2004, Talley wrote to GIP and asked for their help in proving his innocence. GIP learned that biological evidence in all the cases but one had been lost or destroyed.

43.     In 2009, Court-ordered DNA testing of that biological evidence proved Talley's innocence. He was *not* the source of the male DNA in the sole remaining sexual assault evidence kit ("rape kit"). GIP pursued an Emergency Motion for a New Trial in that case. The Motion was finally granted in 2013. However, the indictment was not dismissed until years later – in February 2021.

44.     The DNA exoneration in that one case – one that was part of the series of 1981 LaGrange rapes and attacks – helped spur the LaGrange Police Department, under different leadership than was in place at the time of Talley's prosecution, to re-investigate *all* the cases for which Talley had been convicted.

45.     During the re-investigation, the GIP and the LGPD uncovered the significant exculpatory evidence that should have been disclosed to the prosecutor and Talley's defense lawyer in advance of his trial in November 1981. Based upon the additional information that was finally brought to light, the Troup County District Attorney ("DA's Office") joined in the motion to vacate Talley's convictions.

46.     On February 23, 2021, the Superior Court of Troup County entered a Consent Order Vacating Convictions and Granting Motion to Enter Nolle Prosequi ("Consent Order"). The convictions in four of the six cases in which Talley was convicted were thus vacated and declared null and void.[3]

---

[3]  For reasons that remain unclear, the DA's Office would not consent to having the convictions in the assaults for which Talley had already served his ten-year sentences, Case Nos. 970 (ES) and 971 (Sugai),

47.    This action seeks to compensate Talley for the nearly four decades he spent in prison as an innocent man and for the continuing effects of his wrongful incarceration.

## JURISDICTION AND VENUE

48.    Talley brings this action under 42 U.S.C. § 1983 for acts committed by Defendants under color of state law which deprived him of liberty without due process of law, in violation of his rights under the United States Constitution.

49.    This action arises under the Constitution and laws of the United States. This Court has original jurisdiction over Talley's federal claims pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(3).

50.    This Court has pendent jurisdiction over Talley's state-law claims pursuant to 28 U.S.C. § 1367(a) because they are part of the same case and controversy described by Plaintiff's federal claims.

51.    Pursuant to U.S.C. § 1391(b), venue is proper in the United States District Court for the Middle District of Georgia as significant events or omissions giving rise to the claims at issue in this matter occurred in this District.

## PARTIES

52.    Terry Talley is a citizen and resident of the State of Georgia. He resides in LaGrange, Georgia.

---

vacated, and those cases purportedly remain "under review." After nearly four decades in prison, Talley was ready to go home and agreed to the proposed Consent Order that vacated the four rape convictions and provided for his immediate release. No evidence whatsoever suggests that Talley had any knowledge of or role in the assault of ES. With respect to the Sugai conviction, Talley is not guilty of the felony assault of which he was convicted. Talley has always admitted to the underlying facts and his responsibility for what was originally alleged, and what he did – *the commission of a simple misdemeanor battery*.

53.     Defendant City of LaGrange is a municipal corporation organized under the laws of the State of Georgia. The LaGrange Police Department ("LGPD") is, and was at all times pertinent to this action, a department of the Defendant City of LaGrange.

54.     Defendant Barbara Price ("Price") is, upon information and belief, a citizen and resident of Georgia. At all times relevant to this Complaint, Price was employed as a detective with the LGPD, and served as the lead investigator on this case for the LGPD. Price is sued in her individual capacity for acts taken under color of state law and within the course and scope of her employment.

55.     Defendant Roy Olinger ("Olinger") is, upon information and belief, a citizen and resident of Georgia. At all times relevant to this Complaint, Olinger was employed as a Special Agent with the Georgia Bureau of Investigation ("GBI").  Upon information and belief, Olinger was assigned to the GBI Regional Investigative Office in Columbus, Georgia, and beginning on July 1, 1981, served as the lead investigator for the GBI on this case. Olinger is sued in his individual capacity for acts taken under color of state law and within the course and scope of his employment.

56.     Defendant Benny Blankenship ("Blankenship") is, upon information and belief, a citizen and resident of Georgia. At all times relevant to this Complaint, Blankenship was employed as a forensic analyst with the GBI laboratory in Columbus, Georgia. Blankenship is sued in his individual capacity for acts taken under color of state law and within the course and scope of his employment.

57.     Defendant Otis Furgerson ("Furgerson") was, upon information and belief, a citizen and resident of Georgia. At all times relevant to this Complaint, Furgerson was employed as a

detective with the LGPD. Furgerson is sued in his individual capacity for acts taken under color of state law and within the course and scope of his employment.

58.    Defendant George Yates ("Yates") is, upon information and belief, a citizen and resident of Georgia. At all times relevant to this Complaint, Yates was employed as a police officer with the LGPD. Yates is sued in his individual capacity for acts taken under color of state law and within the course and scope of his employment.

59.    Defendant Cecil Barentine ("Barentine") is, upon information and belief, a citizen and resident of Georgia. At all times relevant to this Complaint, Barentine was employed as a police officer with the LGPD. Barentine is sued in his individual capacity for acts taken under color of state law and within the course and scope of his employment.

60.    Defendants John and Jane Does 1-10 are unknown officers and employees of the LGPD and the GBI and/or others acting in concert with them. These individuals, at all relevant times, were acting under color of state law and within the scope of their employment with either the LGPD or the GBI. These individuals either participated in the wrongful acts described herein or failed to prevent the violation of Talley's constitutional rights. They are sued in their individual capacities and will be specifically named as their identities are revealed in discovery.

61.    At all times relevant hereto, in committing the acts and omissions herein alleged, each of the Defendants was acting within the scope of his or her employment and under color of state law.

12

## FACTS

### I.   TERRY TALLEY IS WRONGFULLY TARGETED AS A SERIAL RAPIST.

#### Terry Talley in 1981

62.   In 1981, Talley did shift work as a millworker at Elm City Mill in LaGrange, Georgia. To earn extra money, Talley took on odd jobs and did yard work, primarily grass-cutting, in LaGrange.

63.   He would often walk the neighborhood in which LaGrange College was located and knock on doors to ask if people needed help with yard work or other odd jobs. Talley typically walked or rode his bike from the "black section" of LaGrange and sought work in what was regarded as the "white section" or "white neighborhoods" of LaGrange. As a result, he was a familiar-looking figure to people who lived in that neighborhood.

64.   Prior to being the focus of investigators with LGPD and GBI with respect to the underlying criminal cases, there was nothing in Talley's background or history that would suggest he might commit such crimes. His criminal history in 1981 consisted of relatively minor theft offenses. Talley did not graduate from high school, having dropped out of school in the 10th grade.[4]

#### LaGrange College and the Surrounding Community are the Site of a Number of Apparently Related Rapes and Assaults in Early 1981

65.   From February through June of 1981, the City of LaGrange was the site of a series of vicious rapes and assaults. In quick succession, one rape, another attempted rape, and other

---

[4]   As will be explained in greater detail *infra*, some of the attacks and incidents at LaGrange College involved a degree of planning and seemed to be targeted (e.g., the assailant making efforts to ascertain in advance the names and phone numbers of victims and, in one instance, the car she drove). Compared to Talley, the culpability of the primary alternative suspect –a police officer who had attended college – was much more plausible.

disturbing incidents occurred on or near the campus of LaGrange College. Authorities determined that a serial rapist was on the loose and were under tremendous pressure to make an arrest.

66.    Some of the rapes, assaults, and incidents occurred directly on the LaGrange College campus in February and March 1981, while the others took place off-campus, in areas adjacent to LaGrange College.[5] The later incidents occurred in April and June 1981.[6]

67.    Pertinent details regarding the series of incidents occurring at LaGrange College are as follows:

### February 7, 1981: LaGrange College (Case No. 972)

A white female with the initials KW was attacked in her dorm room when a man grabbed her from behind and choked her until she was unconscious. When KW awoke, she had a pillowcase over her head. KW fought her attacker and he fled, threatening to kill her if she told anyone. KW reported the attack ten days later and said her assailant was a young black man.

### February 21, 1981: LaGrange College (Case No. 973)

Two weeks later, a white female with the initials EB was attacked from behind in her dorm room at about 2:30 a.m. while she was sleeping. The attacker struck EB, dislocating her jaw, and then proceeded to rape and sodomize her. He placed something around her neck and choked her. The man told EB, "If you scream, I'll kill you."

**Though it was not revealed to the prosecutor or Talley's trial counsel, the crime-scene evidence included a pair of black gloves. A Sergeant with the LGPD noted that the gloves were the "same as worn by Lovelace."[7]**

---

[5]  The theory of prosecution was that all the attacks had been perpetrated by a single individual.

[6]  As noted above, these "off-campus" rapes occurred after LaGrange Police Department Officer Lovelace, who served as a Rape Prevention Officer at LaGrange College in February and March 1981, was dismissed from the police department on March 16, 1981.

[7]  At the time of the incidents occurring on the campus of LaGrange College, Lovelace was both a police officer with LGPD and a student at the college. As the Rape Prevention Officer, he had access to the dormitories which would have otherwise been restricted, and to student directories which contained personal information such as names and addresses.

February 28, 1981: LaGrange College (unindicted)

One week later, a white female with the initials BH, another student at LaGrange College, found a note on her car windshield which read, "You're next." Shortly after finding the note, BH received a phone call from someone she described as sounding like a black male. The caller said, "I want to fuck you" and hung up. About ten minutes later, the man called again and said, "I am on my way out there now."

**Though it was not revealed to the prosecutor or Talley's trial counsel, GBI obtained latent lifts from the note left on BH's car and determined that Talley was *not* the source of the fingerprints. Additionally, it was not disclosed that a man named Ike Ikegwuonu ("Ikegwuonu") had been named a suspect with respect to this incident.**

68.    Pertinent details regarding the later-occurring, off-campus incidents, which were all committed after Lovelace lost his access to LaGrange College dorms on March 16, 1981, are set forth below:

April 19, 1981: Private residence in LaGrange (Case No. 974)

A 64-year-old white female with the initials MK was attacked at her home near LaGrange College. The assailant, a black male, choked her, put a pillow over her head, and raped her.

**Though it was not revealed to the prosecutor or Talley's trial counsel, MK was heavily intoxicated at the time of the rape. Her blood alcohol content ("BAC") was .34 several hours after the assault. Additionally, investigators failed to disclose that MK identified another man as her assailant when reviewing lineup photos. The man MK identified, Ikegwuonu, was apparently considered at one time as an alternative suspect by investigators, but this was also not disclosed to the prosecutor or Talley.**

June 24, 1981: Southwest LaGrange Baptist Church (Case No. 969)

This assault occurred at a church situated two blocks from MK's home, also in the vicinity of LaGrange College. A white woman with the initials EM was assaulted in the basement of the church where she was working. EM was approached from behind and choked with a rope until she passed out. EM pleaded with her attacker, and he replied, "Shut up bitch. I'm not going to kill you." She asked that he remove the rope from her neck, and he said, "You were hollering, and you scared me [so] what did you expect me to do." He cut off her clothes, punched her in the mouth, tied her wrists with her clothing, and raped her. The next day, a man identified as a

15

black male called EM at her mother's house, where she lived, and asked, "Hey, Sugar, do you need me now?" He added, "You know what I want."

**EM never saw her assailant. Still, she was allowed to participate in a live lineup and purportedly selected Talley and three other men with similar body types to say sentences. EM allegedly then identified Talley by voice.**

<u>June 30, 1981: West Georgia Medical Center (Case No. 970)</u>

A black female with the initials ES was assaulted while cleaning the bathrooms at the Heart Clinic of the West Georgia Medical Center, near LaGrange College. The attacker grabbed ES around the neck from behind and dragged her into an adjacent library. ES described a black male with a short afro and alcohol on his breath. ES reported that he did not rape her because she was menstruating.

### **The LaGrange Police Department Enlists the Georgia Bureau of Investigation to Participate in the Investigation**

69.    Defendant Price came to the reasonable conclusion that police were dealing with a serial rapist. There were many similarities between the rapes and assaults in question. All involved aggressive, violent attacks. LGPD officials were under intense pressure to apprehend a suspect at or near LaGrange College.

