IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

TERRY LAMAR TALLEY,                    *

    Plaintiff,                         *

vs.                                    *        CASE NO. 4:23-CV-32 (CDL)

CITY OF LAGRANGE, GEORGIA, *et al*.,   *

    Defendants.                        *

_____

<u>O R D E R</u>

Terry Lamar Talley was convicted of multiple rapes and
assaults in 1981.  After Talley spent nearly four decades in
prison, he was exonerated and released from prison in 2021.  Talley
alleges that his convictions were the product of police misconduct,
including fabrication of inculpatory evidence, failure to disclose
exculpatory evidence, failure to investigate obvious leads, and
destruction of evidence.  He asserts claims under 42 U.S.C. § 1983
and state law, seeking to recover damages for almost forty years
of lost freedom.

In his Complaint, Talley named as Defendants the City of
LaGrange, four LaGrange police investigators, and two employees of
the Georgia Bureau of Investigation.  Presently pending before the
Court are Defendants' motions to dismiss, Talley's motion for leave
to amend his Complaint, and Talley's motion for an extension of
time to serve certain Defendants.  For the reasons set forth below,

the Court grants in part and denies in part the motion to dismiss of Roy Olinger and Benny Blankenship (ECF No. 24), denies LaGrange's motion to dismiss (ECF No. 26), grants the motion to dismiss of Barbara Price and Otis Furgerson (ECF No. 38), grants in part and denies in part the motion for leave to amend (ECF No. 50), and denies the motions for an extension of time to serve certain Defendants (ECF Nos. 53 & 64).

## MOTION TO DISMISS STANDARD

"To survive a motion to dismiss" under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  The complaint must include sufficient factual allegations "to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.  In other words, the factual allegations must "raise a reasonable expectation that discovery will reveal evidence of" the plaintiff's claims. *Id.* at 556.  But "Rule 12(b)(6) does not permit dismissal of a well-pleaded complaint simply because 'it strikes a savvy judge that actual proof of those facts is improbable.'" *Watts v. Fla. Int'l Univ.*, 495 F.3d 1289, 1295 (11th Cir. 2007) (quoting *Twombly*, 550 U.S. at 556).

FACTUAL ALLEGATIONS

The Court accepts the following factual allegations as true for purposes of this order.  In February 1981, two female students were sexually assaulted in their dormitory rooms at LaGrange College.  Another student received a handwritten note stating, "You're next," along with threatening phone calls.  Then, in April 1981, a woman who lived near the college was bound and raped.  Shortly thereafter, in June 1981, two more women in the area were assaulted—one was raped in the basement of a church, and the other was threatened with rape at a local hospital.  Local law enforcement officials believed the crimes were committed by a serial rapist.  LaGrange police investigator Barbara Price was the lead investigator on the case, and she was assisted by LaGrange investigators Otis Furgerson, George Yates, and Cecil Barentine.  By July 1981, LaGrange police had made little progress toward identifying a suspect.  Feeling significant pressure from the community to find the perpetrator, the police chief requested assistance from the Georgia Bureau of Investigation ("GBI").  GBI Special Agent Roy Olinger was assigned to the case.  Olinger was assisted by Benny Blankenship, a forensic analyst.

During the investigation, substantial evidence suggested that LaGrange police officer JL was involved in the crimes.  JL was a rape prevention officer who was also a student at LaGrange College and had access to the restricted dormitories and student

directories.    After   numerous   complaints   of   "aggressive,
threatening,  and  inappropriate  conduct  directed  toward  young
women" at LaGrange College that "created fear in the minds of some
students," the police chief fired JL and JL lost his access to the
dorms.   Compl. ¶¶ 23, 81, ECF No. 1.   Subsequent to his firing,
reports  of  sexual  assaults  on  campus  ceased.    But  off-campus
assault reports in the general area of the campus continued.

     Although physical and circumstantial evidence implicating JL
in the rapes and assaults was discovered, there are no records
suggesting that JL was ever investigated in connection with the
crimes.  He was never included in a photo or live lineup, and he
was never asked for a voice exemplar.   And, although police and
GBI investigators collected physical evidence linked to JL, that
evidence disappeared.   That physical evidence included a pair of
gloves left by the assailant at one of the crime scenes—gloves
that another LaGrange police officer identified as the same as
those worn by JL.  Price and Furgerson drove the gloves to the GBI
crime lab in Columbus, Georgia, where Blankenship performed a
visual inspection.   Price and Furgerson returned to LaGrange with
the gloves, which then went missing.   Talley alleges that the
LaGrange investigators "either intentionally destroyed the gloves
or otherwise disposed of them."   *Id.* ¶ 79.   Another piece of
physical evidence that disappeared was the "You're next" note;

although latent prints were obtained from it, those prints were never compared to JL's fingerprints.

On July 21, 1981, LaGrange police arrested Talley, a black millworker, for simple battery.  Talley frequently earned extra money by taking on odd jobs in the neighborhood near LaGrange College.[1]  He dropped out of high school in 10th grade and had a criminal history of minor theft and property crimes.  The incident giving rise to his July 1981 arrest was a report that Talley had gone to the home of a woman, YS, in April 1981 and offered her money for sex.  When YS declined, Talley placed his hand on her arm, but he left when it became clear that YS did not want to have sex with him.  YS did not call the police at the time.  Talley later visited YS's residence in July 1981, but she did not answer the door and he left.  YS called her neighbor to report that a black man was on her porch, and the neighbor called the police.  The police picked up Talley while he was riding his bicycle in the neighborhood, and YS reported that Talley had entered her home in April, offered her money for sex, and placed his hand on her arm when she declined.  The incident was not similar to the sexual assaults committed by the suspected serial rapist, where the suspect attacked women from behind, bound and gagged them,

---

[1] Though it is not entirely clear from the Complaint, it appears that Talley alleges that JL was also black.  *See, e.g.*, Compl. ¶ 85 (alleging that students reported a "black male . . . running from the dormitories, getting in a car with [JL]'s license plate, and speeding away" and that the students "were 'alarmed' by [JL]'s actions").

threatened to kill them with a knife, dragged them across floors, and struck them with his fists.  Nonetheless, Price and Olinger focused their investigation on Talley.