70.    On July 1, 1981, the Chief of Police of the LGPD, Gary B. Shepherd, wrote to Special Agent Mike Carothers of the GBI and requested GBI's assistance in ascertaining the perpetrator of what was referred to as a "series of rapes."

71.    Upon information and belief, Olinger, then a Special Agent assigned to the GBI Regional Investigative Office in or near Columbus, was assigned to the investigation.

72.    In a memo dated July 14, 1981, Olinger reported meeting with Chief Shepherd and noted that Shepherd was "receiving a lot of pressure from the community to solve these rapes."

73.    From that point forward, Olinger worked closely with Defendant Price of the LBPD, who was assisted by Otis Furgerson. Defendants Yates and Barentine also assisted with the investigation, at the direction of Price. Defendant Blankenship assisted with any forensic

16

analysis requested by Olinger and the other investigators. From the moment GBI assistance was requested, Olinger and other GBI staff were intimately involved in every aspect of the investigation and eventual prosecution of Talley.

74.     From an early point in the investigation, the names of two alternative suspects surfaced: Jack Lovelace and Ike Ikegwuonu. Substantial evidence indicated Lovelace was actually involved in the crimes and Plaintiff contends that investigators themselves believed he was actually the perpetrator with respect to the assaults and incidents in question. The evidence implicating Ikegwuonu consisted primarily of his proximity to the sites of the incidents and the fact that he was identified in photo arrays, the fairness of which are unknown.

### Substantial Evidence Suggests the Involvement of LGPD Officer Jack Lovelace in the Assaults

75.     In early 1981, Jack Lovelace was a police officer with LGPD and was also a student at LaGrange College. In his role as an officer with LGPD, Lovelace was assigned to "rape prevention duty" at LaGrange College and was granted access to the secured female dorms at the college pursuant to those duties.

76.     Lovelace was terminated from the LGPD on March 16, 1981, following a string of complaints about threatening and inappropriate behavior. With Lovelace's termination, his work as the "rape prevention officer" at the college – and his access to the female student dorms – ended. *No assaults occurred at LaGrange College after that date*.

77.     The strongest direct evidence of Lovelace's involvement in the subject assaults came with the February 21, 1981, rape of EB on the campus of LaGrange College. The assailant, in fleeing, left two black gloves at the crime-scene. A fellow LGPD officer, Sergeant Cox, noted that that the gloves were the "same as worn by Lovelace."

78. The gloves subsequently went missing while in the custody and control of Defendants Price and Furgerson, who personally brought the gloves to GBI Columbus for a visual inspection by Blankenship, while other physical evidence in the case was delivered to the crime lab by Yates. The gloves apparently were never logged in as evidence at GBI Columbus. No record of their disposition or destruction exists.

79. Based upon the circumstances of the investigation and Lovelace's status as a potential suspect, albeit an undisclosed and "unofficial" one, it is alleged upon information and belief that LGPD investigators either intentionally destroyed the gloves or otherwise disposed of them such that they would not be available to the prosecutor and, later, to those working on behalf of Talley.

80. In addition, Lovelace was *known by the LGPD* to have been in the vicinity of EB's dorm during the early morning hours of February 21, 1981. One of the incidents cited in the March 16, 1981, LGPD termination letter described Lovelace accosting a female student, Robin Rowan, outside the dorms *at 1:30 – 2:00 a.m. on February 21, 1981. EB was raped in the dorm at approximately 2:30 a.m.,* Therefore, at least as of March 16, 1981, LGPD investigators knew Lovelace had been in the vicinity of EB's dorm within an hour of her rape.

81. Chief Shepherd's termination letter was blunt and candid regarding the misconduct on the part of Lovelace and the effect it had on the female students at LaGrange. Shepherd told Lovelace his conduct had been "reprehensible" and noted that his actions "*created fear in the minds of some students and a concerted effort to avoid you whenever you are seen on campus.*"

82. The complaints and incidents involving Lovelace were long-running and, frequently, of an extremely disturbing nature. Lovelace was aggressive and overtly sexual in his

interactions with female students. He used the same language as the assailant (e.g., using the term "sugar" and asking a young coed if "are you going to be quiet or am I going to have to gag you").

83.    In light of the incidents of misconduct involving Lovelace, which increased in frequency in early 1981, he never should have been assigned as the rape prevention officer or in any other role at LaGrange College. The City of LaGrange and LGPD should have determined – prior to February 1981 – that Lovelace was unfit to serve as a uniformed officer, let alone as the "rape prevention officer" at a college. There were complaints in 1980 of female students' fear of Lovelace and wariness of his "strange ways."

84.    Moreover, in February and into March 1981, Lovelace was reportedly drinking heavily, spiraling under personal and professional crises, under a great deal of emotional distress, and acting irrationally.

85.    The incidents that should have prompted investigators to fully explore Lovelace as a suspect in the series of rapes, assaults, and related incidents include the following:

- Beginning in early 1981, Lovelace was experiencing a great deal of distress and discord in his personal life, reporting that his wife and family had left him. Two fellow LGPD police officers noted concerning comments by Lovelace. One officer, Brenda Holston, reported Lovelace saying "he feels like killing himself" because he was "lovesick." Lieutenant Donald Scott reported that Lovelace asked not to work alone and "then he stated that he was afraid, he did not say at what."

- During the third week of February 1981, Lovelace entered an instructor's office at LaGrange College where student Sheila Ware was making a phone call. Lovelace shut the door, placed his hands on her back and shoulders without consent, and told her he wanted her to come home with him, telling her, "I have a bottle of wine and we could make love."

- Lovelace was known to be in the area of EB's dorm room near the time she was raped. Another student, Robin Rowan, filed a complaint against Lovelace for his actions at approximately 1:30 – 2:00 a.m. on the same date. The complaint submitted by Rowan placed Lovelace in the dorm, just 45 – 60 minutes before EB was raped. Rowan reported that Lovelace had made

19

improper advances toward her as she walked from her car to Turner Dormitory.

- Black gloves were found in the dorm room of EB after she was raped on February 21, 1981. Another police officer with LGPD noted that the gloves were "the same as worn by Lovelace."

- During this same time period, there were complaints about Lovelace being intoxicated and pawing at women. On February 23 or 24, 1981, just days after the first rape at LaGrange College, Lovelace was "in a drunken condition" at the Student Center, "acting strange," and grabbing at females, according to the report of a LaGrange College student. It was reported that Lovelace would approach a female and "grab at her," and that as a result of his conduct "the girls try to avoid him whenever they see him on campus."

- On March 3, 1981, an administrator at LaGrange College complained to LGPD about Lovelace's conduct while attending classes at the college. The next day, Judy Burdette, an instructor at the college, was interviewed and reported (i) that she had detected alcohol on Lovelace's breath in class; (ii) that she had seen an instance of an unwanted touching by Lovelace; and (iii) hearing female students "say Lovelace is a pest and *they are afraid of him*."

- On March 6, 1981, Lovelace approached Ware in a room at Pitts Dormitory on the campus of LaGrange College and told her: "Today, I'm going to get some of your sugar." He then put his hands on her neck and shoulder and said, "Are you going to be quiet or am I going to have to gag you?" Ware escaped the room and reported the incident to LGPD that same day.

- On March 6, 1981, two students reported to police that a black male was seen running from the dormitories, getting in a car with Lovelace's license plate, and speeding away. The students were "alarmed" by Lovelace's actions.

- Lovelace was written up on March 6, 1981, because he had gone to two separate women's dorms at LaGrange College "looking for" a female student who had lodged a complaint against him. The LGPD supervisor noted that "[s]tudents that saw you became alarmed by your actions."

86.    There were other alarming incidents involving Lovelace in the months leading up to the series of rapes and assaults in LaGrange. On June 17, 1980, Lovelace had been placed on five days' suspension following the substantiation of a complaint filed by his girlfriend, Stephanie Boyd, that Lovelace entered her residence without permission and caused a disturbance.

20

87.     In yet another incident involving Lovelace and Boyd, a LaGrange College student who had gone with Lovelace to his house reported that he showed her how to use a gun and left the gun out during a heated exchange with Boyd after Lovelace told Boyd that "he had a girl in his house." The student, Loretta Smith, reported to LGPD Internal Affairs that she "believes Lovelace had planned for her to shoot Mrs. [sic] Boyd." Smith added:

> [S]he is afraid of him [Lovelace] and so are the other girls who have knowledge of his strange ways.

88.     Additional incidents involving Ms. Boyd occurred during the time frame in which Lovelace reported being afraid to work alone and that he was both suicidal and "lovesick." These other incidents included the following:

- At approximately 3:00 a.m. on February 27, 1981, police were called to Ms. Boyd's residence in response to a report that Lovelace had entered her home by force, cursed Ms. Boyd, and threw alcohol on her personal effects.

- Police were again called to Ms. Boyd's residence on March 3, 1981, in response to aggressive conduct on the part of Lovelace in which he purportedly confronted a man named Willie Swanson and "pulled Miss Boyd from [Swanson's] auto."

89.     A number of the attacks, particularly those occurring at LaGrange College or involving persons with a connection to the college, seemed to be targeted and *not* random. In some instances, the perpetrator had the wherewithal and made the effort to ascertain names and phone numbers of his victims.[8] The following facts suggest targeted attacks:

- The perpetrator left a note reading "You're next" on the windshield of LaGrange College student BH's car on February 28, 1981. That day, BH received two calls from someone she believed to be a black male. First, he

---

[8] As a student at LaGrange College, Lovelace would have had access to student directories with the addresses and phone numbers of his fellow students. It bears repeating that Talley was excluded as the source of the latent lifts obtained from the note left on BH's car. For reasons that are not yet clear, the latent lifts were not compared to Lovelace's fingerprints. Plaintiff alleges on information and belief that the decision to not check the latent lifts against Lovelace was made in furtherance of the effort to steer the investigation away from Lovelace and to focus on Talley for crimes that investigators believed Lovelace had committed.

21

said, "I want to fuck you." He called ten minutes later to say, "I am on my way out there now."

- The day after the June 24, 1981, rape of EM, a man described as a black male called the house where EM lived with her mother and said, "Hey sugar, do you need me now" and "you know what I want."

- On the night of the EB rape on February 21, 1981, a black male abruptly entered the dorm room of another LaGrange College student, who was naked after having showered. The man, who fit the general description of the assailant, excused himself, saying he had the wrong room. This student resided in Room 105 of Turner Dorm. EB was in Room 205 of that dorm.

### **Special Agent Olinger and Detective Price Focus on Terry Talley**

90.     Following the campus sexual assaults, the next incident occurred on April 19, 1981, when a 64-year-old woman was bound and raped in her home. Then, on June 24, 1981, a 28-year-old woman and former student at LaGrange College—who appeared on the same yearbook page as Lovelace—was brutally attacked and raped in a church basement.

91.     While the police investigation purportedly continued, LGPD had made no arrests in connection with the series of attacks.

92.     On July 21, 1981, Talley knocked on the door of a woman named Yoiko Sugai ("Sugai") with the intent of offering her money for sex. He had done the same thing on April 10, 1981, after being told that Sugai provided sex in return for payments.

93.     During that April 10, 1981, encounter, Talley believed there was a misunderstanding due to a language barrier and attempted to step inside Sugai's house. In so doing, he placed his hand on her arm. Sugai and her minor child became upset, and Talley left.

94.     When Talley returned to Sugai's home on July 21 to offer money in exchange for sex, Sugai did not answer the door and Talley left the residence without incident. Unbeknownst to Talley, Sugai had alerted a neighbor that there was a black man on her porch and the neighbor called police.

95.     Sugai's reaction was likely a product of the hysteria in the community regarding the serial rapes and assaults. There was nothing threatening or aggressive regarding Talley's conduct on her porch. He simply knocked on her door. Notably, Sugai had not called the police or lodged any sort of complaint following their April 10, 1981, interaction.

96.     Following his July 21, 1981, visit to Sugai's residence, Talley was picked up by the police while riding his bicycle in the neighborhood. It was only then that Sugai reported that Talley had entered her home on April 10, 1981, offered her money for sex, and placed his hand on her arm when she declined.