Talley admitted to his interaction with YS, voluntarily provided hair and bodily fluid samples, and passed a polygraph in which he was asked about the incident with YS (but was not asked about any other assaults).  While Talley was being held on the simple battery charge related to YS, Price and Olinger "orchestrated a series of suggestive lineups" during which victims and witnesses identified Talley as the assailant or someone who had been in the vicinity of the other attacks.  *Id.* ¶ 31.  Those victims and witnesses, though, had previously identified someone else.  Talley eventually received a court-appointed lawyer. Another lineup was conducted, but the victim who participated in that lineup had seen media coverage of Talley's arrest.  Based on those "identifications," Price and Olinger charged Talley on July 23, 1981 with the rape of two victims and the assault of another. *Id.* ¶ 113.  After other suggestive lineups, Price and Olinger charged Talley on July 28, 1981 with the attempted rape of one victim and on July 29, 1981 with the rape of another victim.  The charge for the YS incident was upgraded from misdemeanor simple battery to felony aggravated assault and attempted rape.

Before trial, Talley's lawyer filed a motion expressing concern that the law enforcement investigators had not fully

complied with their disclosure requirements under *Brady v. Maryland*, 373 U.S. 83 (1963). The prosecutor represented that he had provided his entire file to Talley's lawyer, and he stated that he would ask the investigating officers to produce any *Brady* material that had not yet been disclosed. Nonetheless, the following evidence was concealed from Talley and his attorney:

(1) exculpatory and impeachment evidence regarding the lineups;

(2) the list of alternative suspects who were identified by witnesses and victims before Talley's arrest;

(3) the "You're next" note and the threatening phone calls to the LaGrange College student;

(4) Talley's fingerprints were compared to latent lifts from the "You're next" note and did not match;

(5) the gloves left by the suspect and the site of one rape were identified by a LaGrange police sergeant as belonging to JL;

(6) JL was in the vicinity of one victim's dormitory within an hour of the attack;

(7) evidence of JL's termination and the basis for it.

At trial, the prosecution's cases hinged on identification testimony. No other evidence implicated Talley. At the trial on the first rape charge, the victim identified Talley as the assailant, but Olinger and Price had concealed evidence that the victim had previously identified another man as her assailant, that she was heavily intoxicated at the time of the assault, and that she had a blood alcohol content of .34 when she was tested hours after the assault. Price falsely testified at that trial

that the victim had not identified her assailant in pre-trial reviews of photo arrays; Price knew that the victim had identified a man other than Talley as her assailant. And although Price knew that the victim was heavily intoxicated, Price testified that she had no reason to think the victim was not making a correct identification. The jury found Talley guilty. The rape kit for the victim remained in the GBI's custody, and Blankenship ordered its destruction in 1982 without notifying Talley or his lawyer.

The trial on the second rape charge began the next day, and Talley was again convicted without receiving exculpatory or impeachment evidence that Olinger and Price concealed. As with the first trial, there was no physical evidence implicating Talley in the rape, and the case hinged on identification testimony. Investigators concealed the fact that the witnesses identified another man as the person who was acting suspiciously near the crime scene. The jury found Talley guilty. After the second conviction, Talley believed that his situation was hopeless, and he pleaded guilty to the remaining charges—two rapes and two assaults. Talley received a life sentence on each of the rape charges, and he received a ten-year sentence on each of the assault charges. No appeal was filed on Talley's behalf. The rape kit for the victim in the second trial remained in the Troup County Clerk's possession, and it was later used to exonerate Talley.

In 2004, Talley wrote a letter to the Georgia Innocence Project seeking help. The Innocence Project learned that biological evidence in all but one case had been lost or destroyed. In 2009, court-ordered DNA testing of the biological evidence revealed that Talley was not the source of male DNA in the sole remaining rape kit. Talley filed a motion for a new trial in that case, which was granted in 2013, though the indictment was not dismissed until February 2021. Meanwhile, the 2009 DNA exoneration led the LaGrange police department, under new leadership, to reinvestigate all the cases for which Talley had been convicted. During the reinvestigation, the Innocence Project and LaGrange police uncovered significant exculpatory evidence that should have been disclosed to the prosecutor and Talley's defense lawyer before his trials in November 1981. Based on that information, the Troup County District Attorney's office joined the motion to vacate Talley's convictions in the four rape cases, although it did not consent to vacating the assault convictions for which Talley had already served his ten-year sentences. On February 23, 2021, the Superior Court of Troup County entered an order vacating Talley's convictions on the four rape charges, and it ordered Talley's immediate release from prison. The convictions for the two assault charges—for which Talley served the entire sentence—have not been overturned.

On February 21, 2023, Talley filed this action asserting claims under 42 U.S.C. § 1983 and state law. Talley's claims are based on the conduct giving rise to the four convictions that have been overturned; Talley appears to acknowledge that he may not bring claims based on the two assault convictions that have not been overturned, for which he long ago completed ten-year sentences. After Talley filed his Complaint in February 2023, he learned that four of the Defendants died before he filed this action. Price died in 2012, and Furgerson died in 2004. It is not clear from the present record when Yates and Balentine died.