97.     The April 10, 1981, incident with Ms. Sugai – *to which Talley has always consistently admitted* – bore no resemblance to the series of brutal and vicious rapes and assaults which had plagued LaGrange College and the surrounding community. There was no objective reason to suspect Talley as the serial rapist. He had no history of violence against women.

98.     Talley was arrested on July 21, 1981, and charged with simple battery, a misdemeanor, in connection with the April 10, 1981, Sugai incident. He was questioned by Price and Olinger and voluntarily provided samples of saliva, blood, and head and pubic hairs. During questioning, Talley was candid and truthful: he admitted to offering Sugai money for sex and grabbing her arm but denied ever assaulting or raping anyone.

99.     The next morning, the local newspaper ran a story on page 1 stating that Terry Talley, a man known in the neighborhood as someone who went door to door on his bicycle asking for work cutting grass, had been arrested for *attempted rape*. Defendant Furgerson told the newspaper that the victim saw Talley "riding a bicycle in her neighborhood," and that he had "asked about doing some yard work."

100.    The article, based on statements made by Furgerson, stated that Talley had "grabbed her [Sugai] by the arm and forced her inside her apartment," and that "she was able to escape and ran from the house."   None of this was true, but it created the impression that Talley, the "man on the bicycle," was the person responsible for the rapes.

101.    The same day, Agent Olinger had Talley transported to Atlanta for a polygraph examination at the GBI's Polygraph Office. During the pre-testing interview, Talley once again admitted to the truthful facts surrounding his interactions with Sugai. He did likewise during the polygraph examination and *Talley's responses were deemed truthful*.

102.     Notably, Olinger and Price did *not* subject Talley to a polygraph exam with respect to the series of rapes and assaults they were investigating. No reasonable explanation for this has ever been provided.

103.    At that point, Talley had agreed to everything investigators had asked – repeated questioning, provision of hair and biological samples, and a polygraph examination at the Atlanta GBI office. Talley was not represented by counsel.

104.    No physical evidence linked Talley to any of the rapes, assaults, or incidents under investigation. Talley had been forthright regarding his interaction with Ms. Sugai. He passed a polygraph examination about that encounter.

105.    Despite this, Agent Olinger and Detective Price intentionally and/or recklessly conducted a series of unduly suggestive lineup and identification procedures that resulted in the fabrication of inculpatory evidence against Talley.

106.    For example, before conducting any of these identification procedures, Olinger and Price, upon information and belief, had authorized the issuance of the press release to the local paper asserting that Talley had been arrested for an attempted rape even although the arrest was

for a misdemeanor assault, and identifying him as the person who rode a bicycle around the neighborhood asking to do yard work. Upon information and belief, issuance of this press release was done with the knowledge and assent of Price and her superiors with the City of LaGrange and the LGPD.

107.   LaGrange was a small community and was obsessed with the serial rapist.  The article appeared in the local paper and was no doubt eagerly read, especially by the victims of the attacks. Needless to say, when Olinger and Price showed Talley's photos to victims and witnesses the next day, Talley looked familiar as a result of his walking, riding his bike, and working in the neighborhood, and they confirmed what law enforcement had told the media, and what they had read in the paper: Talley was the rapist. Case closed.

### Olinger and Price Conceal Exculpatory Evidence Regarding the Purported Identification of Talley

108.   On the morning of July 23, 1981, one day after Talley had passed the polygraph about the April 10, 1981, Sugai incident, lead investigators Olinger and Price arranged for a series of live lineup procedures at the LaGrange Police Department.

109.   Though Olinger and Price failed to keep and preserve proper records of the lineups and identification procedures they implemented, the limited documentation that does exist demonstrates the exculpatory evidence created by those procedures.

110.   Upon information and belief, Olinger and Price made no attempt to ensure that Talley was displayed in a lineup with individuals who fit the general description of the assailant as provided by victims. The others in the lineup were of greatly varying heights, body sizes, hairstyles, and skin colors.

25

111.    As described above, the circumstances of the attacks, where victims were suddenly physically attacked from behind and their vision completely obstructed, made any reliable visible identification difficult, if not impossible.

112.    Indeed, two of the victims *did not physically identify Talley in the lineup at all*, but allegedly identified him only by voice. One other witness described Talley as *resembling* a man near Southwest LaGrange Baptist Church on the day of the EM rape but noted her doubts. A notation on a police record related to the lineups states that the witness "*thinks #2 – not positive.*"

113.    Based solely upon these "identifications" of Talley as the perpetrator of the rapes and attacks on MK, EM, and ES, Olinger and Price lodged charges against Talley with respect to those assaults on July 23, 1981.

114.    The day after that lineup, on July 24, 1981, Talley's fingerprints were compared to the latent lifts from the note left on BH's car. GBI determined that the prints did *not* match Talley.

115.    On July 28, 1981, witness Evangeline Robinson viewed a lineup with Talley in it. She made no identification.[9]

116.    That same day, July 28, 1981, Olinger and Price charged Talley with the attempted rape of KW on February 7, 1981, even though no evidence supported that charge.

117.    On July 29, 1981, a lineup procedure was conducted for EB. By this time, however, EB had seen the extensive media coverage regarding Talley's arrest as the serial rapist. Not surprisingly, EB purportedly picked Talley out of the lineup.

---

[9]  Robinson resided in a dorm room, Turner 105. Shortly before the February 21, 1981, rape of EB – in Turner *205*, a black male had burst into her room. He then quickly excused himself, saying that he had "the wrong room." This was further evidence that the rapes were targeted and premeditated. The presumption, of course, was that Robinson had an interaction with the perpetrator of the EB rape shortly before it occurred.

118. All told, Talley was charged with the following offenses: (i) the February 7, 1981, assault of KW; (ii) the February 21, 1981, rape and assault of EB; (iii) the April 19, 1981, rape and assault of MK; (iv) the June 24, 1981, rape and assault of EM; and (v) the June 30, 1981, assault of ES. Additionally, the charge against Talley with respect to the Sugai incident was upgraded from the original misdemeanor charge of simple battery to the felony charges of aggravated assault and attempted rape.

119. Olinger and Price knew the purported identifications of Talley as the assailant in these cases were unreliable but did not provide that information to the prosecutor. Facts undermining the reliability of the purported lineup identifications, which were known to Olinger and Price but concealed from the prosecutor, included the following:

- Before victim ES picked Talley out of a lineup, she first identified alternative suspect Ikegwuonu as the perpetrator.

- Another employee working at the hospital where ES was assaulted, Bobbie Spence, also identified Ikegwuonu as the man she had seen in the vicinity prior to the attack.

- ES told police she had seen her assailant outside the hospital prior to the attack with a white or cream-colored bicycle. Investigators knew Talley had a red or maroon bike – they had seized his bike.

- Two witnesses in the area of MK's house and the Southwest LaGrange Baptist Church picked out Ikegwuonu as someone who had been in the area and acting suspiciously around the time of both attacks.

- Victim MK had a blood alcohol content of .34 – more than three times the legal limit of intoxication – at the time her blood was drawn at the hospital following the reported attack on her.

- MK identified a photo of Ikegwuonu as her attacker before she allegedly picked Talley out of a lineup.

- Victim EM never saw her attacker because she was blindfolded, yet she purportedly picked four men out of a lineup as resembling her attacker's general size. The four were then told to speak certain sentences and EM purportedly identified Talley by voice.

120.     These facts, which cast doubt on the accuracy of the purported identification of Talley as the perpetrator – *and which constitute either exculpatory or impeachment evidence which investigators were bound to disclose* – were instead kept hidden from the prosecutor, and therefore from Talley's trial attorney.

121.     The cases against Talley proceeded to trial with no disclosure to the prosecutor of either the flaws in the identification procedures or the fact that victims and witnesses had previously identified someone other than Talley – another alternative suspect – as the perpetrator.

122.     Tellingly, none of the victims or witnesses were ever shown a photo of Officer Lovelace by Olinger or Price, nor was he ever placed in a live lineup or asked for a voice exemplar.

### The District Attorney's Files Did Not Contain Exculpatory Evidence

123.     At trial, Talley was represented by court-appointed counsel, Lee Hasty. Though the cases were set for trial a mere four months after Talley's arrest, Hasty did what he could to ensure that he received all the materials that law enforcement officers were obligated to disclose to the District Attorney.

124.     On September 11, 1981, Hasty served discovery motions by which he sought copies of any scientific reports related to the investigation. Hasty also sought statements of witnesses, investigatory materials, and any information that arguably had exculpatory or impeachment value.

125.     Though Hasty was not required by law or court procedure to do so, Hasty served and filed a discrete motion seeking any such evidence (hereafter, "*Brady* Motion").

126.     With his *Brady* Motion, Hasty expressly sought the complete investigative files of any law enforcement agency or individual involved in the investigation of the subject crimes. He also sought the names and addresses of any involved law enforcement officer.

28

127. Notwithstanding Hasty's pre-trial efforts to ensure that investigators complied with their disclosure obligations, Defendants Olinger and Price failed to identify and produce significant pieces of impeachment and exculpatory evidence to the District Attorney.

128. Hasty specifically raised the issue of exculpatory evidence with the trial court in a hearing conducted on November 6, 1981. In a lengthy colloquy between Hasty, Judge Joseph C. Jackson, and District Attorney A.E. Mallory ("DA Mallory"), the following was made clear: (i) Hasty expressed concern that law enforcement officers had not fully complied with *Brady*; (ii) DA Mallory represented that the prosecution file had been made available to Hasty; (iii) investigators had not informed DA Mallory that a polygraph exam of Talley had been conducted; and (iv) Mallory, an officer of the court, assured Hasty and Judge Jackson that he would make inquiry of investigators and have them produce anything that had not yet been disclosed.

129. Pertinent parts of the exchange regarding pre-trial discovery obligations are set forth below:

Mallory:    To my knowledge, there was not one [a polygraph exam]. We can ask the investigating officers. *Mr. Hasty has seen the entire file and he's welcome to see it again.* That's all I have.

. . .

Hasty:    Also, Your Honor, I'd like to point out to the State that on September the 11th of this year a request for discovery was filed and served on the State and the State replied to that request on November 4th, they filed all the material they had early this week.

. . .

Mallory:    *I received it [discovery motions] and a member of my staff took a copy of my entire file to him shortly thereafter.* I believe that's the entire file I had, I believe that's correct.

. . .

29

> The Court:    Has there been any new information, have you turned everything in your file over to him?
>
> Mallory:      Your Honor, *I've made available everything to Mr. Hasty as I received it*.

(Pre-Trial Motions Hearing, Troup Co. Superior Court, Nov. 6, 1981) (emphasis added).

130.    Based upon the representations of DA Mallory, the trial court noted that the prosecutor had complied with the pre-trial motion for disclosure of evidence favorable to the defendant. (T p. 13.)

131.    The hearing revealed that the Troup County District Attorney's Office and DA Mallory adhered to the practice of "open file" discovery and had made available to Hasty all investigatory materials provided to them by law enforcement officers. Significantly, with regard to the one item which Hasty specifically represented to the court he knew nothing about – a report related to a polygraph of Talley – *this report was not in the DA's file*.

132.    In spite of Hasty's best efforts to ensure that investigators complied with their obligations under *Brady*, Defendants Olinger and Price continued to withhold critical pieces of evidence from the prosecutor. As a result, Talley was deprived of fair trials.

## II.    <u>TERRY TALLEY IS UNJUSTLY CONVICTED.</u>

### <u>Talley is Twice Deprived of a Fair Trial</u>

133.    The first case called for trial involved the April 19, 1981, rape of MK at her home. The one-day trial was conducted on November 9, 1981.

134.    At the beginning of trial, Hasty noted the discovery that had been provided to him: (i) a GBI Division of Forensic Services report dated August 1, 1981; (ii) a LGPD incident report on the complaint of Sugai; and (iii) a LGPD incident report on the complaint of MK.