DISCUSSION

Presently pending before the Court are Defendants' motions to dismiss, Talley's motion for leave to amend his Complaint, and Talley's motion for an extension of time to serve the estates of the deceased Defendants. The Court addresses each motion in turn, beginning with the motions related to the deceased Defendants.

## I.   Motions Related to the Deceased Defendants (ECF Nos. 38, 50, 53, and 64)

In his February 2023 Complaint, Talley named Price, Furgerson, Yates, and Barentine as Defendants in his § 1983 and state law claims. By mid-May 2023, Talley learned that these four Defendants died before he filed this action. At that point, Talley sought an extension of time to locate and serve personal representatives of the deceased Defendants' estates, which the

Court granted.  Talley served the personal representatives of the estates of Price and Furgerson, who then filed a motion to dismiss Price and Furgerson as Defendants in this action because a dead person cannot be a party to legal proceedings, and the representative of an estate cannot be substituted for a deceased defendant under the federal rules if the defendant predeceased the filing of the action.  *See Cox v. Progressive Bayside Ins. Co.*, 728 S.E.2d 726, 728 (Ga. Ct. App. 2012) ("In Georgia, a deceased person cannot be a party to legal proceedings . . . ."); *Mizukami v. Buras*, 419 F.2d 1319, 1320 (5th Cir. 1969) (per curiam) (affirming denial of substitution under Federal Rule of Civil Procedure 25 where the defendant predeceased the filing of the action).[2]  The proper party is a representative of each estate, and thus the Complaint must be amended and the estate representative served as a new party to the action.

Talley does not dispute that he may not maintain an action against the four deceased Defendants.  The Court thus grants the motion to dismiss Price and Furgerson (ECF No. 38) and dismisses the claims against Yates and Barentine.  The Court also quashes the summonses that were served on the executors of the estates of Price and Furgerson, who were not named as parties to this action

---

[2] **Error! Main Document Only.**In *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

when they were served.  The Court also denies Talley's motions for
an extension of time to serve Yates and Barentine (ECF No. 53 &
64).  Being dead, neither Yates nor Balentine can be served.  As
Talley recognizes, the proper course is to seek to amend his
Complaint to add representatives of their estates, then serve those
representatives in accordance with the rules if the motion for
leave to amend is granted.

Talley seeks permission to amend his Complaint (ECF No. 50)
as follows.  First, he wants to withdraw certain claims and clarify
others.  Talley's motion for leave to amend his Complaint on this
ground is granted.  Second, Talley wants to amend his Complaint to
name the personal representatives of the estates of Price and
Furgerson ("Estate Defendants"), and he wants to correct any
deficiencies in the service of the representatives.[3]  As discussed
below, the Court denies this portion of Talley's motion for leave
to amend.

Federal Rule of Civil Procedure 15(a)(2) allows a party to
amend its pleading with leave of the Court.  Although leave should
be freely given "when justice so requires," Fed. R. Civ. P.

---

[3] Talley did not seek leave to amend his Complaint to add claims against
the administrators of the estates of Yates and Barentine.  Instead, the
proposed amended complaint still names Yates and Barentine as Defendants
even though they are deceased and cannot be parties to this action.
Talley represents that Yates and Barentine died in Alabama and that an
administrator ad litem will need to be appointed for each of their
estates because Yates's estate has been closed and his executor is dead,
and Barentine died intestate and it does not appear that an administrator
was appointed for his estate.

15(a)(2), the Court need not give leave to amend if the amendment would be futile. *Foman v. Davis*, 371 U.S. 178, 182 (1962). The Estate Defendants argue that an amendment to name the representatives of the deceased Defendants' estates instead of the deceased Defendants would be futile because Georgia's survivorship law includes a statute of repose that applies here.

The Court begins its analysis of the statute of repose with its effect on the state law claims Talley wishes to assert against the personal representatives of the deceased Defendants' estates. Under Georgia law, the only way to bring a cause of action for torts committed by a person who has died is to assert a claim against the decedent's personal representative—the executor or administrator of the decedent's estate. So, if the "wrongdoer" dies before an action is brought against him, then the decedent's personal representative "shall be subject to the action just as the wrongdoer himself would have been during his life." O.C.G.A. § 9-2-41. But claims against the personal representative of a decedent's estate "that arose before the death of the decedent" cannot "be brought more than six years after the date of the decedent's death." O.C.G.A. § 9-3-36(a). This prohibition "is intended to create a six-year statute of ultimate repose and abrogation." *Id.* § 9-3-36(b). Thus, Georgia permits survival of an action based on conduct of a deceased defendant (a departure from the traditional common-law rule) but limits when such an

action can be brought against the decedent's personal representative.

Talley argues that the statute of repose does not apply to his state law claims because the statute of repose only applies to claims "that *arose* before the death of the decedent" and his claims did not *accrue* until he was exonerated in 2021. *Id.* § 9-3-36(a) (emphasis added). But O.C.G.A. § 9-3-36 explicitly states that it is a statute of ultimate repose. "A statute of ultimate repose delineates a time period in which a right may accrue. If the injury occurs outside that period, it is not actionable." *Simmons v. Sonyika*, 614 S.E.2d 27, 29 (Ga. 2005) (quoting *Craven v. Lowndes County Hosp. Auth.*, 437 S.E.2d 308, 310 (Ga. 1993)). "The statute of repose destroys the previously existing rights so that, on the expiration of the statutory period, the cause of action no longer exists." *Id.* (quoting *Wright v. Robinson*, 426 S.E.2d 870, 872 (Ga. 1993)). For these reasons, the Court finds that Talley's proposed state law claims against the deceased Defendants' personal representatives are barred.