135.    The only witnesses at this trial were the victim, MK, and Defendant Barbara Price.

136.    MK testified on direct examination that she identified Talley by his voice and his size. (T p. 20.) On cross-examination, MK acknowledged that she was only able to identify Talley as her attacker by his voice, which she characterized as "a common voice" and "[not] an unusual voice." (T pp. 24, 27-28.) MK further admitted that she did not get a good look at her assailant because "he kept his face hid" and was wearing sunglasses. (T p. 33.)[10]

137.    On two separate occasions while on the stand, MK struggled with the identification of Talley as her assailant. Indeed, she picked two men out of a photo array – neither of whom was Talley – as looking like her attacker. Of course, Talley was in the courtroom, just feet away from her at the time.

138.    The defense strategy at trial was to show that Talley had been misidentified. Hasty did not know, nor could he have known, of critical evidence that would have eviscerated MK's mistaken testimony that Talley was her assailant. Hasty did not know that: (i) MK had previously identified Ikegwuonu as her rapist during a pre-trial photo array; and (ii) MK was extremely intoxicated at the time of the rape, with a blood alcohol content of .34.

139.    MK's mistaken identification of Talley and Hasty's inability to properly challenge that testimony were compounded by the fact that Defendant Price repeatedly offered false testimony at trial. Price perjured herself in telling the jury that: (i) MK had *not* previously identified anyone else as her rapist; (ii) her purported identification of Talley in a lineup at LGPD was the "first time" MK had made an identification; and (iii) there was no reason to doubt that MK made an accurate identification. Upon information and belief, she had told the DA the same thing when he was preparing her to testify.

---

[10] Though there are no photographs or records of the procedure, Defendant Price arranged for Talley to be viewed wearing sunglasses in an effort to have MK and other witnesses identify him.

31

140.    Defendant Price's false testimony was elicited primarily on direct and re-direct examination, with DA Mallory questioning her. Had he known the true facts, Mallory would not have elicited this false testimony. He elicited this false testimony, which bolstered the identification and the credibility of MK, because he too had been misled by Defendant Price about the circumstances surrounding MK's identification of Talley.

141.    As Mallory noted during a hearing, with no objection by defense counsel, he adhered to "open file" discovery, had made the prosecution file available to Hasty, and would continue to do so. Quite simply, the facts make clear that Mallory had been misled by Defendant Price *before she took the stand*.

142.    Defendant Price, when asked if MK had ever identified her assailant during pre-trial reviews of photo arrays, testified she had not.

143.    That testimony was false. Though the truth would only become apparent many years later, MK had, in fact, previously identified Ikegwuonu as her attacker.

144.    Hasty was deprived of critical evidence with which to impeach the identification testimony fully and properly because the District Attorney had not been informed that MK had previously identified someone other than Talley as her attacker.

145.    Defendant Price provided false testimony on this point on another occasion, again stating that MK had only identified Talley as her assailant and that such identification was made pursuant to the lineup in which Talley participated on July 23, 1981.

> Q:    When was the first time that [MK] made any identification of the person who raped her?

> A:    When we had a personal lineup at the LaGrange Police Department.

(T p. 39.)

32

146.    That testimony was false. According to the more complete version of investigative reports – the ones obtained by GIP during efforts to prove Talley's innocence *that were not in the DA's files* – MK had affirmatively identified Ikegwuonu as her assailant. Again, Hasty did not have the benefit of this information at the time he questioned MK and Defendant Price at trial.

147.    Defendant Price also offered false testimony when repeatedly asked by the DA about MK's condition after the rape and whether there was any reason to question the accuracy of her recollection. The DA, unaware of the true facts concerning MK's intoxication (because this had been concealed from him by Defendants) and that Defendant Price would lie on the stand, elicited testimony which bolstered the identification. Pertinent portions of the trial transcript are set forth below:

> Q:    [D]id you have any reason to doubt that [MK] was making an accurate and correct identification?
>
> A:    No, sir, I did not.
>
> Q:    Based on your observations of [MK] immediately after the crime of rape and aggravated assault, and based on your talking with her immediately after the in-person identification, did you have any reason as a result of comparing those two situations to think that she might not have made a correct and true identification?
>
> A:    No, sir, I did not.
>
> Q:    In your opinion, based on all the observations you made as the chief investigating officer in this case, and based on your experience in the past in dealing with victims of rape and aggravated assault, was there any question in your mind or any reason for you to think that [MK] was not making a correct identification?
>
> A:    No, sir.

(T pp. 51-52.)

148.    Price's testimony was false in that she knew MK was impaired at the time of the rape. Her blood alcohol content was .34, more than three times the legal limit for intoxication.

33

149.    The District Attorney would not have elicited this false testimony about MK's ability to make an "accurate and correct identification" if he had been informed by Price that she was seriously intoxicated. But Price concealed this critical fact from Mallory.

150.    The fact of MK's intoxication was not revealed until GIP obtained the more complete investigative reports – *which were not in the DA's files* – pursuant to their work on Talley's behalf. The records obtained included Olinger's GBI investigative file which set forth previously undisclosed facts concerning both MK's intoxication and her prior identification of Ikegwuonu as her assailant.[11]

151.    Other undisclosed information in Olinger's GBI file included substantial evidence implicating Lovelace in the rapes in question, other alternative suspects who were questioned, and the fact that Talley's fingerprints were not a match on the "You're next" note left for BH.

152.    The jury reached its verdict in the MK case after just 15 minutes, finding Talley guilty of both counts – rape and aggravated assault. He was sentenced to life in prison on the rape verdict and an additional ten-years imprisonment on the assault conviction.

153.    The very next day, Talley went to trial on the charge for the June 24, 1981, rape of EM. Defendants Price, Furgerson, and Blankenship were among the prosecution witnesses who testified.

154.    No physical evidence tied Talley to EM or her rape. The case hinged on identification testimony provided by the victim and witnesses who reported seeing a man who allegedly looked like Talley near the Southwest LaGrange Baptist Church, where EM was

---

[11]    Special Agent Olinger's GBI investigative file was first provided to any lawyer or representative of Talley in 2006. A cover page for the file, initialed and dated by Defendant Olinger and his supervisor in 1981, contains a section reading "Case Distribution/Date." The only outside person or entity listed is GIP with the date of August 24, 2006. Olinger's GBI investigative file, containing exculpatory and impeachment evidence, should have been provided to the DA (and pursuant to open file discovery, to Hasty) in advance of Talley's trials in November 1981.

assaulted. Again, due to undisclosed exculpatory and impeachment evidence and the unduly suggestive identification procedures orchestrated by Defendants, Talley did not receive a fair trial.

155.    The following exculpatory facts and circumstances were concealed by investigators from the District Attorney, and combined to deprive Talley of a fair trial for the charges of assaulting and raping EM:

- The purported identification of Talley by EM was effected through improper and unduly suggestive means. Though EM never saw her attacker, she purportedly picked him by size and then voice.

- Investigators did not disclose to the District Attorney that witnesses had initially identified Ikegwuonu, not Talley, as the person who had been seen in the vicinity of the church where EM was raped and noted that he had been acting suspiciously.

- Law enforcement officers failed to disclose the substantial evidence indicating that Jack Lovelace was responsible for the rapes in question.

- Evidence that Talley's fingerprints had been compared to latent lifts from the "You're next" note and that he had been excluded as the source of those prints was concealed from the prosecutor.

- Investigators did not disclose to the prosecutor that an LGPD officer was of the opinion that gloves left at the scene of the EB rape belonged to Jack Lovelace.

- Investigators did not disclose to the District Attorney that numerous other individuals had been considered suspects in the EB rape.

156.    On November 11, 1981, following a two-day trial, Talley was convicted on both counts – rape and aggravated assault. Again, Talley was sentenced to life imprisonment on the rape charge and ten years for the assault conviction.

### Following the Back-to-Back Guilty Verdicts and Life Sentences, Talley Pleads Guilty to the Remaining Charges

157.    Talley was a life-long resident of LaGrange, Georgia. His family was with him for support during the two trials held the week of November 9, 1981.

158. The two quick trials and guilty verdicts against him were devastating for Talley and his family and friends. Talley was despondent and believed his situation was hopeless.

159. To save his family the heartache of watching him face further trials and what he viewed as inevitable (though wrongful) jury verdicts against him, Talley decided to plead guilty to the remaining charges.

160. On November 11, 1981, Talley pled guilty in the four remaining cases:

- Case No. 972 – aggravated assault in connection with the February 7, 1981, assault of KW at LaGrange College.

- Case No. 973 – aggravated assault, aggravated sodomy, and rape in connection with the February 21, 1981, assault of EB at LaGrange College.

- Case No. 970 – aggravated assault in connection with the June 24, 1981, assault of ES at the West Georgia Medical Center.

- Case No. 971 – aggravated assault in connection with the April 10, 1981, incident with Sugai.

161. On November 11, 1981, Talley was sentenced to two more life sentences in Case No. 973, ten years each for the assaults in Case Nos. 972 and 970, and ten years on the felony charge arising from the April 10, 1981, incident with Ms. Sugai, which was originally charged as a misdemeanor.

162. Talley did not understand that he had a right to appeal, and no appeal was filed.

## III. EFFORTS TO PROVE TALLEY'S INNOCENCE.

### Talley Enlists the Help of the Georgia Innocence Project

163. In 2004, Talley wrote to the Georgia Innocence Project and asked for help in proving his innocence. GIP accepted Talley's case and promptly undertook efforts to obtain all relevant investigatory materials and to ascertain the whereabouts of the physical and biological evidence obtained in the underlying cases.

164.    GIP diligently and dutifully sought records and information about the whereabouts of any remaining evidence from every agency or entity that might have such records or information: LGPD, GBI, the Troup County DA's Office, and the Troup County Clerk's Office.

165.    Chain of custody and property control documentation was sparse. Records related to the transfer and disposition of evidence, particularly with respect to LGPD – the entity primarily responsible for the safekeeping of crime-scene evidence in the underlying cases – were missing or incomplete. GIP staff and attorneys found it exceedingly difficult to piece together what investigators did with evidence once it had been collected.

166.    Items of physical evidence that should have been in the possession of the City of LaGrange and/or the LaGrange Police Department could not be located. Chain of custody documentation for such evidence was missing or incomplete. Documentation related to any destruction or disposal of physical evidence was nowhere to be found.

167.    The same proved to be true with respect to the GBI. Documentation was sparse and reports regarding transfers and disposition of evidence were varied. Items of evidence which appear to have been last under the custody of the GBI can no longer be found and were presumably destroyed without proper authorization or notice to Talley.

168.    The City of LaGrange, the LGPD, and the GBI lacked appropriate safeguards, policies, and procedures needed to properly store, safekeep, and maintain physical evidence and investigatory records related to criminal investigations. Those failings impeded GIP's efforts to prove Talley's innocence and he spent additional years in prison because evidence which could have been used to exonerate him had been lost or destroyed, often with no record related to its ultimate disposition.

**GIP Learns that all Biological Evidence Except for One Rape Kit has been
Lost or Destroyed – But the Remaining Evidence Exonerates Talley**

169.    In 2007, GIP learned that the Troup County Clerk of Court had retained custody of a sexual assault evidence kit ("rape kit") from the EM rape investigation and trial.

170.    At the time of Talley's trial for the rape of EM, scientific testing of the rape kit confirmed the presence of sperm. It proved the act, but nothing else. DNA testing was not yet available.

171.    GIP pursued a motion on Talley's behalf to have the rape kit evidence subjected to DNA testing. That motion was granted in 2008. Testing at a private lab in Virginia proved that Talley could not have been the perpetrator – he was *not* the source of the male DNA detected in the EM rape kit.

172.    With the benefit of the DNA testing from the EM rape kit demonstrating that Talley was not the serial rapist responsible for the rape of EM, GIP filed an Emergency Motion for New Trial ("EMNT"). That motion was granted in 2009, with the conviction in the EM case being vacated.

173.    Though the conviction in the EM case was vacated, the indictment was not dismissed. That charge remained pending against Talley until February 23, 2021. Additionally, because no other biological evidence had been preserved by Defendants, GIP was unable to prove Talley's innocence in the other cases through DNA testing.

**GIP Learns of the Alternative Suspects
and other Undisclosed Exculpatory and Impeachment Evidence**

174.    In addition to seeking any existent physical or biological evidence remaining from the underlying cases, GIP also sought all investigatory reports and related documentation. These efforts would result in the first occasion on which any lawyer or representative for Talley learned

of the substantial body of exculpatory and impeachment evidence investigators had uncovered yet concealed.