The next question is whether these rules also bar Talley's proposed § 1983 claims against the deceased Defendants' personal representatives. This question turns on the extent to which the Court must "borrow" from Georgia law. Under 42 U.S.C. § 1988, if federal law is "unsuited or insufficient 'to furnish suitable remedies,'" the courts "look to principles of the common law, as

altered by state law, so long as such principles are not inconsistent with the Constitution and laws of the United States." *Moor v. Alameda Cnty.*, 411 U.S. 693, 703 (1973) (quoting 42 U.S.C. § 1988(a)).  Section 1983 provides a cause of action against a "person" who, under color of state law, deprives another person of his rights secured by the United States Constitution and laws. But § 1983 does not contain a statute of limitations, so the courts borrow the forum state's statute of limitations for personal injury claims.  *Wallace v. Kato*, 549 U.S. 384, 387 (2007).  Section 1983 also does not provide for the survival of a civil rights action "upon the death of either the plaintiff or defendant." *Moor*, 411 U.S. at 703 n.14.  So, state survivorship statutes that "reverse the common-law rule may be used in the context of actions brought under § 1983." *Id.*  State law may not be applied, however, if it is inconsistent with federal law. *Robertson v. Wegmann*, 436 U.S. 584, 590 (1978).

Here, Talley relies on Georgia's survivorship law to bring this action against the personal representatives of the deceased Defendants' estates.  He argues, though, that the Court should ignore the related statute of repose that limits when an action can be brought against a decedent's personal representative. Talley points out that courts are not generally required to borrow state-law statutes of repose that are independent from statutes of limitations.  *Moore v. Liberty Nat'l Life Ins. Co.*, 267 F.3d 1209,

1215 (11th Cir. 2001) (concluding that 42 U.S.C. §§ 1981 and 1982 were not "deficient" within the meaning of § 1988 for lack of a statute of repose). But here, the Estate Defendants do not argue that a general statute of repose should apply. Rather, they argue that when applying Georgia's survivorship statute, the Court must also apply the related statute of repose for actions against estates. *Cf. Willis v. City of Atlanta*, 684 S.E.2d 271, 273 (Ga. 2009) (noting that statutes relating to the same subject matter "must be construed together").

Again, the only way to bring a cause of action in Georgia for torts committed by a person who has died is to assert a claim against the decedent's personal representative. Georgia law limits when such an action can be brought against the decedent's personal representative, and the law is intended to create a six-year statute of ultimate repose. Nothing in § 1983 "or its underlying policies . . . indicate[s] that a state law causing abatement of a particular action should invariably be ignored in favor of a rule of absolute survivorship." *Robertson*, 436 U.S. at 590. And a "state statute cannot be considered 'inconsistent' with federal law merely because the statute causes the plaintiff to lose the litigation." *Id.* at 593.

Section 1983 is intended to compensate "persons injured by deprivation of federal rights" and prevent "abuses of power by those acting under color of state law." *Id.* at 591. Georgia's

16

survivorship law generally aids the compensatory purpose by permitting a plaintiff to bring a § 1983 action even if the alleged wrongdoer has died.  Regarding deterrence, most § 1983 actions accrue at the time of the tortious conduct and are subject to a two-year statute of limitations; the possibility of a § 1983 action should deter a reasonable official from violating clearly established law.  A state law that permits such claims against the personal representative of a deceased wrongdoer's estate but extinguishes such claims six years after the wrongdoer's death does not frustrate this deterrent purpose.  For these reasons, the Court finds that the Georgia survivorship law—including its statute of repose—should apply in this case.  Talley brought this action in 2023, eleven years after Price died in 2012 and nineteen years after Furgerson died in 2004.  Under the survivorship law's statute of repose, Talley's claims against the Estate Defendants are time-barred, and he may not amend his Complaint to assert claims against the Estate Defendants because to do so would be an exercise in futility.

## II.  The Motion to Dismiss of Olinger and Blankenship (ECF No. 24)

Olinger and Blankenship seek dismissal of all of Talley's claims against them.  In its evaluation of each of Plaintiff's claims, the Court is guided by the following two principles.  First, a "constitutional claim brought pursuant to § 1983 must begin with the identification of a specific constitutional right

that has allegedly been infringed." *Paez v. Mulvey*, 915 F.3d 1276, 1285 (11th Cir. 2019).  Second, "[q]ualified immunity shields public officials from liability for civil damages when their conduct does not violate a constitutional right that was clearly established at the time of the challenged action." *Williams v. Aguirre*, 965 F.3d 1147, 1156 (11th Cir. 2020) (quoting *Echols v. Lawton*, 913 F.3d 1313, 1319 (11th Cir. 2019)).

A.   Count I: Failure to Investigate

In Count I, Talley alleges a claim against Olinger under § 1983 and the Fourteenth Amendment for failure to investigate. Citing *Kingsland v. City of Miami*, Talley argues that the courts recognize a Fourteenth Amendment right to a fair investigation. 382 F.3d 1220, 1231 (11th Cir. 2004), *abrogated on other grounds as recognized in Aguirre*, 965 F.3d at 1159.  But in *Kingsland*, the Eleventh Circuit concluded that a *Fourth Amendment* false arrest claim could proceed where there was evidence that the defendant officers "failed to conduct a reasonable investigation" and "ignored certain facts within their knowledge." *Id.* at 1231–32; *see also Tillman v. Coley*, 886 F.2d 317, 321 (11th Cir. 1989) (recognizing that the Fourth Amendment requires an officer "to eliminate doubts concerning identity that exist prior to obtaining the warrant and to arrest").  The *Kingsland* court also suggested that such conduct may give rise to a *Fourth Amendment* malicious prosecution claim if such conduct results in a seizure. *Kingsland*,

382 F.3d at 1234-35. *Kingsland* did not establish a Fourteenth Amendment claim for failure to investigate.[4] So, while evidence of a constitutionally deficient investigation could support a Fourth Amendment malicious prosecution claim, it does not give rise to a clearly established freestanding Fourteenth Amendment claim. Count I is dismissed.