175.   GIP obtained more complete records that had been created by the LGPD and the GBI investigators at the time of the underlying rape and assault investigations in 1981. These records – including LGPD investigative reports, supplemental reports, incident reports, the GBI investigative file, and witness interview summaries and witness statements – had not been disclosed to the prosecutor or Talley's trial counsel in advance of his trials in November 1981.

176.   Through these efforts, GIP learned that Defendants Price and Olinger, as well as other LGPD officers, had developed evidence implicating other persons as the perpetrators of the assaults and rapes with which Talley was charged. This exculpatory and impeachment evidence should have been disclosed by Price and Olinger in 1981, but it was not. As a result, Talley was subjected to an unjust prosecution and fundamentally unfair and flawed trials.

177.   Most significantly, GIP learned of the substantial evidence implicating two alternative suspects. One of them, LGPD Officer Lovelace, had been the subject of numerous complaints of inappropriate, aggressive, and sexualized misconduct at the time of the campus rapes. As an LGPD officer assigned to LaGrange College on "rape prevention duty," Lovelace had access to the women's dorms where some of the assaults and other incidents occurred. Additionally, as a student at the college, he had access to the student directories with the names and contact information of several of the victims who were specifically targeted by someone with that information. The other suspect, Ikegwuonu, was identified as being the assailant or being in the area near the time of the assaults.

178.   Additional information that was not disclosed in advance of trial but was later learned by GIP included the following: (i) Lovelace was terminated by the LGPD for

39

"reprehensible" conduct; (ii) Lovelace exhibited odd, concerning behavior and indicated to fellow officers that he was suicidal, "lovesick," and scared to work alone; (iii) Lovelace was reported to grab female students and a number of them tried to avoid them due to the fear and discomfort his presence evoked; and (iv) a pair of gloves found at the site of one of the campus rapes was noted to belong to Lovelace by a fellow LGPD officer.

179.    The new evidence discovered by GIP constituted exculpatory and impeachment evidence and, pursuant to *Brady* and its progeny, the law enforcement officers involved in the investigation and prosecution of Talley were duty-bound to disclose it to the prosecutor so that the evidence would have been provided to Talley's trial counsel.

180.    The *Brady* evidence that was withheld by Defendants Olinger and Price was material and substantial and its disclosure would have altered the outcome of the prosecution in Talley's favor. Indeed, the undisclosed evidence provides probable cause to investigate Lovelace, not Talley.

181.    No reasonable law enforcement officer would have initiated charges against Talley in light of the substantial evidence implicating Lovelace without conducting a comprehensive investigation of Lovelace. An honest and proper review of the known facts would have compelled a full investigation of Lovelace for the subject rapes and assaults.

## III.    TALLEY IS EXONERATED.

182.    In the wake of the 2009 exoneration of Talley with respect to the EM case, the LGPD agreed to reopen that case and began to reinvestigate it and the entire series of sexual assaults believed in 1981 to be the act of a single perpetrator. Eventually, the Troup County DA's Office agreed to and did assist with the reinvestigation.

183.    The re-investigation confirmed the following: (i) Talley was innocent of the rapes and assaults that plagued LaGrange, Georgia in 1981 and never should have been charged with those offenses; (ii) substantial evidence implicated alternative suspects who were never properly investigated; (iii) Defendants failed to maintain and safekeep physical and biological evidence which would have resulted in Talley's exoneration far earlier and would have saved him many years of wrongful incarceration; and (iv) the prosecution and incarceration of Talley were wrongful and violative of his constitutional rights.

184.    On February 22, 2021, GIP filed an Unopposed Extraordinary Motion for New Trial on Talley's behalf in Troup County Superior Court. The Motion was granted the next day, when the Court entered the Consent Order Vacating Convictions and Granting Motion to Enter Nolle Prosequi in Case Nos. 969 (EM), 972 (KW), 973 (EB), and 974 (MK). The Court further ordered Talley's immediate release from prison.[12]

185.    Talley walked out of prison on February 23, 2021, after more than 39 years of wrongful incarceration.

---

[12]    As mentioned above, the DA's Office would not consent to having the convictions in Case Nos. 970 (ES) and 971 (Sugai) vacated and Plaintiff understands that those case remain under review. To be clear, there is no evidence whatsoever suggesting that Talley committed the assault of ES and he has consistently maintained his innocence of that crime since 1981. Since that case was always considered to be one of a number of serial rapes, it is perplexing why the DA's Office would attempt to treat it differently now. Though it is not his burden to prove his innocence, Talley and those working on his behalf have attempted to do just that. Unfortunately, other actors destroyed the evidence with which he could achieve DNA exoneration in the other cases. As it stands now, testing of biological evidence in the sole case in which Defendants did not destroy all such evidence has proved what Talley has maintained with respect to all of the serial assaults and rapes – he is innocent and had no involvement in them.

## COUNT I:

### 42 U.S.C. § 1983 Claim for Fourteenth Amendment Violation:

### Failure to Investigate

(Against Defendants Price, Furgerson and Olinger
in their Individual Capacities)

186.    Plaintiff hereby incorporates all the foregoing paragraphs as if fully restated herein and further alleges as follows:

187.    Beginning no later than February 7, 1981, and continuing through at least July 1981, Defendants Price, Furgerson, and Olinger knew or reasonably should have known about the substantial evidence implicating LGPD Officer Jack Lovelace in the rapes and other assaults that took place during that time-period. This evidence included, but was not limited, the information set forth in paragraphs 75-89 *supra*, which paragraphs are hereby incorporated by reference.

188.    Despite this evidence, Defendants Price, Furgerson, and Olinger failed to take any steps to investigate Lovelace's possible role in the attacks. Any reasonable investigator in 1981 would have taken the following investigative steps, among others:

(a)    Investigate the domestic stress that affected Lovelace in early 1981, just before the attacks on the LaGrange students began, including interviewing his estranged wife and the two LGPD officers who expressed concerns about him. (Paragraph 85).

(b)    Interview Robin Rowan, the student who reported Lovelace to the LGPD for making improper advances to her outside Turner dormitory at about 1:30 am on March 21, 1981, within an hour of EB being attacked in that same dorm. (Id.)

(c)    Investigate the source of the gloves left in the dorm room where EB was raped on February 21, 1981, after a fellow LGPD officer, Sgt. Cox, identified the gloves as belonging to Lovelace. Defendants Price, Furgerson, and Olinger did not interview Sgt. Cox to determine the source of his knowledge, did not question Lovelace about or confront him with the gloves and Sgt. Cox's statement, and took no steps to determine whether the gloves were police-issue and, if so, whether they belonged to Lovelace. (Id.)

42

(d)    Show Lovelace's photo to EB and play her a voice exemplar from Lovelace to determine if EB could identify Lovelace as the person who attacked her in her dorm room on February 21, 1981. (Id.)

(e)    Interview the students who saw Lovelace "acting strange" and "grabbing" at female students at the LaGrange College Student Center on February 23 or 24, 1981. (Id.)

(f)    Interview LaGrange student Sheila Ware about the non-consensual and inappropriate physical touching and sexual comments Lovelace made to her at LaGrange during the third week of February 1981 and on March 6, 1981. (Id.)

(g)    Determine whether Lovelace was the source of the latent lifts on the "You're next" note left on BH's car windshield, and if not, run the prints through the AFIS database. (Id.)

(g)    Obtain and play an exemplar of Lovelace's voice for the woman who received the threatening calls from the rapist after the note was left on her car, using the words the rapist used. (Id.)

(h)    Interview the administrator and the Instructor at LaGrange who complained about Lovelace's inappropriate behavior at LaGrange on March 3 and 4, 1981, and who observed disturbing conduct on Lovelace's part. (Id.)

(i)    Interview Stephanie Boyd about Lovelace's breaking into her residence in June 1980, February 27, 1981, and March 3, 1981. (Id.)

(j)    Interview and show a photo lineup to the female student who Lovelace went into two dorms looking for on March 6, 1981, and the two women who that same day saw a black male running away from the LaGrange College dorms and speeding off in a car with Lovelace's license plate. (Id.)

(k)    Interview any other LaGrange students who complained about Lovelace's sexualized and inappropriate behavior in 1980 or 1981. (Id.)

(l)    Create photo and/or in-person lineups including Lovelace, and show these to all the various victims. (Id.)

(m)    Record a voice exemplar of Lovelace to which the victims who heard him speak could listen. (Id.)

189.    Defendants Price, Furgerson, and Olinger's failure to conduct a reasonable and constitutionally adequate investigation before arresting Talley was intentional, deliberate, and/or reckless. They knew or reasonably should have known that Talley had truthfully denied any

43

involvement in the rapes and assaults in question and that there was cause to fully investigate

Lovelace.  Despite this, they focused their efforts solely on Talley.

190.    Defendants Price, Furgerson, and Olinger's misconduct in pursuing charges against

Talley under the circumstances described herein shocks the conscience of any reasonable person.

191.    Any reasonable law enforcement officer in 1981would have fully investigated the

potential involvement of Lovelace in the subject rapes, assaults, and incidents, and would not have

proceeded with an arrest of Talley for those crimes under the circumstances presented.

192.    To his credit, the most recent Chief of Police for the LGPD, Lou Dekmar, noted the

failings of investigators in a letter supporting Talley's exoneration. Chief Dekmar, while observing

that almost all of the physical and biological evidence was lost or destroyed stated in his November

11, 2022, letter that:

- Terry Talley was convicted based on sparse and unreliable evidence.

- The police department failed to adequately investigate a viable alternative suspect that they were aware of at the time, apparently to the detriment of Mr. Talley.

- Almost all of the physical and biological evidence in the cases was lost or destroyed, preventing it from being scientifically tested for things like DNA evidence.

- In the one case where physical evidence was located and that could be DNA tested, that DNA testing proved Mr. Talley's innocence.

- Terry Talley appears to have been unjustly convicted on the remaining cases that he was exonerated on, there are several indicators of innocence in those cases as well, especially when considered in relation to the very similar case where DNA evidence proved his innocence.

193.    Defendants Price, Furgerson, and Olinger's conduct in undertaking such a reckless

investigation of the series of rapes and assaults with which Talley was charged violated Talley's

right to a fair criminal proceeding under the Fourteenth Amendment of the United States Constitution.

194.    Defendants Price, Furgerson, and Olinger's misconduct in undertaking such a shockingly reckless investigation directly and proximately caused Talley to be deprived of his liberty without due process of law, as well as the other injuries and damages set forth in this Complaint.

<div align="center">

**COUNT II:**

**42 U.S.C. § 1983 Claim for Fourteenth Amendment Procedural and Substantive Due Process Violations:**

**Fabrication of False Inculpatory Evidence**

(Against Defendants Price, Furgerson, and Olinger
in their Individual Capacities)

</div>

195.    Plaintiff hereby incorporates all the foregoing paragraphs as if fully restated herein and further alleges as follows:

196.    Defendants Price, Furgerson, and Olinger, while acting in concert and aiding and abetting one another, deprived Talley of his constitutional right to a fair trial and fair legal process by deliberately and/or recklessly causing the fabrication of false inculpatory evidence.

197.    Defendants Price, Furgerson, and Olinger deprived Talley of his liberty without due process of law and of his right to a fair criminal proceeding by deliberately and/or recklessly fabricating evidence that was used to arrest, prosecute, convict, and imprison him for over 39 years.

198.    Defendants Price, Furgerson, and Olinger deliberately and/or recklessly fabricated evidence by orchestrating misleading and unduly suggestive lineups, and by omitting Lovelace from the lineups, thereby causing the false identification of Talley as a serial rapist.

199.    Upon information and belief, prior to conducting any of the lineups involving Talley, Defendants Price and Olinger authorized the LGPD to issue a press release to the local

paper asserting that Talley had been arrested for an attempted rape even although the arrest was for a misdemeanor assault, and identifying him as the person who rode a bicycle around the neighborhood asking to do yard work. Upon information and belief, issuance of this press release was done with the knowledge and assent of Olinger and Price.