B.   Count II: Fabrication of Evidence

Talley alleges a § 1983 and Fourteenth Amendment claim against Olinger for fabrication of false inculpatory evidence. Olinger contends that the fabrication of false inculpatory evidence does not give rise to an independent Fourteenth Amendment claim, although he acknowledges that such conduct may support a false arrest or a malicious prosecution claim. *See, e.g.*, *Williams v. Miami-Dade Police Dep't*, 297 F. App'x 941, 947 (11th Cir. 2008) (per curiam) (finding that evidence supported a § 1983 Fourth Amendment malicious prosecution claim against a police officer who fabricated evidence); *accord Kingsland*, 382 F.3d at 1231 (suggesting that manufactured evidence may support a Fourth Amendment claim).

---

[4] Nor did the other authority Talley cited. *See United States v. Agurs*, 427 U.S. 97 (1976) (evaluating motion for a new trial based on alleged violations of *Brady v. Maryland*, 373 U.S. 83 (1963)); *Daniels v. Williams*, 474 U.S. 327, 328 (1986) (finding no Fourteenth Amendment due process violation based on negligent conduct of a jail officer that resulted in injuries to an inmate).

It has long been clearly established that the Fourteenth Amendment's due process clause prohibits the State and its representatives from knowingly using false evidence to obtain a tainted conviction. *Napue v. Illinois*, 360 U.S. 264, 269, 272 (1959) (reversing conviction where prosecutor procured conviction with false testimony); *Miller v. Pate*, 386 U.S. 1, 7 (1967) (reversing denial of habeas corpus petition because "the Fourteenth Amendment cannot tolerate a state criminal conviction obtained by the knowing use of false evidence"). Though Talley did not clearly label Count II as a Fourteenth Amendment procedural due process claim, that seems to be the essence of this claim.[5] Olinger's motion to dismiss does not address whether Count II states a Fourteenth Amendment procedural due process claim based on fabrication of evidence, and the Court declines to consider this issue *sua sponte*. Olinger's motion to dismiss Count II is denied.

C.   Counts III, V, and VI: *Brady* Claims

Talley asserts claims against Olinger for concealment of exculpatory and impeachment evidence and against Olinger and Blankenship for bad faith destruction of evidence. Talley acknowledges that these claims are all based on alleged violations

---

[5] The Supreme Court noted that a fabrication-of-evidence claim is distinct from a malicious prosecution claim, and the Supreme Court assumed without deciding that such a claim is a Fourteenth Amendment procedural due process claim. *McDonough v. Smith*, 139 S. Ct. 2149, 2155–56, 2156 n.3 (2019).

of *Brady v. Maryland*, 373 U.S. 83 (1963); in his forthcoming amended complaint, he intends to clarify these claims.

"*Brady* protects an accused's due process right to a fair trial." *McMillian v. Johnson*, 88 F.3d 1554, 1567 (11th Cir.), *opinion amended on other grounds*, 101 F.3d 1363 (11th Cir. 1996). A police investigator "has a duty under *Brady* to turn exculpatory and impeachment evidence over to the prosecutor." *Id.* By 1979, binding precedent of this circuit "clearly established that an accused's due process rights are violated when the police conceal exculpatory or impeachment evidence." *Id.* (relying on *Freeman v. Georgia*, 599 F.2d 65, 69 (5th Cir. 1979)).

Defendants nonetheless argue that it was not clearly established until *McMillian* was decided in 1996 that a law enforcement officer could be held liable for a *Brady* violation. In *McMillian*, the Eleventh Circuit acknowledged in a footnote that it had "never squarely held that it is the police who violate *Brady*, as opposed to 'the state,' when the police fail to turn exculpatory evidence over to the prosecutor." *Id.* at 1569 n.19. That fact, though, did not stop the Eleventh Circuit from remanding the *McMillian* action for a determination of whether a reasonable official in the officers' position "would have known that the withheld evidence was material"—in which case the defendants would not be entitled to qualified immunity. *Id.* at 1572. Accordingly, *McMillian* suggests that it was clearly established by 1979 that a

law enforcement officer violates *Brady* by concealing exculpatory evidence from use at trial when a reasonable official in his position would know that the withheld evidence was material. Taking Talley's allegations as true and construing all inferences in his favor, the present Complaint sufficiently alleges that Olinger withheld or destroyed material evidence, so he is not entitled to qualified immunity on Counts III and V.[6]

In Count VI, Talley asserts a claim against Blankenship for destruction of evidence. Talley alleges that Blankenship oversaw the destruction of a rape kit for the victim in the first trial. The trial took place on November 9, 1981, and Talley alleges that the rape kit was destroyed "in late 1982." Compl. ¶ 250. Talley also asserts that Blankenship destroyed physical evidence, including bedding and clothing, related to one of the rape cases to which Talley pleaded guilty. Although Talley asserts that his pursuit of post-conviction relief was hampered because this evidence was destroyed, he did not clearly allege facts to suggest that the destruction of this evidence caused him to be convicted at trial. As discussed above, a *Brady* claim arises when a failure to turn over *Brady* material causes a defendant to be convicted in

---

[6] Defendants point out that it was not clearly established in 1981 whether certain exculpatory evidence must be disclosed to a defendant before a guilty plea. At this stage of the litigation, the Court cannot determine which exculpatory evidence gathered during the investigation that led to the four now-overturned convictions was only material to the guilty pleas and which was also material to the trials.

an unfair trial.  Talley did not point to any authority clearly establishing by 1981 that post-trial or post-plea destruction of evidence gives rise to a *Brady* claim.  Blankenship is thus entitled to qualified immunity on Count VI, and the claim is dismissed.