200.    The next morning, the local newspaper ran a story on page 1 of the paper stating that Terry Talley, a man known in the neighborhood as someone who went door to door on his bicycle asking for work cutting grass, had been arrested for *attempted rape*. Defendant Furgerson told the newspaper that the victim saw Talley "riding a bicycle in her neighborhood," and that he had "asked about doing some yard work."

201.    The article, based statements made by Furgerson, stated that Talley had "grabbed her [Sugai] by the arm and forced her inside her apartment," and that "she was able to escape and ran from the house." None of this was accurate.

202.    At the time they arranged for the in-person lineups with Talley, no evidence implicated him in the rapes or assaults in question. On the other hand, there was significant evidence, including physical evidence, that indicated former LGPD Officer Lovelace was the perpetrator of the attacks.

203.    Despite this, whether by explicit direction or implicit suggestion, the lineups orchestrated by Defendants somehow resulted in victims who did not see the perpetrator, were too impaired to make any accurate identification, and/or had previously positively identified others as the perpetrator, identifying Talley as the perpetrator.

204.    Defendants made no effort to ensure that proper lineups were conducted. They simply pulled other men from holding cells, regardless of whether they fit the general description provided by victims or witnesses. As a result, the individuals featured in the lineup were of vastly

different heights, body sizes, hair styles, and skin complexions. None fit the description provided by any victim or witness.

205.    Some of the victims and/or witnesses had described the perpetrator as wearing sunglasses. Upon his arrest, investigators had Talley put on sunglasses and took photographs of him with the sunglasses on. These photographs, like most documentation pertaining to the lineup and identification procedures, were not preserved or maintained by Defendants. However, the fact that Talley was identified indicates this suggestive photograph, and/or other suggestive means, was used in the lineups to secure his identification.

206.    The circumstances surrounding Talley's arrest and the investigation belie any indication that the identification and lineup procedures were undertaken in good faith in an effort to identify the actual perpetrator. No other suspect – not even Lovelace – was ever placed in any live lineup. A photo of Lovelace was inexplicably never shown to any victim or witness, nor was any voice exemplar obtained from Lovelace.

207.    Talley's prosecution was premised upon the above-referenced false inculpatory identifications and resulted in Talley serving more than 39 years in prison for crimes he did not commit.

208.    Any reasonable law enforcement officer in 1981 would have known – and these Defendants did know – that the tactics used to create these false inculpatory identifications were improper. No reasonable officer would have believed that the lineups and identification procedures employed were proper or that this conduct was lawful.

209.    The misconduct described herein was objectively unreasonable and was undertaken willfully, intentionally, and/or in reckless disregard for Talley's clearly established constitutional rights.

210.    Absent Defendants' misconduct, the arrest and prosecution of Talley could not and would not have been pursued, and Talley would not have been convicted.

211.    The arrest, prosecution, conviction, and confinement of Talley were deliberately and purposefully and/or recklessly brought about by Defendants and was the obvious and intended result of their manipulative identification procedures.

212.    All of the foregoing acts and omissions were committed under color of state law and violated clearly established law of which any reasonable law enforcement officer would have known.

213.    Defendants' conduct in creating false identifications directly and proximately caused Talley's wrongful arrest, conviction, and deprivation of liberty without due process of law for over 39 years, as well as the physical, emotional, and pecuniary injuries described in this Complaint and to be proved through discovery and at trial.

### COUNT III:

### 42 U.S.C. § 1983 Claim for Fourteenth Amendment Proceduraland Substantive Due Process Violations:

### Concealment of Exculpatory and Impeachment Evidence

(Against Defendants Price, Furgerson, and Olinger
in their Individual Capacities)

214.    Plaintiff hereby incorporates all the foregoing paragraphs as if fully restated herein and further alleges as follows:

215.    Defendants Price, Furgerson, and Olinger deliberately, intentionally, and/or recklessly failed to disclose exculpatory and impeachment evidence to the DA's Office as required by *Brady v. Maryland,* 373 U.S. 83 (1963), and its progeny.

216.    Defendants Price, Furgerson, and Olinger deprived Talley of his clearly established constitutional right to due process of law and fair criminal proceedings by deliberately, intentionally and/or recklessly failing to disclose exculpatory and impeachment evidence to the District Attorney, including but not limited to the following:

(a)    MK's extreme intoxication and the fact that she had previously identified someone other than Talley as her assailant.

(b)    The fact that GBI had compared Talley's fingerprints to the latent lifts from the "You're next" note and knew that Talley had not left the note in an incident believed to be connected to the serial rapist who was sought.

(c)    The fact that numerous victims and witnesses had identified individuals other than Talley, including but not limited to Lovelace, as the perpetrator of the rapes and assaults in question and that the purported identifications of Talley were accomplished through improper and suggestive means.

(d)    The fact that ES and witness Bobbie Spence had identified a black male named Ike Ikegwuonu as the assailant and referenced this individual having a cream-colored or white bike. Talley's bicycle was red.

(e)    The fact that Lovelace was considered an "unofficial" suspect in the series of rapes, assaults, and incidents.

(f)    All evidence of misconduct on Lovelace's part, as well as his termination from the LGPD for "reprehensible" conduct that had evoked fear among female students at LaGrange College.

(g)    Other exculpatory and impeachment evidence to be developed through discovery and at trial.

217.    Defendants Price, Furgerson, and Olinger's failure to document and disclose exculpatory and impeachment evidence to the DA's Office was intentional, deliberate, and/or reckless.

218.    Any reasonable law enforcement officer in 1981 would have known, and these Defendants did know, that the exculpatory and impeachment evidence described in this Complaint

49

had to be documented and disclosed to the DA's Office. No reasonable officer would have believed that the misconduct described herein was lawful.

219.    The deliberate, intentional, and/or reckless failure of Defendants Price, Furgerson, and Olinger to document and to produce to the DA's Office the exculpatory and impeachment information described above deprived Talley of his right to a fair criminal process and violated his constitutional right to due process under the Fourteenth Amendment.

220.    Defendants' deliberate, intentional, and/or reckless concealment of exculpatory and impeachment evidence directly and proximately caused Talley's wrongful conviction and deprivation of liberty without due process of law during his 39-year wrongful incarceration, as well as the other injuries and damages set forth in this Complaint.

### COUNT IV:

### 42 U.S.C. § 1983 Claim for Fourth and Fourteenth Amendment Violations:

### Malicious Prosecution

(Against Defendants Price, Furgerson, and Olinger
in their Individual Capacities)

221.    Plaintiff hereby incorporates all the foregoing paragraphs as if fully restated herein and further alleges as follows:

222.    As described more fully above, Defendants Price, Furgerson, and Olinger instituted and continued a criminal proceeding for rape against Talley, despite his actual innocence. The prosecution was initiated by Defendants and continued by them without probable cause to believe that Talley had committed the crimes with which he was charged.

223.    Defendants Price, Furgerson, and Olinger, acting individually and in concert with each other, under color of state law and within the scope of their employment, caused, instituted,

or participated in the initiation of a criminal proceeding against Talley for a series of rapes and sexual assaults, and thereafter caused these proceedings to continue until January 2021.

224. The criminal proceedings against Talley were based solely upon false identifications fabricated by Defendants' conduct and was therefore not supported by probable cause. No physical evidence linked Talley to the victims or their rapes. The prosecutions were based on the suggestive and improper identification procedures orchestrated by Defendants.

225. The deleterious effect of these faulty identifications on the fairness of proceedings against Talley was compounded by Defendants' deliberate withholding of all exculpatory and impeachment evidence, including but not limited to evidence which completely undermined the reliability of these identifications.

226. As a direct and foreseeable consequence of Defendants' misconduct, Plaintiff was unreasonably and unlawfully subjected to criminal prosecution and more than 39 years of wrongful incarceration.

227. As a direct and foreseeable consequence of being arrested, prosecuted, and wrongfully imprisoned for 39 years, Talley suffered physical, emotional, and pecuniary injuries as described in this Complaint and to be proved through discovery and at trial.

### COUNT V:

### <u>42 U.S.C. § 1983 Claim for Fourteenth Amendment Procedural and Substantive Due Process Violations – Bad Faith Destruction of Evidence</u>

(Against Defendants Price, Furgerson, Yates, Barentine, and Olinger in their Individual Capacities)

228. Plaintiff hereby incorporates all the foregoing paragraphs as if fully restated herein and further alleges as follows:

229.    The individual who assaulted EB during the early morning hours of February 21, 1981, left a pair of black gloves in his haste to flee the scene. The evidentiary value of the gloves was obvious: they unquestionably had been left by the person who assaulted EB with the intent of raping her.

230.    The gloves were taken into evidence. A LGPD officer, Sergeant Cox, noted that the gloves left by the perpetrator and collected at the crime-scene were the "same as worn by [Jack] Lovelace," who was on duty that night at the dormitory where the rape occurred, and who accosted a female student outside the dorm where the rape occurred within the same hour as the assault.

231.    There was reason to suspect that the perpetrator of the assault of EB on February 21 was the same man who had raped KW on campus two weeks prior, on February 7, 1981. The evidentiary value of the gloves would only increase as more assaults and rapes occurred and investigators recognized that a serial rapist was on the loose and had access to the LaGrange College dorms.

232.    According to police reports that were first discovered by the GIP many years after Talley's wrongful conviction, Defendants Price and Furgerson drove the gloves to the GBI Crime Lab in Columbus, Georgia ("GBI Columbus") on March 6, 1981. There, they met with GBI forensic analyst Benny Blankenship, who purportedly performed only a visual inspection of the gloves.

233.    Defendants Price and Furgerson then returned to LGPD with the gloves. Upon information and belief, Defendant Olinger, who worked closely with LGPD investigators from the point LGPD requested GBI's assistance with the investigation, was also aware of both the collection of the gloves and their transport to and from GBI Columbus.

234. The gloves – unquestionably left by the assailant and identified as belonging to Jack Lovelace – went "missing" after being returned to the LGPD and remain unaccounted for. When GIP began work on Talley's case, GIP sought access to any existent physical evidence, including the gloves. No court order authorized the destruction of the gloves and there is no record of their disposition after they were returned to LGPD by these Defendants.

235. Upon information and belief, these Defendants destroyed or otherwise disposed of the gloves in an effort to protect Lovelace and the LGPD from any scrutiny or liability for the attacks committed while he was serving as a LGPD Rape Prevention Officer with access to the LaGrange College dorms.

236. Defendants never disclosed to the prosecutor the substantial evidence implicating Lovelace in the series of rapes, assaults, and incidents that occurred at and around LaGrange College. Defendants, however, were aware of that evidence and believed that Lovelace was the perpetrator.

237. In furtherance of their effort to deflect attention away from a fellow officer (Lovelace) and the LGPD, Defendants not only hid all exculpatory and impeachment evidence they had uncovered in their investigation, but also destroyed any evidence which would implicate Lovelace.

238. Upon information and belief, Defendants destroyed the gloves because they believed they belonged to Lovelace. The "You're next" note and the latent lifts obtained from it, upon information and belief, were also destroyed by Defendants once GBI determined that the prints were not Talley's. Defendants conspicuously made no attempt to check Lovelace's fingerprints against the latent lifts from the note at any point in time.

239.    Defendants' intentional destruction of evidence was done in bad faith, with malice, and with knowledge of both its exculpatory and evidentiary value. Their destruction of evidence was objectively unreasonable and was undertaken intentionally and/or recklessly and with deliberate indifference to Talley's constitutional rights.

240.    Defendants knew, or reasonably should have known, that the bad faith destruction of evidence was likely to lead to the conviction of Talley for the rapes and assaults under investigation, despite his actual innocence. These actions were committed under color of state law and violated clearly established law of which any reasonable law enforcement officer would have known.

241.    Defendants not only deprived Talley of evidence which would have prevented his wrongful conviction, they also denied him the ability to prove his innocence through post-conviction remedies. Just as the rape kit evidence kept secure by the Clerk of Court for Troup County was tested and proved Talley's innocence in the case involving EM, the evidence that was wrongfully destroyed by Defendants could have been used to demonstrate Talley's evidence in the other cases in which physical or biological evidence was originally obtained.