> D.   Count IV: Malicious Prosecution

To maintain his § 1983 malicious prosecution claim against Olinger, Talley must establish "that he suffered a seizure pursuant to legal process that violated the Fourth Amendment."  *Laskar v. Hurd*, 972 F.3d 1278, 1284 (11th Cir. 2020).  He also must satisfy the elements of a common law malicious prosecution claim.  *Id.*  In his motion, Olinger argues that Talley did not adequately allege a Fourth Amendment seizure.[7]

Unlike a false arrest claim, which concerns seizures without legal process (like warrantless arrests), a malicious prosecution claim requires a seizure "pursuant to legal process."  *Aguirre*, 965 F.3d at 1158 (quoting *Black v. Wigington*, 811 F.3d 1259, 1267 (11th Cir. 2016)).  A warrant-based seizure or a seizure "following an arraignment, indictment, or probable-cause hearing" falls within this category.  *Id.*  "A Fourth Amendment violation involving these seizures occurs 'when legal process itself goes wrong—when, for example, a judge's probable-cause determination is predicated solely on a police officer's false statements.'"  *Id.* (quoting

---

[7] There is no dispute that Talley may not assert a malicious prosecution for the two assault claims that have not been overturned because there was no favorable termination of those proceedings.

*Manuel v. City of Joliet*, 580 U.S. 357, 367 (2017)).   To demonstrate a seizure pursuant to legal process that violated the Fourth Amendment, Talley must show "(1) that the legal process justifying his seizure was constitutionally infirm and (2) that his seizure would not otherwise be justified without legal process." *Id.* at 1165.

Olinger argues that Talley alleged no Fourth Amendment seizure pursuant to legal process because the only seizure Talley explicitly references in his Complaint is his warrantless arrest for simple battery in connection with the incident for which he admitted the facts—the April 1981 incident involving YS.   But Talley clearly alleges that *after* that warrantless arrest, Olinger and the other investigators began investigating Talley for other crimes, fabricated evidence against him, ignored exculpatory evidence which suggested Talley was not the perpetrator, unlawfully charged Talley with other crimes, and participated in the prosecution and trial of those crimes.   While the Complaint does not allege specific facts regarding the probable cause determination for any of these charges, it is clear that Talley alleges that the probable cause determination for the false charges—and thus his seizure pursuant to legal process for these charges—was tainted by officer misconduct.   The fact that the officers had probable cause for a warrantless arrest in connection with the YS incident does not establish probable cause for seizing

Talley on any other charges.   And while a probable cause determination and the conviction related to the YS incident, which has not been overturned, may impact the extent to which Talley was injured by malicious prosecution for the other charges, Talley alleges that after he completed his sentence for the YS conviction he remained incarcerated on false charges for decades.   For these reasons, the Court rejects Olinger's argument that Talley's malicious prosecution claim fails for lack of a Fourth Amendment seizure.   The motion to dismiss Count IV on this basis is denied.

E.   Count VII: Deprivation of Access to Courts

Talley claims that Olinger violated the First Amendment by concealing and/or destroying evidence that Talley could have used to prove his innocence.   For purposes of the present motion, Olinger does not dispute that inmates have a constitutional right of access to the courts, and he does not dispute that this right has been clearly established since the 1970s.   *See Barbour v. Haley*, 471 F.3d 1222, 1225 (11th Cir. 2006) ("It is now clearly established that prisoners have a constitutional right of access to the courts." (citing *Bounds v. Smith*, 430 U.S. 817 (1977), *abrogated on other grounds by Lewis v. Casey*, 518 U.S. 343, 354 (1996))).

Olinger argues that a plaintiff asserting a right-of-access claim must allege a lost underlying cause of action and "identify a remedy that may be awarded as recompense but not otherwise

available in some suit that may yet be brought." *Christopher v. Harbury*, 536 U.S. 403, 415 (2002). Olinger contends that Talley did not identify an underlying cause of action that was lost because of Olinger's alleged conduct in concealing and/or destroying evidence. But he did. Viewing the factual allegations as a whole, Talley alleges that he would not have been convicted in the two trials (and would not have pleaded guilty to other charges) if exculpatory evidence had not been concealed or destroyed. He further alleges that during his time in prison, the exculpatory evidence remained concealed from him, so the courthouse door was effectively barred because he could not successfully seek post-conviction relief until such evidence was finally disclosed. Talley's claim is that if he had received all the relevant exculpatory evidence when he initially sought it years ago, he would have been able to pursue the post-conviction relief he finally achieved in 2021 (via a properly supported motion for new trial and later a joint motion to vacate the convictions) much earlier. That is the underlying claim he contends that he lost.

Olinger also argues that even if Talley adequately alleged a lost underlying cause of action, he did not identify a remedy that is not otherwise available. The remedy Talley seeks is damages to compensate him for lost freedom that Olinger and the other investigators allegedly caused by concealing and destroying exculpatory evidence. Olinger contends that Talley has an

available remedy for the delay in justice allegedly caused by the concealment and destruction of exculpatory evidence: the other claims he asserts in this action. Even if Talley's other tort claims against Olinger could be considered an otherwise available remedy, they are the very claims that Olinger argues should be dismissed as barred by some legal defect; those arguments could be repeated based on a more developed record at a later stage of litigation and render the remedies unavailable. For all these reasons, the Court finds that Talley adequately alleged a § 1983 right of access to courts claim, and Olinger's motion to dismiss the claim is denied.

F.   Count VIII: Failure to Intervene

In his motion for leave to amend, Talley agreed to dismiss Count VIII, his claim against Olinger and Blankenship under § 1983 for failure to intervene. Accordingly, that count is dismissed as having been abandoned.