242.    As a direct and proximate result of Defendants' concealment and destruction of evidence, including but not limited to the gloves, the note left for BH, and the latent lifts from that note, Talley was deprived of his Fourteenth Amendment rights to a fair trial and due process of law.

243.    As a result of Defendants' misconduct, Talley was wrongfully convicted and subjected to 39 years of wrongful incarceration and suffered physical, emotional, and pecuniary damages as described in this Complaint and to be proved through discovery and at trial.

**COUNT VI:**

**<u>42 U.S.C. § 1983 Claim for Fourteenth Amendment Procedural and
Substantive Due Process Violations – Bad Faith Destruction of Evidence</u>**

(Against Defendant Blankenship in his Individual Capacity)

244.     Plaintiff hereby incorporates all the foregoing paragraphs as if fully restated herein and further alleges as follows:

245.     At the time of the investigation into the rapes, assaults, and incidents that took place in LaGrange during the first half of 1981, Defendant Blankenship worked as a forensic analyst at GBI Columbus. He held that same role at the time of Talley's trials in November 1981.

246.     Defendant Blankenship was both knowledgeable of and a participant in the other Defendants' actions with respect to the investigation of the underlying crimes and the prosecution of Talley. He met with Defendants Price and Furgerson regarding the gloves and spoke with those Defendants regarding the evidentiary value of the gloves.

247.     Defendant Blankenship was a witness in the trial involving EM and testified at that trial. He knew that Talley faced multiple charges as a serial rapist with four life sentences in the balance. Defendant Blankenship knew that the rape kit in the MK investigation had been submitted to GBI Columbus for analysis, just as the rape kit in the EM investigation was.

248.     By virtue of his work with GBI and multiple interactions with the Defendants pursuing the investigation and prosecution of Talley, Blankenship knew that no physical or biological evidence connected Talley to either the rapes or the victims. Upon information and belief, he also knew that the fingerprints on the "You're next" note left on BH's car did not match Talley. He knew that the gloves brought to him at GBI Columbus were linked to Lovelace.

249.     Upon information and belief, Defendant Blankenship was aware of the evidentiary value of the rape kits submitted to GBI for analysis and of the physical evidence that existed, but

which was not disclosed to the prosecutor or Talley's counsel. Though the EM rape kit remained in Troup County at the Clerk's Office, GBI retained custody of the MK rape kit.

250. Upon information and belief, in late 1982, Defendant Blankenship oversaw and/or ordered the destruction of the MK rape kit. No court order or other authorization provided for the destruction of that evidence. No notice of the intended destruction of the MK rape kit was provided to Talley or trial counsel.

251. The MK rape kit contained critical evidence and, like the EM rape kit that was subsequently subjected to DNA testing, could have exonerated Talley and led to his earlier release from prison.

252. Upon information and belief, Defendant Blankenship intentionally and/or recklessly caused the MK rape kit to be destroyed despite its obvious importance, and in willful and/or reckless disregard to Talley's constitutional right to a fair criminal proceeding. The destruction was accomplished without proper authority and with no notice having been provided to Talley or his counsel.

253. Upon information and belief, Defendant Blankenship also examined and took custody of physical evidence collected at the site of the EB rape, including bedding and clothing. Upon information and belief, Defendant Blankenship intentionally and/or recklessly caused the EB physical evidence which had been delivered to GBI Columbus to be destroyed despite its obvious importance, in willful and/or reckless disregard to Talley's constitutional right to a fair criminal proceeding. The destruction was accomplished without proper authority and with no notice having been provided to Talley or his counsel.

254. Defendant Blankenship's destruction of the MK rape kit and the physical evidence from the EB rape was undertaken intentionally and/or recklessly and with deliberate indifference

to Talley's constitutional rights. The subject actions were committed under color of state law and violated clearly established law of which any reasonable law enforcement officer would have known.

255.    As a direct and proximate result of Defendant Blankenship's destruction of sexual assault evidence, Talley was deprived of his liberty without due process of law. As a result of this Defendant's misconduct, Talley was not able to avail himself of post-conviction remedies, his wrongful incarceration was unnecessarily extended, and he suffered the physical, emotional, and pecuniary injuries as described in this Complaint and to be proved through discovery and at trial.

<div align="center">

**COUNT VII:**

**<u>42 U.S.C. § 1983 Claim for Deprivation of Due Process<br>and Meaningful Access to the Courts</u>**

(Against Defendants Price, Furgerson, Yates, Barentine, Olinger,<br>and John and Jane Does 1-10 in their Individual Capacities)

</div>

256.    Plaintiff hereby incorporates all the foregoing paragraphs as if fully set forth herein and further alleges as follows:

257.    Defendants deprived Talley of his constitutional right to due process of law and meaningful access to the courts (a) by initially covering up and concealing from Talley, the prosecutor, and the court, evidence that demonstrated Talley's innocence, and (b) by continuing to conceal evidence and records with which Talley could have proved his innocence and secured release from prison.

258.    As a result of Defendants' acts and omissions before and subsequent to Talley's convictions in 1981, Talley was deprived of evidence that would have allowed him to successfully challenge his convictions through post-conviction remedies that were available to him, including but not limited to an emergency motion for new trial and pursuit of post-conviction DNA testing.

<div align="center">57</div>

Such efforts, based on evidence which these Defendants hid and/or destroyed, would have been successful and would have exonerated Talley and freed him from prison.

259. Defendants were, at all relevant times, aware of Talley's persistent and truthful denial of any involvement in the rapes and assaults with which he was charged. These Defendants were also aware of efforts on behalf of Talley and others acting on his behalf to uncover evidence necessary to prove Talley's innocence. These Defendants willfully and/or recklessly interfered with Talley's constitutional rights by continuing to deny him and those acting on his behalf access to evidence which would exonerate Talley.

260. Evidence that Defendants obtained that could have been used to prove Talley's innocence in post-trial proceedings, and potentially identify the actual perpetrator of the rapes and assaults in question, can no longer be accounted for, but much of it was last under the custody and control of LGPD. Other such evidence was last under the custody and control of GBI.

261. Defendants had in their possession evidence that would have proved Talley's innocence of the heinous crimes for which he was convicted and wrongfully imprisoned. Talley, through post-conviction counsel, repeatedly requested access to the evidence, so that he could properly prove his innocence and end his wrongful incarceration. Such requests were regularly and routinely made by GIP personnel to the LGPD and the GBI from the time they accepted Talley's case in 2004 through the date of his exoneration in 2021.

262. Defendants, through neglect, misconduct, and/or recklessness and adherence to unconstitutional policies, customs, and practices, as set forth *infra*, were unable to account for evidence and records that should have been made available, and thereby prevented Talley from having access to evidence that would have exonerated him.

263.    Because of Defendants' misconduct, Talley could not file properly supported post-conviction motions based on new evidence or otherwise obtain meaningful access to the courts and prove his innocence.

264.    The wrongful acts and omissions that caused Talley's initial and continued wrongful conviction and incarceration were carried out pursuant to the municipal defendant's policies, customs, patterns or practices as described in Count X brought pursuant to *Monell*. Those municipal policies, customs or patterns and practices of the City of LaGrange were the moving force and proximately, directly and foreseeably caused Talley's continued wrongful incarceration by systematically denying him and his representatives of evidence needed to prove his innocence.

265.    Defendants' actions and omissions foreseeably, directly and proximately deprived Talley of his rights under the First and Fourteenth Amendments by unlawfully interfering with his right of meaningful access to the courts and needlessly extended his wrongful incarceration. As a result of Defendants' misconduct, Talley was wrongfully imprisoned for 39 years, and suffered physical, emotional, and pecuniary injuries as described in this Complaint and to be proved through discovery and at trial.

## COUNT VIII:

### 42 U.S.C. § 1983 Claim for Failure to Intervene

(Against Defendants Price, Furgerson, Yates, Barentine, Olinger, Blankenship and John and Jane Does 1-10 in their Individual Capacities)

266.    Plaintiff hereby incorporates all the foregoing paragraphs as if fully set forth herein and further alleges as follows:

267.    In the manner described above, by their conduct and under color of state law, during the constitutional violations described herein, one or more of Defendants stood by without

59

intervening to prevent the violation of Talley's constitutional rights, even though they had the opportunity to do so.

268.   As a result of Defendants' failure to intervene to prevent the violation of Talley's constitutional rights, Talley suffered injuries, including but not limited to loss of liberty, physical harm, pecuniary losses, and emotional distress. These Defendants had a reasonable opportunity to prevent this harm but failed to do so.

269.   The misconduct described in this Count was objectively unreasonable, was undertaken intentionally and/or recklessly, with malice and/or deliberate indifference to Talley's clearly established constitutional rights and was so reckless as to demonstrate a substantial lack of concern for whether injury or harm would result.

270.   Talley's injuries were caused, in part, by the policies, practices, and customs of Defendant City of LaGrange in that agents and employees of LGPD regularly failed to disclose exculpatory evidence to the District Attorney, caused the fabrication of false inculpatory evidence, orchestrated unduly suggestive witness identifications, caused wrongful convictions through profoundly flawed investigations, failed to comply with lawful and proper requests for post-conviction production of crime-scene evidence and investigatory materials and records, and otherwise violated due process in a manner similar to that alleged herein.

271.   The above-described widespread practices, which were so well-settled as to constitute the de facto policy of the City of LaGrange, were allowed to exist because municipal policymakers with authority over the same exhibited deliberate indifference to these pervasive problems, thereby effectively ratifying them.

272.   The misconduct described in this Count was undertaken pursuant to the policy and practices of the City of LaGrange in that the constitutional violations at issue were committed with

the knowledge or approval of persons with final policymaking authority for the City of LaGrange and LGPD or were actually committed by persons with such final policymaking authority.

273.   The policies, practices, and customs set forth above were the moving force behind the numerous constitutional violations in this case and directly and proximately caused Talley to suffer the grievous and permanent injuries and damages as described in this Complaint and to be proved through discovery and at trial.

## COUNT IX:
### 42 U.S.C. § 1983 Claim for Fourteenth Amendment Procedural and Substantive Due Process Violations:

### Civil Conspiracy to Deprive Plaintiff of his Constitutional Rights

(Against Defendants Price, Furgerson, Yates, Barentine, Olinger, Blankenship and John and Jane Does 1-10 in their Individual Capacities)

274.   Plaintiff hereby incorporates all the foregoing paragraphs as if fully set forth herein and further alleges as follows:

275.   During the investigation of the series of rapes, assaults, and incidents that occurred in LaGrange in 1981, Defendants knowingly conspired, reached a mutual understanding, and acted in concert to violate Talley's constitutional rights, including his Fourteenth Amendment rights to a fair trial and due process of law. Defendants reached an agreement amongst themselves to create false inculpatory evidence against Talley, and to conceal from the prosecutor evidence of the Lovelace's guilt, in order to protect former LGPD Officer Lovelace and the reputation and liability of the LGPD for his actions while serving as Rape Prevention Officer at LaGrange College, despite Talley's actual innocence and Defendants' knowledge that Talley was, in fact, innocent.

276.   In furtherance of the conspiracy, Defendants each undertook overt acts, including without limitation:

(a)      Defendants deliberately concealed all evidence implicating Jack Lovelace in the rapes, assaults, and incidents under investigation with the intent to implicate Talley in crimes they knew or reasonably should have known that Talley did not commit, and for which there was substantial evidence of Lovelace's culpability.

(b)      Defendants orchestrated manipulative, unduly suggestive lineups so as to create evidence that Talley was the perpetrator when they knew or reasonably should have known that he had truthfully denied any involvement in the rapes and assaults under investigation and that no evidence suggested his culpability for those offenses.

(c)      Defendants concealed all evidence that would have cast doubt on the accuracy of the purported victim and witness identifications of Talley as the perpetrator, including prior identifications of other suspects.

(d)      Defendants withheld and concealed all evidence that could not be linked to Talley and which was affirmatively linked to other suspects, including but not limited to Lovelace's gloves left at the site of the EB assault and the note left on BH's car.