G.   Count IX: Conspiracy

Talley alleges a § 1983 conspiracy claim against Olinger and Blankenship, Count IX. Talley contends that Olinger and Blankenship worked with the LaGrange investigators to conceal exculpatory evidence from Talley, initiate false charges against Talley, and pursue the prosecution and resulting conviction. "Conspiring to violate another person's constitutional rights violates section 1983." *Rowe v. City of Fort Lauderdale*, 279 F.3d

1271, 1283 (11th Cir. 2002) (evaluating conspiracy claim at the *summary judgment* stage).  To establish a § 1983 conspiracy, Talley must show that the defendants "reached an understanding to violate" his constitutional rights.  *Id.* at 128384.  Thus, he must allege facts to suggest that there was an agreement between the defendants.  *Id.*  And, of course, Talley must allege facts to establish an underlying constitutional violation.

Olinger and Blankenship argue that the § 1983 conspiracy claim fails because Talley did not adequately allege a single underlying constitutional violation.  As discussed above, though, he did.  Olinger and Blankenship also argue that Talley did not allege sufficient facts to show that they had an agreement to violate Talley's constitutional rights.  But at this pleading stage, the Court must take the complaint's allegations as true and draw reasonable inferences in Talley's favor.  Talley plausibly alleges that Olinger and Blankenship, together with the LaGrange investigators, knew about but deliberately concealed significant exculpatory evidence.[8]  He further alleges that these individuals worked together to build a case implicating Talley even though

---

[8] Although Count VI against Blankenship is dismissed and Talley did not assert the other substantive § 1983 claims against Blankenship, he does adequately allege that Blankenship participated in the conspiracy. Talley alleges that Blankenship knew that no biological evidence connected Talley to any of the rape victims and that some evidence did connect JL to the crimes.  Talley further alleges that Blankenship knew this information was not disclosed to Talley or his lawyer and that Blankenship participated in the scheme to keep the exculpatory evidence from Talley and his lawyer.

they knew or reasonably should have known that he was innocent and that no legitimate evidence supported his prosecution or conviction. At this stage in the proceedings, these allegations are sufficient to support a § 1983 conspiracy claim, and the motion to dismiss this claim is denied.

### H.   Counts XI-XIV: State Law Claims

In addition to his federal constitutional claims, Talley asserts state law claims against all Defendants for obstruction of justice, "negligence/gross negligence/willful and wanton misconduct," intentional infliction of emotional distress, and negligent infliction of emotional distress. In his motion for leave to amend, Talley agreed to dismiss Counts XI and XIV, as well as Count XII to the extent it is based on negligence, so the Court need not address those claims. Count XII for willful and wanton misconduct and Count XIII for intentional infliction of emotional distress remain pending.

Olinger and Blankenship contend that all state law claims against them, including Counts XII and XIII, are barred by state law sovereign immunity. In Georgia, a "state officer or employee who commits a tort while acting within the scope of his or her official duties or employment is not subject to lawsuit or liability therefor." O.C.G.A. § 50-21-25(a). State officers "are immune from tort suits seeking to impose individual liability on them for any tort committed by them within the scope of state

29

employment, including torts based on intentional wrongful conduct or actions taken with malice and intent to injure." *Gowen Oil Co. v. Streat*, 750 S.E.2d 708, 709 (Ga. Ct. App. 2013). Here, Talley's claims against Olinger and Blankenship are for their conduct as GBI employees, within the scope of their employment. Compl. ¶¶ 55-56. The state law claims against Olinger and Blankenship are therefore dismissed.

**III. The Motion to Dismiss of LaGrange (ECF No. 26)**

Talley asserts the following claims against LaGrange: Count X under § 1983 for deprivation of Talley's constitutional rights and Count XIII intentional infliction of emotional distress.

A.   Count X: § 1983 Municipal Liability Claim

Talley alleges that LaGrange had a custom of failing to supervise and train investigators and a custom of condoning unlawful investigatory practices, which led to repeated instances of police misconduct that caused Talley's wrongful convictions, adversely impacted his access to courts, and significantly delayed his exoneration. In essence, Talley maintains that LaGrange's customs were the moving force behind the events giving rise to his § 1983 claims against the individual investigators for malicious prosecution, fabrication of evidence, *Brady* violations, and deprivation of access to the courts.

Without addressing any of these specific claims or when they accrued, LaGrange summarily argues that any § 1983 claim against

it is time-barred because the statute of limitations for a personal injury claims is two years and Talley discovered some exculpatory evidence long before he filed his Complaint.  This argument ignores the rule that a malicious prosecution claim does not accrue until "the prosecution against the plaintiff terminates in his favor." *Laskar*, 972 F.3d at 1285.  This favorable termination requirement applies to a fabrication-of-evidence claim. *McDonough*, 139 S. Ct. at 2161; *accord Heck v. Humphrey*, 512 U.S. 477, 486-87 (1994) (concluding that before a plaintiff may "recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid," a § 1983 plaintiff must prove that the conviction has been invalidated).  The Court thus rejects LaGrange's statute of limitations argument asserted in its present motion.

LaGrange also argues that the Complaint does not adequately allege a basis for municipal liability.  To establish municipal liability under § 1983, a plaintiff like Talley must "show that a deprivation of constitutional rights occurred as a result of an official government policy or custom." *Cooper v. Dillon*, 403 F.3d 1208, 1221 (11th Cir. 2005).  Put another way, Talley must show that LaGrange's "custom or practice is the moving force behind" a constitutional violation. *Knight ex rel. Kerr v. Miami-Dade County*, 856 F.3d 795, 819 (11th Cir. 2017) (quoting *Grech v.*

*Clayton County*, 335 F.3d 1326, 1329 (11th Cir. 2017) (en banc)).
A final municipal policymaker's custom or policy may give rise to
municipal liability; under appropriate circumstances, a single
decision by a final policymaker may give rise to municipal
liability under § 1983. *Id.*; *accord Scala v. City of Winter Park*,
116 F.3d 1396, 1399 (11th Cir. 1997) (noting that if action is
directed by a final policymaker, a municipality may be responsible
whether the action is taken once or taken repeatedly, so liability
may arise from a course of action tailored to a particular
situation).