(e)      Defendants intentionally steered the investigation away from Jack Lovelace so as to shield a fellow officer and the LGPD from any scrutiny and possible liability for his actions. They built a case implicating Talley even though they knew or reasonably should have known he was innocent and that no legitimate evidence supported his involvement in the subject rapes or assaults.

(f)      Defendants destroyed evidence and records or otherwise caused them to be unavailable in an effort to ensure that Talley was convicted and that Lovelace evaded scrutiny. Critical pieces of evidence, such as the gloves linked to Lovelace and retrieved at the site of the EB rape, and other items of evidence and records are unaccounted for but were last under the custody of Defendants.

(h)      Defendants engaged in other overt acts in furtherance of their conspiracy to be developed through discovery and at trial.

277.    Following Talley's convictions, Defendants conspired, and continued to conspire, to deprive Talley of exculpatory materials to which he was lawfully entitled, and which would have proved his innocence and led to his earlier exoneration.

278.    Defendants' conspiracy directly and proximately deprived Talley of his rights under the Fourteenth Amendment and caused his unfair trials, wrongful conviction, and 39 years of wrongful incarceration. As a direct and foreseeable consequence of Defendants' conspiracy,

Talley suffered physical, emotional, and pecuniary injuries as described in this Complaint and to be proved through discovery and at trial.

## COUNT X:

## 42 U.S.C. § 1983 Municipal Liability Claim For Deprivation of Constitutional Rights

### *Monell v. Dep't of Social Servs. of the City of New York* 436 U.S. 658 (1978)

(Against Defendant City of LaGrange)

279.    Plaintiff hereby incorporates all the foregoing paragraphs as if fully restated herein and further alleges as follows:

280.    The LaGrange Police Department was at all times relevant to this Complaint an entity controlled and funded by the City of LaGrange.

281.    Upon information and belief, the Chief of the LaGrange Police Department was at all times relevant to this Complaint selected by officials of the City of LaGrange.

282.    Upon information and belief, the City of LaGrange delegated the rules, procedures and training that applied to officers employed by the LaGrange Police Department to the Chief of Police.

283.    The Chief of Police of LGPD, and/or his designee, during the relevant time period was a final policymaker for the City of LaGrange with regard to all investigative and policing activities within the City of LaGrange.

284.    The acts and omissions of the Chief of Police and/or his designee, during the time relevant to this Complaint, constituted the policy, custom, or pattern and practice of the City of LaGrange.

285.    Upon information and belief, the City of LaGrange, by and through its final policymaker(s), with deliberate indifference, created, promulgated, and maintained the following

policies, customs, or patterns which deprived Talley of his constitutional rights, including but not limited to his rights not to be arrested or seized without probable cause, not to be deprived of his liberty without due process of law, to a fair criminal proceeding, and to meaningful access to the courts by:

(a)    Failing to properly train, supervise and/or discipline LGPD investigators and officers with regard to their constitutional duties not to (i) cause the fabrication evidence; (ii) engage in suggestive identification procedures; (iii) conceal exculpatory and impeachment evidence; (iv) destroy exculpatory evidence; (v) intentionally or recklessly fail to conduct an investigation to determine the true facts of a crime; and (vi) ignore or conceal evidence that points to the innocence of a person under criminal investigation, prosecution, or serving a sentence for a crime he did not commit.

(b)    Encouraging, promoting, and condoning LGPD investigators and officers to (i) cause the fabrication evidence; (ii) engage in suggestive identification procedures; (iii) conceal exculpatory and impeachment evidence; (iv) destroy exculpatory evidence; (v) intentionally or recklessly fail to conduct an investigation to determine the true facts of a crime; and (vi) fail to properly record details relating to activities undertaken in a criminal investigation and to preserve and maintain those records and items of evidence collected.

(c)    Creating, promulgating, and maintaining a policy, custom, or pattern and practice of failing to properly safeguard, organize or inventory evidence seized or obtained in connection with criminal investigations, and of failing to require that all evidence collected or received be immediately turned in to a locked and secure property office, be logged in to that office, and not be released except to an officer with authority in the investigation, and then only upon a signed, dated and timed receipt signed by that officer in the presence of the property control officer.

(d)    Creating, promulgating, and maintaining a policy, custom, or pattern and practice of failing to ensure that records of criminal investigations and evidence received were properly kept, maintained, stored, and preserved and not transferred, released, destroyed, or disposed of except upon proper and lawful authority with all records of disposition properly maintained and preserved.

(e)    In other respects to be proved through discovery and at trial.

286.    The acts and omissions that caused Talley's wrongful arrest, prosecution, convictions, and incarceration were carried out pursuant to the municipal defendant's policies, customs, patterns, or practices. The municipal policies, customs, or patterns and practices of the

64

City of LaGrange were the moving force of and proximately and directly caused Talley's wrongful arrest, prosecution, convictions, and incarceration.

287. It would have been plainly obvious and foreseeable to a reasonable policymaker that failing to enact adequate policies or procedures that investigators and LGPD officers and personnel were required to follow with respect to the matters referenced immediately above would lead to deprivations of individuals' constitutional rights.

288. The Chief of Police and/or his designees knew or reasonably should have known that LGPD had no adequate policies or procedures regarding the conduct of criminal investigations, disclosure of exculpatory or impeachment evidence, record-keeping, and the maintenance, storage, and safekeeping of crime-scene evidence and records of criminal investigations.

289. The failures of the Chief of Police, and his designees, to train and supervise investigators, as described in this Count, amounted to deliberate indifference and intentional misconduct, was the moving force of and directly caused the violations of Talley's constitutional rights and his nearly four-decade wrongful incarceration.

290. The municipal policies, customs, or patterns and practices of the City of LaGrange proximately and directly caused Talley's wrongful prosecution and convictions and, thereafter, the failure to properly maintain and safekeep records and evidence unnecessarily extended the term of Talley's wrongful incarceration.

291. Defendant City of LaGrange is liable for the deprivation of Talley's constitutional rights caused by the policies, practices, and customs agreed to, approved, condoned, and/or ratified by the Chief of Police as described above.

292.    As a direct and proximate result of the above-described wrongful conduct of Defendant City of LaGrange, Talley suffered the grievous and permanent injuries and damages as described in this Complaint and to be proved through discovery and at trial.

**STATE-LAW CLAIMS**

**COUNT XI:**

**Obstruction of Justice**

(Against All Defendants)

293.    Plaintiff hereby incorporates all the foregoing paragraphs as if fully set forth herein and further alleges as follows:

294.    In committing the foregoing acts and omissions, Defendants prevented, obstructed, impeded, or hindered public or legal justice in that they fabricated and withheld evidence, destroyed exculpatory evidence, and elicited and failed to correct false testimony, preventing Talley from successfully mounting a defense to criminal charges.

295.    Thereafter, Defendants destroyed and/or lost additional evidence which could have been used to exonerate Talley and identify the individual who committed the rapes and assaults for which Talley was charged and convicted. Additionally, Defendants failed to safekeep crime-scene evidence and investigatory records and thereby frustrated and impeded Talley's right to obtain critical evidence necessary to prove his wrongful conviction.

296.    The misconduct described in this Count and elsewhere in this Complaint was undertaken intentionally, willfully and/or recklessly, and with malice and/or deliberate indifference to the constitutional rights of Talley.

297.     Defendants, through neglect, misconduct, and the adherence to unconstitutional policies, customs, and practices, obstructed justice by denying Talley fair criminal proceedings and by preventing Talley from having access to evidence that would have exonerated him.

298.     As a direct and proximate result of Defendants' obstruction of justice, Talley was wrongfully imprisoned for 39 years, and suffered physical, emotional, and pecuniary damages as described in this Complaint and to be proved through discovery and at trial.

## COUNT XII:

### Negligence/Gross Negligence/Willful and Wanton Misconduct

(Against All Defendants)

299.     Plaintiff hereby incorporates all the foregoing paragraphs as if fully set forth herein and further alleges as follows:

300.     These Defendants were under a lawful duty to maintain, preserve, and safekeep evidence (both physical and biological) entrusted to their custody. They were likewise under a duty to maintain logs, chain of custody records, and records related to any transfer or disposition of evidence under their custody.

301.     These Defendants were entrusted with critical evidence and records needed to ensure that Talley received a fair trial and could thereafter pursue meaningful access to the courts through post-conviction proceedings with the benefit of evidence and records entrusted to the custody of these Defendants.

302.     Defendants failed to properly safekeep, maintain, and preserve evidence and records entrusted to them and they thereby breached a legal duty owing to Talley.

67

303. Defendants' failings constitute negligence, gross negligence, and willful and wanton misconduct and were committed recklessly and willfully, without due regard for the rights and well-being of Plaintiff.

304. Plaintiff suffered damage as a result of Defendants' negligence, gross negligence, and willful and reckless misconduct in that he was denied a fair criminal prosecution. He further suffered damage in that he was unable to pursue meaningful access to the courts through available post-conviction remedies because Defendants failed to properly safekeep, maintain, and preserve evidence and records which would have allowed Talley to successfully prove his innocence and secure his release from prison.

305. As a direct and proximate result of Defendants' negligence, gross negligence, and reckless and willful misconduct, Plaintiff suffered damages in the form of wrongful conviction and a needless continuation of his wrongful incarceration.

## COUNT XIII:

## Intentional Infliction of Emotional Distress

(Against All Defendants)

306. Plaintiff hereby incorporates all the foregoing paragraphs as if fully set forth herein and further alleges as follows:

307. In the manner described more fully above, Defendants caused Talley to be prosecuted for crimes he did not commit and thereafter needlessly extended his term of wrongful incarceration. Their conduct in doing so was extreme and outrageous and exceeds all bounds usually tolerated by a decent society.

308. The misconduct committed by Defendants was undertaken intentionally and in deliberate disregard of a high probability that emotional distress would follow.

309.   As a result of Defendants' misconduct, Talley suffered severe and debilitating emotional distress.

## COUNT XIV:

### Negligent Infliction of Emotional Distress

(Against All Defendants)

310.   Plaintiff hereby incorporates all the foregoing paragraphs as if fully set forth herein and further alleges as follows:

311.   Plaintiff pleads alternatively to the allegations in Count XIII that Defendants' extreme and outrageous acts were taken negligently and with reckless disregard of the high probability that emotional distress would follow.

312.   As a result of Defendants' negligent infliction of emotional distress, Talley suffered severe and debilitating emotional distress which was a direct and proximate result of the reckless and grossly negligent acts of Defendants in subjecting Talley to a wrongful prosecution and unjust incarceration.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Terry Lamar Talley respectfully requests that the Court award relief as follows:

1.   Compensatory damages in an amount to be determined at trial;

2.   Punitive damages against the individual Defendants, in an amount to be determined at trial, that will deter such conduct in the future;

3.   Pre-judgment and post-judgment interest and recovery of his costs, including reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 and 42 U.S.C. § 1920; and

4.   All other and further relief to which he may be entitled.

Respectfully submitted this 21st  day of February, 2022

<div style="margin-left: 50%;">

WEINBERG, WHEELER,
HUDGINS, GUNN & DIAL, LLC

*/s/ Henry C. Debardeleben IV*
HENRY C. DEBARDELEBEN IV
Georgia Bar No. 111320
3344 Peachtree Road N.E., Suite 2400
Atlanta, GA 30326
Telephone: 404-876-2700
Fax:  404-875-9433
ddebardeleben@wwhgd.com
*Local Counsel for Plaintiff*

David S. Rudolf
NC Bar No.: 8587
Sonya Pfeiffer
NC Bar No.: 37300
Phillip Lewis
NC Bar No.: 27944
**RUDOLF WIDENHOUSE**
225 East Worthington Avenue
Charlotte, NC 28203
Telephone:  (704) 333-9945
dsrudolf@rudolfwidenhouse.com
spfeiffer@rudolfwidenhouse.com
plewis@rudolfwidenhouse.com
*Attorneys for Plaintiff*
(Pending *Pro Hac Vice* Admittance)

**OLSON LAW, PLLC**
G. Christopher Olson (State Bar No. 21223)
514 Daniels Street, #136
Raleigh, NC 27605
Telephone: (919) 624-3718
Facsimile: (919) 328-5355
chris@olsonlaw-pllc.com
(Pending *Pro Hac Vice* Admittance)

</div>