LaGrange argues that Talley did not point to a final
policymaker whose policy or custom was the moving force behind a
constitutional violation.  But he did.  Talley alleges that in
1981, the LaGrange police chief was a final policymaker for the
city, who monitored the serial rape investigation but condoned
unlawful police conduct and also had a custom of failing to
supervise and train the officers on properly conducting criminal
investigations, disclosing exculpatory and impeachment evidence,
and preserving evidence.  While some allegations are a bit
conclusory, Talley does allege specific facts which support the
conclusion that the police chief knew that JL had accosted female
students at LaGrange College and then fired him for creating fear
in the minds of female students.  After JL was terminated, the on-
campus attacks stopped.  Talley further alleges that the police

chief was personally involved in monitoring the serial rape investigation and that his investigators knew that JL was in the vicinity of one victim's dorm room within an hour of her rape but chose not to investigate him and instead buried evidence that would have implicated him in the crimes. Talley also alleges that any reasonable investigation monitored by the police chief should have included some investigation of JL, particularly given that the police chief knew of his propensity to accost female college students on the campus where he served as rape prevention officer. Talley further alleges that after the investigative team ignored promising leads and buried incriminating evidence against their former colleague and another suspect, the police chief continued pushing for his team to find a perpetrator. Taking all these allegations together, Talley adequately alleged that the police chief, a final policymaker for LaGrange, had notice that his investigative team failed to conduct a constitutionally adequate investigation but made a conscious decision not to correct their deficiencies, which resulted in the constitutional violations that Talley alleges. Accordingly, LaGrange's motion to dismiss Count X is denied.[9]

---

[9] Ultimately, discovery may not support these allegations, but at this stage in the litigation the Court must view the allegations as true.

B.   State Law Claim Against LaGrange

The only state law claim that remains pending against LaGrange is the claim for intentional infliction of emotional distress based on the wrongful convictions and the subsequent concealment of exculpatory evidence that Talley needed to demonstrate his innocence.  LaGrange's motion does not address the merits of this claim.  Instead, LaGrange contends that any state law claims against it are barred by state law sovereign immunity and that the Court thus lacks subject matter jurisdiction over the state law claims.  The Georgia Constitution extends sovereign immunity to municipal corporations like LaGrange unless that immunity is waived by the General Assembly.  Ga. Const. art. IX, § 2, ¶ IX; accord *City of Atlanta v. Mitcham*, 769 S.E.2d 320, 322–23 (Ga. 2015).  A municipal corporation does not "waive its immunity by the purchase of liability insurance" except in limited circumstances involving motor vehicle insurance or other insurance that "covers an occurrence for which the defense of sovereign immunity is available."  O.C.G.A. § 36-33-1(a).  Talley, who has the burden to establish a waiver of sovereign immunity, contends that he needs discovery to determine whether there is an insurance policy that would cover his state law claims against LaGrange for willful and wanton conduct and intentional infliction of emotional distress.  In its reply brief, LaGrange argued for the first time that it could not locate any insurance policies that were effective

34

in 1981.  But there has been no jurisdictional discovery on this issue or whether LaGrange at any time maintained an insurance policy that applies to the state law claim against it. Accordingly, the Court denies the motion to dismiss the state law claim against LaGrange based on sovereign immunity but will permit LaGrange to reassert its factual attack on subject matter jurisdiction for the state law claim against it after Talley has had an opportunity to conduct discovery on the insurance issue.[10]

CONCLUSION

As discussed above, the motion to dismiss of Olinger and Blankenship (ECF No. 24) is granted as to Count I, Count VI, and Count VIII but otherwise denied.  LaGrange's motion to dismiss (ECF No. 26) is denied.  The Court grants the motion to dismiss Price and Furgerson (ECF No. 38) and dismisses the claims against Yates and Barentine.  The Court also quashes the summonses that were served on the executors of the estates of Price and Furgerson,

---

[10] LaGrange also argues that the state law claim against it fails because Talley failed to file an ante litem notice, but the ante litem notice requirement only applies to negligence-based claims, not claims for intentional torts.  *West v. City of Albany*, 797 S.E.2d 809, 812 (Ga. 2017).  LaGrange also contends that Talley's intentional infliction of emotional distress claim is time-barred under the two-year statute of limitations for personal injury claims, although LaGrange acknowledges that Talley alleges tortious conduct which continued after his conviction.  Moreover, neither side's briefing fully addresses the complicated accrual, tolling, and estoppel issues that may apply. Instead of wading into this thicket on the sparse record presently before it, the Court denies the motion to dismiss at this time.  If Talley establishes that the Court has subject matter jurisdiction over his state law claim against LaGrange, then LaGrange may certainly seek judgment on the pleadings or summary judgment on the statute of limitations issue.

who have not yet been named as parties to this action.  The Court grants in part and denies in part Talley's motion for leave to amend (ECF No. 50) to the extent set forth above.  The Court denies Talley's motions for an extension of time to serve Yates and Barentine (ECF Nos. 53 & 64).  Talley shall file his amended complaint within twenty-one days of today's order.

IT IS SO ORDERED, this 22nd day of November, 2023.

S/Clay D. Land
CLAY D. LAND
U.S. DISTRICT COURT JUDGE
MIDDLE DISTRICT OF GEORGIA