**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION**

| | |
|---|---|
| TERRY LAMAR TALLEY, | |
| *Plaintiff,* | |
| v. | CIVIL ACTION No.<br>4:23-cv-32-CDL |
| CITY OF LAGRANGE, GEORGIA; GBI Special Agent ROY OLINGER, in his Individual Capacity; and GBI Forensic Analyst BENNY BLANKENSHIP, in his Individual Capacity, | |
| *Defendants.* | |

**SECOND AMENDED COMPLAINT**

**(Jury Trial Demanded)**

Plaintiff Terry Lamar Talley (hereafter "Talley" or "Plaintiff"), by and through undersigned counsel, and with leave of Court pursuant to Rule 15 of the Federal Rules of Civil Procedure, hereby files his Second Amended Complaint, complaining of Defendants City of LaGrange, Roy Olinger, and Benny Blankenship (hereafter, "Defendants") as follows:

**<u>INTRODUCTION</u>**

1.      On February 23, 2021, following a re-investigation by the LaGrange Police Department, Terry Talley was exonerated of the rape charges for which he spent nearly four decades – more than fourteen thousand (14,000) days – in the Georgia prison system.

2.      Mr. Talley's prolonged nightmare arising from his wrongful conviction and almost half-century of incarceration was not the result of mere negligence or mistake by itself. Instead, it resulted from the acts and omissions of special agents of the Georgia Bureau of Investigation

("GBI") and the detectives of the LaGrange Police Department ("LGPD") who investigated the case.

3.      Agents of the GBI and detectives of the LGPD chose to protect a fellow law enforcement officer, Jack Lovelace, and the reputation of the LGPD, regarding a series of horrific sexual assaults that occurred in LaGrange between February and July 1981.

4.      During that time, despite being the subject of numerous complaints of grossly inappropriate and shocking conduct involving female students, which complaints were known to the LGPD, Officer Jack Lovelace had been assigned by the LGPD to work "rape prevention duty" at LaGrange College.

5.      Lovelace had a key to the dormitory where the first two attacks occurred. Following the second attack, an LGPD sergeant investigating the incident identified black gloves left at the scene by the assailant as belonging to Lovelace.

6.      Lovelace, however, was never investigated in connection with the sexual assaults that occurred in the locked LaGrange College dorms to which he had access, despite physical evidence directly linking him to one of those attacks.

7.      Lovelace was terminated by the LGPD in mid-March 1981. After Lovelace's termination, the sexual assaults on the college campus ceased, but additional assaults were reported in the vicinity of LaGrange College which bore a striking resemblance to those that occurred in the college dormitory. As with the college sexual assaults, Lovelace was never investigated for these subsequent attacks in the surrounding neighborhood.

8.      Instead, beginning July 21, 1981, GBI Special Agent Roy Olinger ("Olinger") and LGPD Detective Barbara Price ("Price"), who were the lead investigators at that time, focused on Terry Talley despite the absence of evidence connecting Talley to the crimes.

9.     Olinger and Price orchestrated suggestive lineups through which victims and witnesses identified Talley as the assailant or as someone who had been in the vicinity of the rapes and assaults at the relevant times.

10.     On November 9, 1981, less than four months after his arrest, Talley was tried and convicted for rape and assault after a one-day trial. The following day, on November 10, Talley was tried for a second rape and was again convicted. For each conviction he was sentenced to life imprisonment, plus an additional ten years.

11.     In 2009, on the basis of DNA evidence, Talley was proven innocent, leading to his exoneration in 2021.

12.     Whether intentional or reckless, the desire to protect Lovelace and/or the reputation of the police department that had assigned him as a "rape prevention officer" at LaGrange College, by concealing evidence from the District Attorney that tended to implicate Lovelace and/or exculpate Talley, makes this case especially egregious.

## SUMMARY OF THE CASE

13.     During February 1981, two violent sexual assaults were committed at LaGrange college in Georgia.

14.     On February 7, a student was attacked in her dorm room and choked until she lost consciousness. When she awoke, she had a pillowcase over her head, and her attacker was still in the room with her. Before fleeing, he threatened to kill her if she told anyone about the attack. She waited ten days before reporting it to the police.

15.     Two weeks later, on February 21, another student was attacked in her room in the same dormitory. She was strangled, beaten, and sodomized. The attacker struck her in the head, bloodying her face and dislocating her jaw.

16.     One week after the second assault, another student received a handwritten note stating, "You're next," followed by threatening phone calls. The police made no arrests.

17.     Less than two months later, in April 1981, a 64-year-old woman who lived nearby was bound and raped. Two more women were assaulted in June, the first being attacked in the basement of a church, where she was strangled, bound, and raped. The second was assaulted at the local hospital, where she was pulled into a room and threatened with rape. The college and the entire community were gripped by fear and panic.

18.     Most of the incidents had some relation to LaGrange College, either occurring on campus in a women's dormitory or involving students or former students at the college, or neighbors who lived in the area.

19.     Local law enforcement officials believed the crimes were committed by a serial rapist. The assaults garnered a great deal of media and public interest and evoked widespread fear.

20.     The crimes were originally investigated by lead investigator Barbara Price of the LGPD. In early July 1981, however, after months of continuing rapes and assaults, the Chief of Police of the LGPD requested the assistance of the GBI with the investigation, citing that the department was receiving "a lot of pressure from the community," but was no closer to making an arrest.

21.     Upon information and belief, as a result of this request, Special Agent Olinger of the GBI Regional Investigative Office located in or near Columbus, Georgia, was assigned to the matter and began working hand in hand with Detective Price of the LGPD on the investigation.

22.     Substantial evidence suggested that Jack Lovelace, a black LGPD police officer, was involved in the crimes.

23.    Following a number of complaints of aggressive, threatening, and inappropriate conduct directed toward young women at the college, Lovelace was fired by the LGPD in March 1981. After he was fired and lost his access to the dorms, there were no other incidents on campus, and the focus of the attacks shifted to the surrounding neighborhood.

24.    Much of the evidence implicating Lovelace in the series of rapes and assaults in LaGrange would remain undisclosed and hidden for many years. Some of the evidence implicating Lovelace vanished entirely. The gloves identified by an LGPD sergeant as belonging to Lovelace, for example, as well as all the other physical evidence in the case most closely linked to Lovelace, disappeared without explanation after being in the possession of the LGPD and the GBI crime lab.

25.     If Lovelace was ever investigated in connection with the crimes, records of such investigation either were not kept or were destroyed.

26.    In late July 1981, Special Agent Olinger and Detective Price instead focused the investigation on Talley. No physical evidence linked Talley to the assaults or the victims. His name had never been uttered as a possible suspect.

27.    Talley was a millworker and laborer with limited education. Nothing about him suggested that he had orchestrated a series of targeted attacks. His criminal history consisted of relatively minor theft and property crimes. He had never been convicted nor arrested for any type of sexual assault. He had no connection with LaGrange College, and no special access to the locked dorms where first two attacks had occurred.

28.    On July 21, 1981, Talley was arrested for simple battery in connection with a previous incident in which he had gone to a woman's house and offered her money for sex. When the woman declined his offer, Talley placed his hand on the woman's arm because he thought

there was a communication issue due to a language barrier. When it was clear that she did not want to have sex with him, Talley left. The woman did not report the incident to the police at the time.

29.    This incident bore no resemblance whatsoever to the series of premeditated, vicious, and violent assaults that had occurred beginning in February 1981. The serial rapist had repeatedly attacked women from behind, bound and gagged them, and threatened to kill them with a knife. He dragged women across floors and struck them with his fists.

30.    When Agent Olinger and Detective Price questioned Talley about the solicitation episode, he freely admitted to his interactions with the woman. He voluntarily provided hair and bodily fluid samples and *passed a polygraph*. Talley truthfully denied that he had assaulted or raped anyone. Nonetheless, Agent Olinger and Detective Price decided to focus on Talley as the alleged serial rapist.

31.    Lacking probable cause to arrest him for the series of attacks, Olinger and Price orchestrated a series of suggestive lineups through which victims and witnesses identified Talley as the assailant or as someone who had been in the vicinity of the rapes and assaults at the relevant times. Olinger and Price would bury evidence that these same victims and witnesses had earlier identified someone else.

32.    Talley went through this charade of an investigation without the benefit of counsel. Only after Olinger and Price had in essence manufactured a case against him would Talley meet with a court-appointed lawyer. A single lineup was conducted after Talley was represented by counsel, and the victim who participated in that lineup had seen media coverage of Talley's arrest.

33.    The die was cast as a result of Olinger and Price's suggestive lineups and concealment of exculpatory and impeachment evidence regarding those lineups. The prosecution

would hinge on the identification testimony. There was no other evidence against Talley. There was no other evidence of guilt.

34.    A jury would never hear about the alternative suspects or that one of them had been identified by victims and witnesses long before Talley's arrest. A jury would not know about the "You're next" note and the threatening phone calls to the LaGrange College student. They certainly would never learn that Talley's fingerprints had been compared to latent lifts from that note and found not to match.

35.    A jury would also never know that gloves left by the assailant at the site of one rape were affirmatively identified by a LGPD Sergeant as belonging to LGPD Rape Prevention Officer Jack Lovelace. There was no testimony about Lovelace's subsequent termination from the LGPD for threatening and inappropriately sexualized conduct, because investigators kept that evidence hidden from the prosecution, Talley, his trial counsel, and the judge and jury.

36.    Talley went to trial on the first rape charge just four months after his arrest. The evidence against Talley consisted of the victim's identification testimony and Detective Price's perjured testimony bolstering the credibility and accuracy of the victim's identification of Talley. Olinger and Price concealed the exculpatory evidence that the victim had previously identified another man as her assailant, and that she was extremely intoxicated at the time of her assault.

37.    A mostly white jury deliberated only 15 minutes before finding Talley guilty. He was sentenced to life in prison, plus ten years. The very next day, Talley's trial on the next rape case began.  The accuracy of victim and witness identifications was once again the critical issue.

38.    Again, all exculpatory or impeachment evidence was unlawfully concealed by Olinger and Price from the prosecutor, Talley, the judge, and the jury. Talley was quickly found guilty and sentenced to another term of life imprisonment, plus ten years.

39.     Following this second conviction, wanting to spare his family the heartache of further trials and believing his situation to be hopeless, Talley pled guilty to the remaining charges and received two more life sentences for two rapes, for which he was exonerated in 2021, and two ten-year sentences for two other assaults.[1]

40.     Talley did not commit any of the sexual assaults and there was no reason to suspect him of those crimes. He would not have been convicted but for Olinger and Price, together with other LGPD personnel and investigators, subjecting him to unfair and misleading identification procedures and withholding critical exculpatory and impeachment evidence which they were bound to disclose to the prosecutor pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963).

41.     No appeal was filed on Talley's behalf, and he languished in prison. Only years later – after Talley had spent decades in prison as an innocent man – did the true facts begin to emerge.

42.     Indeed, Talley likely would have died in prison had it not been for the hard work and dedication of the Georgia Innocence Project ("GIP"). In 2004, Talley wrote to GIP and asked for their help in proving his innocence. GIP learned that biological evidence in all the cases but one had been lost or destroyed.

43.     In 2009, Court-ordered DNA testing of that biological evidence proved Talley's innocence. He was *not* the source of the male DNA in the sole remaining sexual assault evidence kit ("rape kit"). GIP pursued an Emergency Motion for a New Trial in that case. The Motion was finally granted in 2013. However, the indictment was not dismissed until years later – in February 2021.

---

[1] Talley had served these assault sentences by 2021, so they were not vacated at the time of his exoneration with respect to the rape charges. Plaintiff intends to file a motion to vacate these convictions as well.

44.     The DNA exoneration in that one case – one that was part of the series of 1981 LaGrange rapes and attacks – helped spur the LaGrange Police Department, under different leadership than was in place at the time of Talley's prosecution, to re-investigate *all* the cases for which Talley had been convicted.

45.     During the re-investigation, the GIP and the LGPD uncovered the significant exculpatory evidence that should have been disclosed to the prosecutor and Talley's defense lawyer in advance of his trial in November 1981. Based upon the additional information that was finally brought to light, the Troup County District Attorney ("DA's Office") joined in the motion to vacate Talley's convictions.

46.     On February 23, 2021, the Superior Court of Troup County entered a Consent Order Vacating Convictions and Granting Motion to Enter Nolle Prosequi ("Consent Order"). The convictions in four of the six cases in which Talley was convicted were thus vacated and declared null and void.[2]

47.     This action seeks to compensate Talley for the nearly four decades he spent in prison as an innocent man and for the continuing effects of his wrongful incarceration. In addition, through this lawsuit, Talley seeks damages for severe and traumatic bodily injuries, the contraction of diseases and chronic health issues, and other physical and personal injuries sustained by Mr. Talley resulting from his exposure to harmful prison conditions.

---

[2]  For reasons that remain unclear, the DA's Office would not consent to having the convictions in the assaults for which Talley had already served his ten-year sentences, Case Nos. 970 (ES) and 971 (Sugai), vacated, and those cases purportedly remain "under review." After nearly four decades in prison, Talley was ready to go home and agreed to the proposed Consent Order that vacated the four rape convictions and provided for his immediate release. No evidence whatsoever suggests that Talley had any knowledge of or role in the assault of ES. With respect to the Sugai conviction, Talley is not guilty of the felony assault of which he was convicted. Talley has always admitted to the underlying facts and his responsibility for what was originally alleged, and what he did – *the commission of a simple misdemeanor battery*.

## JURISDICTION AND VENUE

48.     Talley brings this action under 42 U.S.C. § 1983 for acts committed by Defendants under color of state law which deprived him of liberty without due process of law, in violation of his rights under the United States Constitution.

49.     This action arises under the Constitution and laws of the United States. This Court has original jurisdiction over Talley's federal claims pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(3).

50.     This Court has pendent jurisdiction over Talley's state-law claims pursuant to 28 U.S.C. § 1367(a) because they are part of the same case and controversy described by Plaintiff's federal claims.

51.     Pursuant to U.S.C. § 1391(b), venue is proper in the United States District Court for the Middle District of Georgia as significant events or omissions giving rise to the claims at issue in this matter occurred in this District.

## PARTIES

52.     Terry Talley is a citizen and resident of the State of Georgia. He resides in LaGrange, Georgia.

53.     Defendant City of LaGrange is a municipal corporation organized under the laws of the State of Georgia. The LaGrange Police Department ("LGPD") is, and was at all times pertinent to this action, a department of the Defendant City of LaGrange. Upon information and belief, the City of LaGrange has purchased and maintained applicable policies of liability insurance and has thereby waived governmental immunity that might otherwise be available to the City and its employees.

54.     Defendant Roy Olinger ("Olinger") is, upon information and belief, a citizen and resident of Georgia. At all times relevant to this Complaint, Olinger was employed as a Special Agent with the Georgia Bureau of Investigation ("GBI").  Upon information and belief, Olinger was assigned to the GBI Regional Investigative Office in Columbus, Georgia, and beginning on July 1, 1981, served as the lead investigator for the GBI on this case. Olinger is sued in his individual capacity for acts taken under color of state law and within the course and scope of his employment.

55.     Defendant Benny Blankenship ("Blankenship") is, upon information and belief, a citizen and resident of Georgia. At all times relevant to this Complaint, Blankenship was employed as a forensic analyst with the GBI laboratory in Columbus, Georgia. Blankenship is sued in his individual capacity for acts taken under color of state law and within the course and scope of his employment.

56.     At all times relevant hereto, in committing the acts and omissions herein alleged, each of the individual Defendants was acting within the scope of his or her employment and under color of state law.

## FACTS

## I.     TERRY TALLEY IS WRONGFULLY TARGETED AS A SERIAL RAPIST.

### Terry Talley in 1981

57.     In 1981, Talley did shift work as a millworker at Elm City Mill in LaGrange, Georgia. To earn extra money, Talley took on odd jobs and did yard work, primarily grass-cutting, in LaGrange.

58.     He would often walk the neighborhood in which LaGrange College was located and knock on doors to ask if people needed help with yard work or other odd jobs. Talley typically

11

walked or rode his bike from the "black section" of LaGrange and sought work in what was regarded as the "white section" or "white neighborhoods" of LaGrange. As a result, he was a familiar-looking figure to people who lived in that neighborhood.

59.    Prior to being the focus of investigators with LGPD and GBI with respect to the underlying criminal cases, there was nothing in Talley's background or history that would suggest he might commit such crimes. His criminal history in 1981 consisted of relatively minor theft offenses. Talley did not graduate from high school, having dropped out of school in the 10th grade.[3]

### LaGrange College and the Surrounding Community are the Site of a Number of Apparently Related Rapes and Assaults in Early 1981

60.    From February through June of 1981, the City of LaGrange was the site of a series of vicious rapes and assaults. In quick succession, one rape, another attempted rape, and other disturbing incidents occurred on or near the campus of LaGrange College. Authorities determined that a serial rapist was on the loose and were under tremendous pressure to make an arrest.

61.    Some of the rapes, assaults, and incidents occurred directly on the LaGrange College campus in February and March 1981, while the others took place off-campus, in areas adjacent to LaGrange College.[4] The later incidents occurred in April and June 1981.[5]

---

[3]  As will be explained in greater detail *infra*, some of the attacks and incidents at LaGrange College involved a degree of planning and seemed to be targeted (e.g., the assailant making efforts to ascertain in advance the names and phone numbers of victims and, in one instance, the car she drove). Compared to Talley, the culpability of the primary alternative suspect – a police officer who had attended college – was much more plausible.

[4]  The theory of prosecution was that all the attacks had been perpetrated by a single individual.

[5]  As noted above, these "off-campus" rapes occurred after LaGrange Police Department Officer Lovelace, who served as a Rape Prevention Officer at LaGrange College in February and March 1981, was dismissed from the police department on March 16, 1981.

62.    Pertinent details regarding the series of incidents occurring at LaGrange College are as follows:

### February 7, 1981: LaGrange College (Case No. 972)

A white female with the initials KW was attacked in her dorm room when a man grabbed her from behind and choked her until she was unconscious. When KW awoke, she had a pillowcase over her head. KW fought her attacker, and he fled, threatening to kill her if she told anyone. KW reported the attack ten days later and said her assailant was a young black man.

### February 21, 1981: LaGrange College (Case No. 973)

Two weeks later, a white female with the initials EB was attacked from behind in her dorm room at about 2:30 a.m. while she was sleeping. The attacker struck EB, dislocating her jaw, and then proceeded to rape and sodomize her. He placed something around her neck and choked her. The man told EB, "If you scream, I'll kill you."

**Though it was not revealed to the prosecutor or Talley's trial counsel, the crime-scene evidence included a pair of black gloves. A Sergeant with the LGPD noted that the gloves were the "same as worn by Lovelace."[6]**

### February 28, 1981: LaGrange College (unindicted)

One week later, a white female with the initials BH, another student at LaGrange College, found a note on her car windshield which read, "You're next." Shortly after finding the note, BH received a phone call from someone she described as sounding like a black male. The caller said, "I want to fuck you" and hung up. About ten minutes later, the man called again and said, "I am on my way out there now."

**Though it was not revealed to the prosecutor or Talley's trial counsel, GBI obtained latent lifts from the note left on BH's car and determined that Talley was *not* the source of the fingerprints. Additionally, it was not disclosed that a man named Ike Ikegwuonu ("Ikegwuonu") had been named a suspect with respect to this incident.**

---

[6]  At the time of the incidents occurring on the campus of LaGrange College, Lovelace was both a police officer with LGPD and a student at the college. As the Rape Prevention Officer, he had access to the dormitories which would have otherwise been restricted, and to student directories which contained personal information such as names and addresses.

63.     Pertinent details regarding the later-occurring, off-campus incidents, which were all committed after Lovelace lost his access to LaGrange College dorms on March 16, 1981, are set forth below:

<u>April 19, 1981: Private residence in LaGrange (Case No. 974)</u>

A 64-year-old white female with the initials MK was attacked at her home near LaGrange College. The assailant, a black male, choked her, put a pillow over her head, and raped her.

**Though it was not revealed to the prosecutor or Talley's trial counsel, MK was heavily intoxicated at the time of the rape. Her blood alcohol content ("BAC") was .34 several hours after the assault. Additionally, investigators failed to disclose that MK identified another man as her assailant when reviewing lineup photos. The man MK identified, Ikegwuonu, was apparently considered at one time as an alternative suspect by investigators, but this was also not disclosed to the prosecutor or Talley.**

<u>June 24, 1981: Southwest LaGrange Baptist Church (Case No. 969)</u>

This assault occurred at a church situated two blocks from MK's home, also in the vicinity of LaGrange College. A white woman with the initials EM was assaulted in the basement of the church where she was working. EM was approached from behind and choked with a rope until she passed out. EM pleaded with her attacker, and he replied, "Shut up bitch. I'm not going to kill you." She asked that he remove the rope from her neck, and he said, "You were hollering, and you scared me [so] what did you expect me to do." He cut off her clothes, punched her in the mouth, tied her wrists with her clothing, and raped her. The next day, a man identified as a black male called EM at her mother's house, where she lived, and asked, "Hey, Sugar, do you need me now?" He added, "You know what I want."

**EM never saw her assailant. Still, she was allowed to participate in a live lineup and purportedly selected Talley and three other men with similar body types to say sentences. EM allegedly then identified Talley by voice.**

<u>June 30, 1981: West Georgia Medical Center (Case No. 970)</u>

A black female with the initials ES was assaulted while cleaning the bathrooms at the Heart Clinic of the West Georgia Medical Center, near LaGrange College. The attacker grabbed ES around the neck from behind and dragged her into an adjacent library. ES described a black male with a short afro and alcohol on his breath. ES reported that he did not rape her because she was menstruating.

**The LaGrange Police Department Enlists the Georgia Bureau of
Investigation to Participate in the Investigation**

64.    Price came to the reasonable conclusion that police were dealing with a serial rapist. There were many similarities between the rapes and assaults in question. All involved aggressive, violent attacks. LGPD officials were under intense pressure to apprehend a suspect at or near LaGrange College.

65.    On July 1, 1981, the Chief of Police of the LGPD, Gary B. Shepherd, wrote to Special Agent Mike Carothers of the GBI and requested GBI's assistance in ascertaining the perpetrator of what was referred to as a "series of rapes."

66.    Upon information and belief, Olinger, then a Special Agent assigned to the GBI Regional Investigative Office in or near Columbus, was assigned to the investigation.

67.    In a memo dated July 14, 1981, Olinger reported meeting with Chief Shepherd and noted that Shepherd was "receiving a lot of pressure from the community to solve these rapes."

68.    From that point forward, Olinger worked closely with Price of the LGPD, who was assisted by detective Otis Furgerson. LGPD officers George Yates and Cecil Barentine also assisted with the investigation, at the direction of Price. Defendant Blankenship assisted with any forensic analysis requested by Olinger and the other investigators. From the moment GBI assistance was requested, Olinger and other GBI staff were intimately involved in every aspect of the investigation and eventual prosecution of Talley.

69.    From an early point in the investigation, the names of two alternative suspects surfaced: Jack Lovelace and Ike Ikegwuonu. Substantial evidence indicated Lovelace was actually involved in the crimes, and Plaintiff contends that investigators themselves believed he was actually the perpetrator with respect to the assaults and incidents in question. The evidence

15

implicating Ikegwuonu consisted primarily of his proximity to the sites of the incidents and the fact that he was identified in photo arrays, the fairness of which are unknown.

**Substantial Evidence Suggests the Involvement of LGPD Officer Jack Lovelace in the Assaults**

70.     In early 1981, Jack Lovelace was a police officer with LGPD and was also a student at LaGrange College. In his role as an officer with LGPD, Lovelace was assigned to "rape prevention duty" at LaGrange College and was granted access to the secured female dorms at the college pursuant to those duties.

71.     Lovelace was terminated from the LGPD on March 16, 1981, following a string of complaints about threatening and inappropriate behavior. With Lovelace's termination, his work as the "rape prevention officer" at the college – and his access to the female student dorms – ended. *No assaults occurred at LaGrange College after that date.*

72.     The strongest direct evidence of Lovelace's involvement in the subject assaults came with the February 21, 1981, rape of EB on the campus of LaGrange College. The assailant, in fleeing, left two black gloves at the crime-scene. A fellow LGPD officer, Sergeant Cox, noted that that the gloves were the "same as worn by Lovelace."

73.     The gloves subsequently went missing while in the custody and control of Price and Furgerson, who personally brought the gloves to GBI Columbus for a visual inspection by Blankenship, while other physical evidence in the case was delivered to the crime lab by Yates. The gloves apparently were never logged in as evidence at GBI Columbus. No record of their disposition or destruction exists.

74.     Based upon the circumstances of the investigation and Lovelace's status as a potential suspect, albeit an undisclosed and "unofficial" one, it is alleged upon information and belief that LGPD investigators either intentionally destroyed the gloves or otherwise disposed of

them such that they would not be available to the prosecutor and, later, to those working on behalf of Talley.

75.    In addition, Lovelace was *known by the LGPD* to have been in the vicinity of EB's dorm during the early morning hours of February 21, 1981. One of the incidents cited in the March 16, 1981, LGPD termination letter described Lovelace accosting a female student, Robin Rowan, outside the dorms *at 1:30 – 2:00 a.m. on February 21, 1981. EB was raped in the dorm at approximately 2:30 a.m.,* Therefore, at least as of March 16, 1981, LGPD investigators knew Lovelace had been in the vicinity of EB's dorm within an hour of her rape.

76.    Chief Shepherd's termination letter was blunt and candid regarding the misconduct on the part of Lovelace and the effect it had on the female students at LaGrange.  Shepherd told Lovelace his conduct had been "reprehensible" and noted that his actions "*created fear in the minds of some students and a concerted effort to avoid you whenever you are seen on campus*."

77.    The complaints and incidents involving Lovelace were long-running and, frequently, of an extremely disturbing nature. Lovelace was aggressive and overtly sexual in his interactions with female students. He used the same language as the assailant (e.g., using the term "sugar" and asking a young coed, "are you going to be quiet or am I going to have to gag you").

78.    In light of the incidents of misconduct involving Lovelace, which increased in frequency in early 1981, he never should have been assigned as the rape prevention officer or in any other role at LaGrange College. The City of LaGrange and LGPD should have determined – prior to February 1981 – that Lovelace was unfit to serve as a uniformed officer, let alone as the "rape prevention officer" at a college. There were complaints in 1980 of female students' fear of Lovelace and wariness of his "strange ways."

79.    Moreover, in February and into March 1981, Lovelace was reportedly drinking heavily, spiraling under personal and professional crises, under a great deal of emotional distress, and acting irrationally.

80.    The incidents that should have prompted investigators to fully explore Lovelace as a suspect in the series of rapes, assaults, and related incidents include the following:

- Beginning in early 1981, Lovelace was experiencing a great deal of distress and discord in his personal life, reporting that his wife and family had left him. Two fellow LGPD police officers noted concerning comments by Lovelace. One officer, Brenda Holston, reported Lovelace saying "he feels like killing himself" because he was "lovesick." Lieutenant Donald Scott reported that Lovelace asked not to work alone and "then he stated that he was afraid, he did not say at what."

- During the third week of February 1981, Lovelace entered an instructor's office at LaGrange College where student Sheila Ware was making a phone call. Lovelace shut the door, placed his hands on her back and shoulders without consent, and told her he wanted her to come home with him, telling her, "I have a bottle of wine and we could make love."

- Lovelace was known to be in the area of EB's dorm room near the time she was raped. Another student, Robin Rowan, filed a complaint against Lovelace for his actions at approximately 1:30 – 2:00 a.m. on the same date. The complaint submitted by Rowan placed Lovelace in the dorm, just 45 – 60 minutes before EB was raped. Rowan reported that Lovelace had made improper advances toward her as she walked from her car to Turner Dormitory.

- Black gloves were found in the dorm room of EB after she was raped on February 21, 1981. Another police officer with LGPD noted that the gloves were "the same as worn by Lovelace."

- During this same time period, there were complaints about Lovelace being intoxicated and pawing at women. On February 23 or 24, 1981, just days after the first rape at LaGrange College, Lovelace was "in a drunken condition" at the Student Center, "acting strange," and grabbing at females, according to the report of a LaGrange College student. It was reported that Lovelace would approach a female and "grab at her," and that as a result of his conduct "the girls try to avoid him whenever they see him on campus."

- On March 3, 1981, an administrator at LaGrange College complained to LGPD about Lovelace's conduct while attending classes at the college. The next day, Judy Burdette, an instructor at the college, was interviewed and reported (i) that she had detected alcohol on Lovelace's breath in class; (ii) that she had seen an instance of an unwanted

touching by Lovelace; and (iii) hearing female students "say Lovelace is a pest and *they are afraid of him*."

- On March 6, 1981, Lovelace approached Ware in a room at Pitts Dormitory on the campus of LaGrange College and told her: "Today, I'm going to get some of your sugar." He then put his hands on her neck and shoulder and said, "Are you going to be quiet or am I going to have to gag you?" Ware escaped the room and reported the incident to LGPD that same day.

- On March 6, 1981, two students reported to police that a black male was seen running from the dormitories, getting in a car with Lovelace's license plate, and speeding away. The students were "alarmed" by Lovelace's actions.

- Lovelace was written up on March 6, 1981, because he had gone to two separate women's dorms at LaGrange College "looking for" a female student who had lodged a complaint against him. The LGPD supervisor noted that "[s]tudents that saw you became alarmed by your actions."

81.    There were other alarming incidents involving Lovelace in the months leading up to the series of rapes and assaults in LaGrange. On June 17, 1980, Lovelace had been placed on five days' suspension following the substantiation of a complaint filed by his girlfriend, Stephanie Boyd, that Lovelace entered her residence without permission and caused a disturbance.

82.    In yet another incident involving Lovelace and Boyd, a LaGrange College student who had gone with Lovelace to his house reported that he showed her how to use a gun and left the gun out during a heated exchange with Boyd after Lovelace told Boyd that "he had a girl in his house." The student, Loretta Smith, reported to LGPD Internal Affairs that she "believes Lovelace had planned for her to shoot Mrs. [sic] Boyd." Smith added:

[S]he is afraid of him [Lovelace] and so are the other girls who have knowledge of his strange ways.

83.    Additional incidents involving Ms. Boyd occurred during the time frame in which Lovelace reported being afraid to work alone and that he was both suicidal and "lovesick." These other incidents included the following:

- At approximately 3:00 a.m. on February 27, 1981, police were called to Ms. Boyd's residence in response to a report that Lovelace had entered her home by force, cursed Ms. Boyd, and threw alcohol on her personal effects.

- Police were again called to Ms. Boyd's residence on March 3, 1981, in response to aggressive conduct on the part of Lovelace in which he purportedly confronted a man named Willie Swanson and "pulled Miss Boyd from [Swanson's] auto."

84.    A number of the attacks, particularly those occurring at LaGrange College or involving persons with a connection to the college, seemed to be targeted and *not* random. In some instances, the perpetrator had the wherewithal and made the effort to ascertain names and phone numbers of his victims.[7] The following facts suggest targeted attacks:

- The perpetrator left a note reading "You're next" on the windshield of LaGrange College student BH's car on February 28, 1981. That day, BH received two calls from someone she believed to be a black male. First, he said, "I want to fuck you." He called ten minutes later to say, "I am on my way out there now."

- The day after the June 24, 1981, rape of EM, a man described as a black male called the house where EM lived with her mother and said, "Hey sugar, do you need me now" and "you know what I want."

- On the night of the EB rape on February 21, 1981, a black male abruptly entered the dorm room of another LaGrange College student, who was naked after having showered. The man, who fit the general description of the assailant, excused himself, saying he had the wrong room. This student resided in Room 105 of Turner Dorm. EB was in Room 205 of that dorm.

### Special Agent Olinger and Detective Price Focus on Terry Talley

85.    Following the campus sexual assaults, the next incident occurred on April 19, 1981, when a 64-year-old woman was bound and raped in her home. Then, on June 24, 1981, a 28-year-

---

[7]  As a student at LaGrange College, Lovelace would have had access to student directories with the addresses and phone numbers of his fellow students. It bears repeating that Talley was excluded as the source of the latent lifts obtained from the note left on BH's car. For reasons that are not yet clear, the latent lifts were not compared to Lovelace's fingerprints. Plaintiff alleges on information and belief that the decision to not check the latent lifts against Lovelace was made in furtherance of the effort to steer the investigation away from Lovelace and to focus on Talley for crimes that investigators believed Lovelace had committed.

old woman and former student at LaGrange College—who appeared on the same yearbook page as Lovelace—was brutally attacked and raped in a church basement.

86.    While the police investigation purportedly continued, LGPD had made no arrests in connection with the series of attacks.

87.    On July 21, 1981, Talley knocked on the door of a woman named Yoiko Sugai ("Sugai") with the intent of offering her money for sex. He had done the same thing on April 10, 1981, after being told that Sugai provided sex in return for payments.

88.    During that April 10, 1981, encounter, Talley believed there was a misunderstanding due to a language barrier and attempted to step inside Sugai's house. In so doing, he placed his hand on her arm. Sugai and her minor child became upset, and Talley left.

89.    When Talley returned to Sugai's home on July 21 to offer money in exchange for sex, Sugai did not answer the door, and Talley left the residence without incident. Unbeknownst to Talley, Sugai had alerted a neighbor that there was a black man on her porch and the neighbor called police.

90.    Sugai's reaction was likely a product of the hysteria in the community regarding the serial rapes and assaults. There was nothing threatening or aggressive regarding Talley's conduct on her porch. He simply knocked on her door. Notably, Sugai had not called the police or lodged any sort of complaint following their April 10, 1981, interaction.

91.    Following his July 21, 1981, visit to Sugai's residence, Talley was picked up by the police while riding his bicycle in the neighborhood. It was only then that Sugai reported that Talley had entered her home on April 10, 1981, offered her money for sex, and placed his hand on her arm when she declined.

92.    The April 10, 1981, incident with Ms. Sugai – *to which Talley has always consistently admitted* – bore no resemblance to the series of brutal and vicious rapes and assaults which had plagued LaGrange College and the surrounding community. There was no objective reason to suspect Talley as the serial rapist. He had no history of violence against women.

93.    Talley was arrested on July 21, 1981, and charged with simple battery, a misdemeanor, in connection with the April 10, 1981, Sugai incident. He was questioned by Price and Olinger and voluntarily provided samples of saliva, blood, and head and pubic hairs. During questioning, Talley was candid and truthful: he admitted to offering Sugai money for sex and grabbing her arm but denied ever assaulting or raping anyone.

94.    The next morning, the local newspaper ran a story on page 1 stating that Terry Talley, a man known in the neighborhood as someone who went door to door on his bicycle asking for work cutting grass, had been arrested for *attempted rape*. Furgerson told the newspaper that the victim saw Talley "riding a bicycle in her neighborhood," and that he had "asked about doing some yard work."

95.    The article, based on statements made by Furgerson, stated that Talley had "grabbed her [Sugai] by the arm and forced her inside her apartment," and that "she was able to escape and ran from the house."   None of this was true, but it created the impression that Talley, the "man on the bicycle," was the person responsible for the rapes.

96.    The same day, Agent Olinger had Talley transported to Atlanta for a polygraph examination at the GBI's Polygraph Office. During the pre-testing interview, Talley once again admitted to the truthful facts surrounding his interactions with Sugai. He did likewise during the polygraph examination and *Talley's responses were deemed truthful*.

97.    Notably, Olinger and Price did *not* subject Talley to a polygraph exam with respect to the series of rapes and assaults they were investigating. No reasonable explanation for this has ever been provided.

98.    At that point, Talley had agreed to everything investigators had asked – repeated questioning, provision of hair and biological samples, and a polygraph examination at the Atlanta GBI office. Talley was not represented by counsel.

99.    No physical evidence linked Talley to any of the rapes, assaults, or incidents under investigation. Talley had been forthright regarding his interaction with Ms. Sugai. He passed a polygraph examination about that encounter.

100.    Despite this, Agent Olinger and Detective Price intentionally and/or recklessly conducted a series of unduly suggestive lineup and identification procedures that resulted in the fabrication of inculpatory evidence against Talley.

101.    For example, before conducting any of these identification procedures, Olinger and Price, upon information and belief, had authorized the issuance of the press release to the local paper asserting that Talley had been arrested for an attempted rape even although the arrest was for a misdemeanor assault, and identifying him as the person who rode a bicycle around the neighborhood asking to do yard work. Upon information and belief, issuance of this press release was done with the knowledge and assent of Price and her superiors with the City of LaGrange and the LGPD.

102.    LaGrange was a small community and was obsessed with the serial rapist.  The article appeared in the local paper and was no doubt eagerly read, especially by the victims of the attacks. Needless to say, when Olinger and Price showed Talley's photos to victims and witnesses the next day, Talley looked familiar as a result of his walking, riding his bike, and working in the

neighborhood, and they confirmed what law enforcement had told the media, and what they had read in the paper: Talley was the rapist. Case closed.

### Olinger and Price Conceal Exculpatory Evidence Regarding the Purported Identification of Talley

103.    On the morning of July 23, 1981, one day after Talley had passed the polygraph about the April 10, 1981, Sugai incident, lead investigators Olinger and Price arranged for a series of live lineup procedures at the LaGrange Police Department.

104.    Though Olinger and Price failed to keep and preserve proper records of the lineups and identification procedures they implemented, the limited documentation that does exist demonstrates the exculpatory evidence created by those procedures.

105.    Upon information and belief, Olinger and Price made no attempt to ensure that Talley was displayed in a lineup with individuals who fit the general description of the assailant as provided by victims. The others in the lineup were of greatly varying heights, body sizes, hairstyles, and skin colors.

106.    As described above, the circumstances of the attacks, where victims were suddenly physically attacked from behind and their vision completely obstructed, made any reliable visible identification difficult, if not impossible.

107.    Indeed, two of the victims *did not physically identify Talley in the lineup at all*, but allegedly identified him only by voice. One other witness described Talley as *resembling* a man near Southwest LaGrange Baptist Church on the day of the EM rape but noted her doubts. A notation on a police record related to the lineups states that the witness "*thinks #2 – not positive.*"

108.    Based solely upon these "identifications" of Talley as the perpetrator of the rapes and attacks on MK, EM, and ES, Olinger and Price lodged charges against Talley with respect to those assaults on July 23, 1981.

109.    The day after that lineup, on July 24, 1981, Talley's fingerprints were compared to the latent lifts from the note left on BH's car. GBI determined that the prints did *not* match Talley.

110.    On July 28, 1981, witness Evangeline Robinson viewed a lineup with Talley in it. She made no identification.[8]

111.    That same day, July 28, 1981, Olinger and Price charged Talley with the attempted rape of KW on February 7, 1981, even though no evidence supported that charge.

112.    On July 29, 1981, a lineup procedure was conducted for EB. By this time, however, EB had seen the extensive media coverage regarding Talley's arrest as the serial rapist. Not surprisingly, EB purportedly picked Talley out of the lineup.

113.    All told, Talley was charged with the following offenses: (i) the February 7, 1981, assault of KW; (ii) the February 21, 1981, rape and assault of EB; (iii) the April 19, 1981, rape and assault of MK; (iv) the June 24, 1981, rape and assault of EM; and (v) the June 30, 1981, assault of ES. Additionally, the charge against Talley with respect to the Sugai incident was upgraded from the original misdemeanor charge of simple battery to the felony charges of aggravated assault and attempted rape.

114.    Talley was arrested and seized pursuant to legal process that violated his constitutional rights. No probable cause supported his arrest and seizure on the rape and assault charges described in this Complaint.

115.    Olinger and Price knew the purported identifications of Talley as the assailant in these cases were unreliable but did not provide that information to the prosecutor. Facts

---

[8] Robinson resided in a dorm room, Turner 105. Shortly before the February 21, 1981, rape of EB – in Turner *205*, a black male had burst into her room. He then quickly excused himself, saying that he had "the wrong room." This was further evidence that the rapes were targeted and premeditated. The presumption, of course, was that Robinson had an interaction with the perpetrator of the EB rape shortly before it occurred.

undermining the reliability of the purported lineup identifications, which were known to Olinger and Price but concealed from the prosecutor, included the following:

- Before victim ES picked Talley out of a lineup, she first identified alternative suspect Ikegwuonu as the perpetrator.

- Another employee working at the hospital where ES was assaulted, Bobbie Spence, also identified Ikegwuonu as the man she had seen in the vicinity prior to the attack.

- ES told police she had seen her assailant outside the hospital prior to the attack with a white or cream-colored bicycle. Investigators knew Talley had a red or maroon bike (they had seized his bike).

- Two witnesses in the area of MK's house and the Southwest LaGrange Baptist Church picked out Ikegwuonu as someone who had been in the area and acting suspiciously around the time of both attacks.

- Victim MK had a blood alcohol content of .34 – more than three times the legal limit of intoxication – at the time her blood was drawn at the hospital following the reported attack on her.

- MK identified a photo of Ikegwuonu as her attacker before she allegedly picked Talley out of a lineup.

- Victim EM never saw her attacker because she was blindfolded, yet she purportedly picked four men out of a lineup as resembling her attacker's general size. The four were then told to speak certain sentences and EM purportedly identified Talley by voice.

116.    These facts, which cast doubt on the accuracy of the purported identification of Talley as the perpetrator – *and which constitute either exculpatory or impeachment evidence which investigators were bound to disclose* – were instead kept hidden from the prosecutor, and therefore from Talley's trial attorney.

117.    The cases against Talley proceeded to trial with no disclosure to the prosecutor of either the flaws in the identification procedures or the fact that victims and witnesses had previously identified someone other than Talley – another alternative suspect – as the perpetrator.

118.    Tellingly, none of the victims or witnesses were ever shown a photo of Officer Lovelace by Olinger or Price, nor was he ever placed in a live lineup or asked for a voice exemplar.

### The District Attorney's Files Did Not Contain Exculpatory Evidence

119.    At trial, Talley was represented by court-appointed counsel, Lee Hasty. Though the cases were set for trial a mere four months after Talley's arrest, Hasty did what he could to ensure that he received all the materials that law enforcement officers were obligated to disclose to the District Attorney.

120.    On September 11, 1981, Hasty served discovery motions by which he sought copies of any scientific reports related to the investigation. Hasty also sought statements of witnesses, investigatory materials, and any information that arguably had exculpatory or impeachment value.

121.    Though Hasty was not required by law or court procedure to do so, Hasty served and filed a discrete motion seeking any such evidence (hereafter, "*Brady* Motion").

122.    With his *Brady* Motion, Hasty expressly sought the complete investigative files of any law enforcement agency or individual involved in the investigation of the subject crimes. He also sought the names and addresses of any involved law enforcement officer.

123.    Notwithstanding Hasty's pre-trial efforts to ensure that investigators complied with their disclosure obligations, LGPD and GBI personnel and officials, including Olinger and Price, failed to identify and produce significant pieces of impeachment and exculpatory evidence to the District Attorney.

124.    Hasty specifically raised the issue of exculpatory evidence with the trial court in a hearing conducted on November 6, 1981. In a lengthy colloquy between Hasty, Judge Joseph C. Jackson, and District Attorney A.E. Mallory ("DA Mallory"), the following was made clear: (i) Hasty expressed concern that law enforcement officers had not fully complied with *Brady*; (ii) DA Mallory represented that the prosecution file had been made available to Hasty; (iii) investigators had not informed DA Mallory that a polygraph exam of Talley had been conducted; and (iv)

Mallory, an officer of the court, assured Hasty and Judge Jackson that he would make inquiry of

investigators and have them produce anything that had not yet been disclosed.

125.    Pertinent parts of the exchange regarding pre-trial discovery obligations are set

forth below:

Mallory:        To my knowledge, there was not one [a polygraph exam]. We can ask the
                investigating officers. *Mr. Hasty has seen the entire file and he's welcome
                to see it again*. That's all I have.

                                    . . .

Hasty:          Also, Your Honor, I'd like to point out to the State that on September the
                11th of this year a request for discovery was filed and served on the State
                and the State replied to that request on November 4th, they filed all the
                material they had early this week.

                                    . . .

Mallory:        *I received it [discovery motions] and a member of my staff took a copy of
                my entire file to him shortly thereafter*. I believe that's the entire file I had,
                I believe that's correct.

                                    . . .

The Court:      Has there been any new information, have you turned everything in your
                file over to him?

Mallory:        Your Honor, *I've made available everything to Mr. Hasty as I received it*.

(Pre-Trial Motions Hearing, Troup Co. Superior Court, Nov. 6, 1981) (emphasis added).

126.    Based upon the representations of DA Mallory, the trial court noted that the

prosecutor had complied with the pre-trial motion for disclosure of evidence favorable to the

defendant. (T p. 13.)

127.    The hearing revealed that the Troup County District Attorney's Office and DA

Mallory adhered to the practice of "open file" discovery and had made available to Hasty all

investigatory materials provided to them by law enforcement officers. Significantly, with regard

to the one item which Hasty specifically represented to the court he knew nothing about – a report related to a polygraph of Talley – *this report was not in the DA's file*.

128.    In spite of Hasty's best efforts to ensure that investigators complied with their obligations under *Brady*, Olinger and Price and all personnel involved in the prosecution continued to withhold critical pieces of evidence from the prosecutor. As a result, Talley was deprived of fair trials.

## II.    TERRY TALLEY IS UNJUSTLY CONVICTED.

### Talley is Twice Deprived of a Fair Trial

129.    The first case called for trial involved the April 19, 1981, rape of MK at her home. The one-day trial was conducted on November 9, 1981.

130.    At the beginning of trial, Hasty noted the discovery that had been provided to him: (i) a GBI Division of Forensic Services report dated August 1, 1981; (ii) a LGPD incident report on the complaint of Sugai; and (iii) a LGPD incident report on the complaint of MK.

131.    The only witnesses at this trial were the victim, MK, and LGPD officer Barbara Price.

132.    MK testified on direct examination that she identified Talley by his voice and his size. (T p. 20.) On cross-examination, MK acknowledged that she was only able to identify Talley as her attacker by his voice, which she characterized as "a common voice" and "[not] an unusual voice." (T pp. 24, 27-28.) MK further admitted that she did not get a good look at her assailant because "he kept his face hid" and was wearing sunglasses. (T p. 33.)[9]

133.    On two separate occasions while on the stand, MK struggled with the identification of Talley as her assailant. Indeed, she picked two men out of a photo array – neither of whom was

---

[9]  Though there are no photographs or records of the procedure, Price arranged for Talley to be viewed wearing sunglasses in an effort to have MK and other witnesses identify him.

Talley – as looking like her attacker. Of course, Talley was in the courtroom, just feet away from her at the time.

134.    The defense strategy at trial was to show that Talley had been misidentified. Hasty did not know, nor could he have known, of critical evidence that would have eviscerated MK's mistaken testimony that Talley was her assailant. Hasty did not know that: (i) MK had previously identified Ikegwuonu as her rapist during a pre-trial photo array; and (ii) MK was extremely intoxicated at the time of the rape, with a blood alcohol content of .34.

135.    MK's mistaken identification of Talley and Hasty's inability to properly challenge that testimony were compounded by the fact that Price repeatedly offered false testimony at trial. Price perjured herself in telling the jury that: (i) MK had *not* previously identified anyone else as her rapist; (ii) her purported identification of Talley in a lineup at LGPD was the "first time" MK had made an identification; and (iii) there was no reason to doubt that MK made an accurate identification. Upon information and belief, she had told the DA the same thing when he was preparing her to testify.

136.    Price's false testimony was elicited primarily on direct and re-direct examination, with DA Mallory questioning her. Had he known the true facts, Mallory would not have elicited this false testimony. He elicited this false testimony, which bolstered the identification and the credibility of MK, because he too had been misled by Price about the circumstances surrounding MK's identification of Talley.

137.    As Mallory noted during a hearing, with no objection by defense counsel, he adhered to "open file" discovery, had made the prosecution file available to Hasty, and would continue to do so. Quite simply, the facts make clear that Mallory had been misled by Price *before she took the stand*.

138.    Price, when asked if MK had ever identified her assailant during pre-trial reviews of photo arrays, testified she had not.

139.    That testimony was false. Though the truth would only become apparent many years later, MK had, in fact, previously identified Ikegwuonu as her attacker.

140.    Hasty was deprived of critical evidence with which to impeach the identification testimony fully and properly because the District Attorney had not been informed that MK had previously identified someone other than Talley as her attacker.

141.    Price provided false testimony on this point on another occasion, again stating that MK had only identified Talley as her assailant and that such identification was made pursuant to the lineup in which Talley participated on July 23, 1981.

Q:    When was the first time that [MK] made any identification of the person who raped her?

A:    When we had a personal lineup at the LaGrange Police Department.

(T p. 39.)

142.    That testimony was false. According to the more complete version of investigative reports – the ones obtained by GIP during efforts to prove Talley's innocence *that were not in the DA's files* – MK had affirmatively identified Ikegwuonu as her assailant. Again, Hasty did not have the benefit of this information at the time he questioned MK and Price at trial.

143.    Price also offered false testimony when repeatedly asked by the DA about MK's condition after the rape and whether there was any reason to question the accuracy of her recollection. The DA, unaware of the true facts concerning MK's intoxication (because this had been concealed from him by Defendants) and that Price would lie on the stand, elicited testimony which bolstered the identification. Pertinent portions of the trial transcript are set forth below:

Q:    [D]id you have any reason to doubt that [MK] was making an accurate and correct identification?

A:    No, sir, I did not.

Q:    Based on your observations of [MK] immediately after the crime of rape and aggravated assault, and based on your talking with her immediately after the in-person identification, did you have any reason as a result of comparing those two situations to think that she might not have made a correct and true identification?

A:    No, sir, I did not.

Q:    In your opinion, based on all the observations you made as the chief investigating officer in this case, and based on your experience in the past in dealing with victims of rape and aggravated assault, was there any question in your mind or any reason for you to think that [MK] was not making a correct identification?

A:    No, sir.

(T pp. 51-52.)

144.    Price's testimony was false in that she knew MK was impaired at the time of the rape. Her blood alcohol content was .34, more than three times the legal limit for intoxication.

145.    The District Attorney would not have elicited this false testimony about MK's ability to make an "accurate and correct identification" if he had been informed by Price that MK was seriously intoxicated. But Price concealed this critical fact from Mallory.

146.    The fact of MK's intoxication was not revealed until GIP obtained the more complete investigative reports – *which were not in the DA's files* – pursuant to their work on Talley's behalf. The records obtained included Olinger's GBI investigative file which set forth previously undisclosed facts concerning both MK's intoxication and her prior identification of Ikegwuonu as her assailant.[10]

---

[10]   Special Agent Olinger's GBI investigative file was first provided to any lawyer or representative of Talley in 2006. A cover page for the file, initialed and dated by Defendant Olinger and his supervisor in 1981, contains a section reading "Case Distribution/Date." The only outside person or entity listed is GIP with the date of August 24, 2006. Olinger's GBI investigative file, containing exculpatory and impeachment

147.    Other undisclosed information in Olinger's GBI file included substantial evidence implicating Lovelace in the rapes in question, other alternative suspects who were questioned, and the fact that Talley's fingerprints were not a match on the "You're next" note left for BH.

148.    The jury reached its verdict in the MK case after just 15 minutes, finding Talley guilty of both counts – rape and aggravated assault. He was sentenced to life in prison on the rape verdict and an additional ten-years imprisonment on the assault conviction.

149.    The very next day, Talley went to trial on the charge for the June 24, 1981, rape of EM. Price, Furgerson, and Blankenship were among the prosecution witnesses who testified.

150.    No physical evidence tied Talley to EM or her rape. The case hinged on identification testimony provided by the victim and witnesses who reported seeing a man who allegedly looked like Talley near the Southwest LaGrange Baptist Church, where EM was assaulted. Again, due to undisclosed exculpatory and impeachment evidence and the unduly suggestive identification procedures orchestrated by LGPD and GBI investigators, Talley did not receive a fair trial.

151.    The following exculpatory facts and circumstances were concealed by investigators from the District Attorney, and combined to deprive Talley of a fair trial for the charges of assaulting and raping EM:

- The purported identification of Talley by EM was effected through improper and unduly suggestive means. Though EM never saw her attacker, she purportedly picked him by size and then voice.

- Investigators did not disclose to the District Attorney that witnesses had initially identified Ikegwuonu, not Talley, as the person who had been seen in the vicinity of the church where EM was raped and noted that he had been acting suspiciously.

---

evidence, should have been provided to the DA (and pursuant to open file discovery, to Hasty) in advance of Talley's trials in November 1981.

- Law enforcement officers failed to disclose the substantial evidence indicating that Jack Lovelace was responsible for the rapes in question.

- Evidence that Talley's fingerprints had been compared to latent lifts from the "You're next" note and that he had been excluded as the source of those prints was concealed from the prosecutor.

- Investigators did not disclose to the prosecutor that an LGPD officer was of the opinion that gloves left at the scene of the EB rape belonged to Jack Lovelace.

- Investigators did not disclose to the District Attorney that numerous other individuals had been considered suspects in the EB rape.

152.    On November 11, 1981, following a two-day trial, Talley was convicted on both counts – rape and aggravated assault. Again, Talley was sentenced to life imprisonment on the rape charge and ten years for the assault conviction.

### Following the Back-to-Back Guilty Verdicts and Life Sentences, Talley Pleads Guilty to the Remaining Charges

153.    Talley was a life-long resident of LaGrange, Georgia. His family was with him for support during the two trials held the week of November 9, 1981.

154.    The two quick trials and guilty verdicts against him were devastating for Talley and his family and friends. Talley was despondent and believed his situation was hopeless.

155.    To save his family the heartache of watching him face further trials and what he viewed as inevitable (though wrongful) jury verdicts against him, Talley decided to plead guilty to the remaining charges.

156.    On November 11, 1981, Talley pled guilty in the four remaining cases:

- Case No. 972 – aggravated assault in connection with the February 7, 1981, assault of KW at LaGrange College.

- Case No. 973 – aggravated assault, aggravated sodomy, and rape in connection with the February 21, 1981, assault of EB at LaGrange College.

- Case No. 970 – aggravated assault in connection with the June 24, 1981, assault of ES at the West Georgia Medical Center.

- Case No. 971 – aggravated assault in connection with the April 10, 1981, incident with Sugai.

157.    On November 11, 1981, Talley was sentenced to two more life sentences in Case No. 973, ten years each for the assaults in Case Nos. 972 and 970, and ten years on the felony charge arising from the April 10, 1981, incident with Ms. Sugai, which was originally charged as a misdemeanor.

158.    Talley did not understand that he had a right to appeal, and no appeal was filed.

III.    **EFFORTS TO PROVE TALLEY'S INNOCENCE.**

**Talley Enlists the Help of the Georgia Innocence Project**

159.    In 2004, Talley wrote to the Georgia Innocence Project and asked for help in proving his innocence. GIP accepted Talley's case and promptly undertook efforts to obtain all relevant investigatory materials and to ascertain the whereabouts of the physical and biological evidence obtained in the underlying cases.

160.    GIP diligently and dutifully sought records and information about the whereabouts of any remaining evidence from every agency or entity that might have such records or information: LGPD, GBI, the Troup County DA's Office, and the Troup County Clerk's Office.

161.    Chain of custody and property control documentation was sparse. Records related to the transfer and disposition of evidence, particularly with respect to LGPD – the entity primarily responsible for the safekeeping of crime-scene evidence in the underlying cases – were missing or incomplete. GIP staff and attorneys found it exceedingly difficult to piece together what investigators did with evidence once it had been collected.

162.    Items of physical evidence that should have been in the possession of the City of LaGrange and/or the LaGrange Police Department could not be located. Chain of custody

documentation for such evidence was missing or incomplete. Documentation related to any destruction or disposal of physical evidence was nowhere to be found.

163.    The same proved to be true with respect to the GBI. Documentation was sparse and reports regarding transfers and disposition of evidence were varied. Items of evidence which appear to have been last under the custody of the GBI can no longer be found and were presumably destroyed without proper authorization or notice to Talley.

164.    The City of LaGrange ("City"), the LGPD, and the GBI lacked appropriate safeguards, policies, and procedures needed to properly store, safekeep, and maintain physical evidence and investigatory records related to criminal investigations. Those failings impeded GIP's efforts to prove Talley's innocence, and he spent additional years in prison because evidence which could have been used to exonerate him had been lost or destroyed, often with no record related to its ultimate disposition.

### GIP Learns that all Biological Evidence Except for One Rape Kit has been Lost or Destroyed – But the Remaining Evidence Exonerates Talley

165.    In 2007, GIP learned that the Troup County Clerk of Court had retained custody of a sexual assault evidence kit ("rape kit") from the EM rape investigation and trial.

166.    At the time of Talley's trial for the rape of EM, scientific testing of the rape kit confirmed the presence of sperm. It proved the act, but nothing else. DNA testing was not yet available.

167.    GIP pursued a motion on Talley's behalf to have the rape kit evidence subjected to DNA testing. That motion was granted in 2008. Testing at a private lab in Virginia proved that Talley could not have been the perpetrator – he was *not* the source of the male DNA detected in the EM rape kit.

168.    With the benefit of the DNA testing from the EM rape kit demonstrating that Talley was not the serial rapist responsible for the rape of EM, GIP filed an Emergency Motion for New Trial ("EMNT"). That motion was granted in 2009, with the conviction in the EM case being vacated.

169.    Though the conviction in the EM case was vacated, the indictment was not dismissed. That charge remained pending against Talley until February 23, 2021. Additionally, because no other biological evidence had been preserved by Defendants, GIP was unable to prove Talley's innocence in the other cases through DNA testing.

**GIP Learns of the Alternative Suspects
and other Undisclosed Exculpatory and Impeachment Evidence**

170.    In addition to seeking any existent physical or biological evidence remaining from the underlying cases, GIP also sought all investigatory reports and related documentation. These efforts would result in the first occasion on which any lawyer or representative for Talley learned of the substantial body of exculpatory and impeachment evidence investigators had uncovered yet concealed.

171.    GIP obtained more complete records that had been created by the LGPD and the GBI investigators at the time of the underlying rape and assault investigations in 1981. These records – including LGPD investigative reports, supplemental reports, incident reports, the GBI investigative file, and witness interview summaries and witness statements – had not been disclosed to the prosecutor or Talley's trial counsel in advance of his trials in November 1981.

172.    Through these efforts, GIP learned that Price and Olinger, as well as other LGPD officers, had developed evidence implicating other persons as the perpetrators of the assaults and rapes with which Talley was charged. This exculpatory and impeachment evidence should have

been disclosed by Price and Olinger in 1981, but it was not. As a result, Talley was subjected to an unjust prosecution and fundamentally unfair and flawed trials.

173.    Most significantly, GIP learned of the substantial evidence implicating two alternative suspects. One of them, LGPD Officer Lovelace, had been the subject of numerous complaints of inappropriate, aggressive, and sexualized misconduct at the time of the campus rapes. As an LGPD officer assigned to LaGrange College on "rape prevention duty," Lovelace had access to the women's dorms where some of the assaults and other incidents occurred. Additionally, as a student at the college, he had access to the student directories with the names and contact information of several of the victims who were specifically targeted by someone with that information. The other suspect, Ikegwuonu, was identified as being the assailant or being in the area near the time of the assaults.

174.    Additional information that was not disclosed in advance of trial but was later learned by GIP included the following: (i) Lovelace was terminated by the LGPD for "reprehensible" conduct; (ii) Lovelace exhibited odd, concerning behavior and indicated to fellow officers that he was suicidal, "lovesick," and scared to work alone; (iii) Lovelace was reported to grab female students and a number of them tried to avoid him due to the fear and discomfort his presence evoked; and (iv) a pair of gloves found at the site of one of the campus rapes was noted to belong to Lovelace by a fellow LGPD officer.

175.    The new evidence discovered by GIP constituted exculpatory and impeachment evidence and, pursuant to *Brady* and its progeny, the law enforcement officers involved in the investigation and prosecution of Talley were duty-bound to disclose it to the prosecutor so that the evidence would have been provided to Talley's trial counsel.

176.    The *Brady* evidence that was withheld by Defendants was material and substantial and its disclosure would have altered the outcome of the prosecution in Talley's favor. Indeed, the undisclosed evidence provides probable cause to investigate Lovelace, not Talley.

177.    No reasonable law enforcement officer would have initiated charges against Talley in light of the substantial evidence implicating Lovelace without conducting a comprehensive investigation of Lovelace. An honest and proper review of the known facts would have compelled a full investigation of Lovelace for the subject rapes and assaults.

## IV.    TALLEY IS EXONERATED YEARS AFTER HE SHOULD HAVE BEEN.

### Talley's Pro Se Habeas Petition Fails

178.    On July 14, 2008, Talley filed a pro se habeas petition in which he again proclaimed his innocence.

179.    Because exculpatory evidence was concealed from him despite valid requests from the GIP, Talley lacked the evidence needed to successfully prosecute his habeas petition, and it was therefore denied in late 2008.

180.    Defendant City and its agents, with knowledge of the substantial exculpatory evidence which had been unlawfully concealed from Talley in advance of his criminal trials, took no action to right their wrongs or to enable Talley to have a fair hearing of his habeas petition. Defendant City and its agents thereby unlawfully interfered with Talley's right of meaningful access to the courts.

181.    When Defendant City and its agents denied Talley a meaningful chance to pursue habeas relief to which he was entitled in 2008 and his habeas petition was denied as a result, Talley suffered additional injuries, including physical injuries, mental anguish, embarrassment, humiliation, and emotional distress, as he continued to languish in prison despite his innocence.

**Talley Remains Incarcerated Despite a DNA Exoneration**

182.    The EM rape kit was located at the Troup County Clerk's Office on or about March 13, 2007.  However, the GBI Crime Lab was inadequately equipped to perform the required DNA testing on the kit.

183.    DNA testing of the EM rape kit in 2009 confirmed that Talley was not the source of the male DNA identified in the rape kit – he was not the perpetrator of the EM rape, which was one of a series of rapes and attempted rapes. The report from the private lab in Virginia, SERI, referenced above at ¶ 167, was issued on May 6, 2009.

184.    The exonerating DNA testing would have been conducted before the 2008 pro se habeas petition was filed but for the failures on the part of Defendant City to promptly and accurately provide information regarding handling, storage, transmittance, and the status of evidence from the underlying investigation in response to GIP inquiries in 2005, 2006, and 2007.

185.    When the exonerating DNA results were made known in May 2009, those results were shared with Defendant City and its agents. At that point in time, Defendant City and its agents were well aware that the EM rape was one of a series of rapes or attempted rapes that also included the following:

- February 7, 1981, attempted rape of KW (Case No. 972).

- February 21, 1981, rape of EB (Case No. 973).

- April 19, 1981, rape of MK (Case No. 974).

- June 30, 1981, attempted rape of ES (Case No. 970).

186.    Thus, Defendant City and its agents knew, as of May 2009, that cause existed to have <u>all</u> of Talley's convictions set aside. Despite this knowledge, Defendant City did not

undertake a re-investigation of Talley's prosecution at that time.  Defendant City and its agents took no action to right their wrongs.

187.    When Defendant City and its agents failed to take any steps to ameliorate Talley's plight upon learning of the exonerating DNA results, Talley suffered additional injuries, including physical injuries, mental anguish, embarrassment, humiliation, and emotional distress, as he continued to languish in prison despite his innocence.

## 2012 Extraordinary Motion for New Trial

188.    On December 26, 2012, the GIP filed an Extraordinary Motion for New Trial ("EMNT") on Talley's behalf with respect to the EM conviction.

189.    The 2012 EMNT was needlessly delayed due to Defendant City's wrongful obstruction of the exoneration efforts pursued by Talley and those working on his behalf, including GIP.

190.    The EMNT was therefore not granted until February 4, 2013.

191.    Throughout its representation of Talley, which began in late 2004, GIP continually sought records and evidence from Defendant City and its agents that would aid in its exoneration efforts. Requests continued into 2015 and included a trip by GIP personnel to the GBI Crime Lab on July 15, 2015, because Defendant City and the GBI had failed to provide clear documentation regarding the chain of custody and the disposition of evidence from the underlying investigation.

192.    During the July 2015 meeting at the GBI Crime Lab, GIP learned for the first time that there existed a handwritten evidence destruction logbook, though the information it purported to convey was less than clear. GBI's Johaan Claassens cited this logbook in stating that "some" biological and physical evidence from the underlying cases may have been destroyed in 1981 or

1982. GIP was told (inaccurately) that the evidence from the MK case was purportedly destroyed on December 7, 1983.

193.     The delays and difficulties in obtaining reasonable information and documentation regarding the chain of custody and disposition of evidence directly resulted from failures to preserve and disclose information throughout the time in which GIP sought evidence and records from 2004 to 2015. These failures in that regard directly interfered with Talley's ability to have meaningful access to the courts and delayed Talley's eventual exoneration and release from prison.

194.     Because Defendant City and its agents collectively concealed exculpatory evidence and interfered with the exoneration efforts undertaken by GIP, the February 4, 2013, Consent Order on EMNT only related to the EM case and did not provide full relief to Talley. The 2012 EMNT resulted in the grant of a new trial in the EM case but he remained wrongfully incarcerated on the other charges brought against him.

**Talley Remains Wrongfully Incarcerated Despite the Grant of the 2012 EMNT**

195.     At the time Talley's EMNT was granted in February 2013, Defendant City knew that the EM case was but one of a series of rapes and attempted rapes which resulted in wrongful convictions of Talley.

196.     Defendant City and its agents rightfully considered, from the time of the underlying crimes through trial and through post-conviction proceedings, the EM rape to have been one of a series of related assaults committed by a single perpetrator, which included the following: (i) February 7, 1981 attempted rape of KW – Case No. 972; (ii) February 21, 1981 rape of EB – Case No. 973; (iii) April 19, 1981 rape of MK – Case No. 974; and (iv) June 30, 1981 attempted rape of ES – Case No. 970.

197.    The May 2009 SERI DNA results had proven what Talley had consistently maintained: that he was not the perpetrator of the serial rapes and assaults committed in LaGrange in 1981. The DNA exoneration in the EM case also called into question the only allegedly inculpatory evidence in the underlying trials and prosecution – supposed witness and victim IDs. According to investigators, EM purportedly identified Talley as her rapist. The DNA exoneration in the EM case proved that her alleged ID lacked a factual basis and should have prompted a re-investigation of the supposed ID evidence and the conduct of the underlying criminal investigations.

198.    Defendant City and its agents, at all relevant times, were aware of the exoneration efforts pursued on Talley's behalf by the GIP, and were, in fact, aware of the 2013 Order vacating the conviction in the EM case.

199.    Defendant City was reminded again as a result of the 2013 Order that cause existed to have all of Talley's convictions re-investigated and set aside. Nonetheless, Defendant City did not undertake a re-investigation of Talley's other convictions. Defendant City took no action to right their wrongs.

200.    Because Defendant City and its agents failed to take any steps to re-investigate Talley's other convictions upon learning that one of his wrongful convictions had been set aside, Talley remained wrongfully incarcerated for an additional eight years, until 2021, and therefore suffered additional injuries, including physical injuries, mental anguish, embarrassment, humiliation, and emotional distress.

**The City/LGPD Finally Agrees to Re-Investigate**

201.    In early 2017, Defendant City, by and through the LGPD, finally agreed to re-investigate based upon Talley's innocence claim. At that point, Defendant City and its agents had

received countless entreaties from GIP to produce records and evidence from the underlying criminal investigation – much of which was exculpatory and should have been provided to Talley's trial counsel decades earlier.

202.    Thus, it was only eight years after the May 2009 exoneration of Talley with respect to the EM case, that the LGPD finally agreed to re-investigate the entire series of related sexual assaults by a single perpetrator.

203.    The re-investigation confirmed the following: (i) Talley was innocent of the rapes and assaults that plagued LaGrange, Georgia in 1981 and never should have been charged with those offenses; (ii) substantial evidence implicated alternative suspects who were never properly investigated; (iii) Defendant City and its agents failed to maintain and safekeep physical and biological evidence which would have resulted in Talley's exoneration far earlier and would have saved him many years of wrongful incarceration; and (iv) the prosecution and incarceration of Talley were wrongful and violated his constitutional rights.

204.    In fact, in February 2021, the LGPD determined that probable cause existed to seek a search warrant as to former LGPD officer Lovelace with respect to the series of rapes and attempted rapes referred to herein (EM, KW, EB, MK, and ES). The Search Warrant Application was sworn to by LGPD's Sergeant Mark Cavender and included the following assertion:

> Based upon the above stated facts and circumstances, the Affiant believes that on [sic] between February 7, 1981 and June 30, 1981, *Jack Lovelace Sr committed* the act of Rape O.C.G.A. 16-6-1 against [EM, EB, MK], the attack on [KW], and [ES] at various locations within the City limits of LaGrange, Troup County, Georgia.

205.    This search warrant contains significant judicial admissions with respect to the following: (i) from beginning to end (1981 to 2021), the subject rapes and attempted rapes were believed to have been committed by a single perpetrator; (ii) probable cause existed, at all times relevant to this action, to believe that the rapes and attempted rapes with which Talley was

wrongfully charged and convicted were committed by LGPD officer Jack Lovelace, who had served as the rape prevention officer at LaGrange College; and (iii) investigators in 1981 had all the evidence needed to pursue a proper investigation as to the culpability of Lovelace for the offenses with which they wrongfully charged Talley. Instead, they chose to protect Lovelace and the reputation of the LaGrange Police Department.

206.    On February 22, 2021, the GIP filed an Unopposed Extraordinary Motion for New Trial on Talley's behalf in Troup County Superior Court. The Motion was granted the next day, when the Court entered the Consent Order Vacating Convictions and Granting Motion to Enter Nolle Prosequi in Case Nos. 969 (EM), 972 (KW), 973 (EB), and 974 (MK). The Court further ordered Talley's immediate release from prison.[11]

207.    Talley walked out of prison on February 23, 2021, after more than 39 years of wrongful incarceration, more than ten of which were spent in solitary confinement.

### INJURIES AND DAMAGES

208.    At twenty-three years of age, Mr. Talley went to prison a healthy young man. Now, following forty years of exposure to abysmal conditions including decades at Reidsville (one of the most hazardous prison institutions in the country), Mr. Talley lives in a constant state of suffocation, his every breath a battle against the slow, unyielding grip of lung disease.

---

[11]    As mentioned above, the DA's Office would not consent to having the convictions in Case Nos. 970 (ES) and 971 (Sugai) vacated and Plaintiff understands that those cases remain under review. To be clear, there is no evidence whatsoever suggesting that Talley committed the assault of ES and he has consistently maintained his innocence of that crime since 1981. Since that case was always considered to be one of a number of serial rapes, it is perplexing why the DA's Office would attempt to treat it differently now. Though it is not his burden to prove his innocence, Talley and those working on his behalf have attempted to do just that. Unfortunately, other actors destroyed the evidence with which he could achieve DNA exoneration in the other cases. As it stands now, testing of biological evidence in the sole case in which Defendants did not destroy all such evidence has proved what Talley has maintained with respect to all of the serial assaults and rapes – he is innocent and had no involvement in them. It should be noted, however, that the sentences in those cases were concurrent with the longest sentences in the cases in which he was exonerated in 2021, so they caused no additional years of imprisonment or damages.

209.    For Mr. Talley, the air he breathed inside those prison walls was not just stagnant and suffocating – it was a slow poison that lodged itself deep within his lungs, setting the stage for chronic, debilitating pulmonary disease. His prisons – overcrowded and underregulated – were breeding grounds for infections and irreversible lung damage.

210.    While Mr. Talley smoked himself in his early years of incarceration, the overwhelming stress of serving a sentence for a crime he did not commit – together with conditions of isolation, fear, and deprivation – pushed Mr. Talley to do so as a coping mechanism. Smoking provided the only temporary relief from unrelenting psychological torture, anxiety, severe depression, suicidal thought, lack of medical care, and violence that he suffered.

211.    Mr. Talley lived amid the constant fear of violence. In January and February 1983, Mr. Talley suffered vicious attacks from another inmate. First, he was stabbed in the chest. Later, this same inmate assaulted Mr. Talley with a mop ringer handle, tearing off part of Mr. Talley's ear and slicing a hole in his head. In November 2000, when Mr. Talley was struck in the eye, causing a blood clot, extraordinary pain, and temporary loss of vision. Similar instances of assaults and the threat of violence existed throughout Talley's wrongful incarceration. He received inadequate nutrition, inadequate dental care, and inadequate medical care. For instance, dispensing Tylenol (not even antibiotics) was about the only form of medical services offered to him, even when Mr. Talley sustained a severe kidney infection in 1997 that went untreated (ultimately resulting in Mr. Talley suffering severe prostate issues today).

212.    In addition, crumbling infrastructure, neglected maintenance, and years of neglect at Reidsville meant that Mr. Talley was forced to breathe in harmful particulates every day. Likewise, mold was a pervasive problem. In his damp, overcrowded cells where humidity built up due to lack of airflow, mold spores thrived. (Mr. Talley recalls the floors and beds as always being

damp, often caused by floods of toilet water, feces, and urine.) Black mold – known to cause severe respiratory issues – would have flourished in the isolation cells where Mr. Talley spent so much of his life, in neglected shower stalls, between cracked concrete walls, and in the mattresses and bedding that are never properly cleaned or replaced.

213.    Mr. Talley's prison labor included making license plates – exposing him to paint fumes, metal dust, and solvents without adequate protective gear. In these workshops, Mr. Talley was exposed to fine particles of paint and industrial chemicals, contributing to his long-term respiratory damage.

214.    Talley also endured extended periods of solitary confinement which were particularly grueling and harmful to his emotional and physical well-being, including stints in 1988, 1999, 2000, 2002, and 2004, in which more than 50% of each year was spent in psychological damaging segregated housing.

215.    By the time Mr. Talley was diagnosed with COPD, the damage was beyond repair. Mr. Talley left prison with his lungs permanently weakened by years of exposure to an environment designed for punishment. Ordinary movements exhaust him. Sleep is difficult because of his reduced breathing capacity. Though he regularly sees a pulmonologist, Mr. Talley's COPD is getting progressively worse.

216.    Mr. Talley has learned to live with the fears associated with his declining health, though it looms over him like a specter. The COPD is a constant reminder of the slow erasure of the remaining life he has. The world moves on without him. Every breath is a struggle. Every moment is a reminder that he is losing.

**FEDERAL CLAIMS**

**COUNT I:**

**42 U.S.C. § 1983 Claim for Fourteenth Amendment Procedural and Substantive
Due Process Violations: Fabrication of False Inculpatory Evidence**

(Against Olinger in his Individual Capacity)

217.    Plaintiff hereby incorporates all the foregoing paragraphs as if fully restated herein and further alleges as follows:

218.    Olinger, Price, and Furgerson, while acting in concert and aiding and abetting one another, deprived Talley of his constitutional right to a fair trial and fair legal process by deliberately and/or recklessly causing the fabrication of false inculpatory evidence.

219.    Olinger, Price, and Furgerson deprived Talley of his liberty without due process of law and of his right to a fair criminal proceeding by deliberately and/or recklessly fabricating evidence that was used to arrest, prosecute, convict, and imprison him for over 39 years.

220.    Olinger, Price, and Furgerson deliberately and/or recklessly fabricated evidence by orchestrating misleading and unduly suggestive lineups, and by omitting Lovelace from the lineups, thereby causing the false identification of Talley as a serial rapist.

221.    Upon information and belief, prior to conducting any of the lineups involving Talley, Olinger and Price authorized the LGPD to issue a press release to the local paper asserting that Talley had been arrested for an attempted rape even though the arrest was for a misdemeanor assault, and identifying him as the person who rode a bicycle around the neighborhood asking to do yard work. Upon information and belief, issuance of this press release was done with the knowledge and assent of Olinger and Price.

222.    The next morning, the local newspaper ran a story on page one of the paper stating that Terry Talley, a man known in the neighborhood as someone who went door to door on his

bicycle asking for work cutting grass, had been arrested for *attempted rape*. Furgerson told the newspaper that the victim saw Talley "riding a bicycle in her neighborhood," and that he had "asked about doing some yard work."

223.    The article, based upon statements made by Furgerson, stated that Talley had "grabbed her [Sugai] by the arm and forced her inside her apartment," and that "she was able to escape and ran from the house." None of this was accurate.

224.    At the time Olinger and the LGPD arranged for the in-person lineups with Talley, no evidence implicated him in the rapes or assaults in question. On the other hand, there was significant evidence, including physical evidence, that indicated former LGPD Officer Lovelace was the perpetrator of the attacks.

225.    Despite this, whether by explicit direction or implicit suggestion, the lineups orchestrated by Olinger, Price, and Furgerson somehow resulted in victims who did not see the perpetrator, were too impaired to make any accurate identification, and/or had previously positively identified others as the perpetrator, identifying Talley as the perpetrator.

226.    Olinger, Price, and Furgerson made no effort to ensure that proper lineups were conducted. They simply pulled other men from holding cells, regardless of whether they fit the general description provided by victims or witnesses. As a result, the individuals featured in the lineup were of vastly different heights, body sizes, hair styles, and skin complexions. None fit the description provided by any victim or witness.

227.    Some of the victims and/or witnesses had described the perpetrator as wearing sunglasses. Upon his arrest, investigators had Talley put on sunglasses and took photographs of him with the sunglasses on. These photographs, like most documentation pertaining to the lineup and identification procedures, were not preserved or maintained by Olinger, Price, and Furgerson.

However, the fact that Talley was identified indicates this suggestive photograph, and/or other suggestive means, was used in the lineups to secure his identification.

228.    The circumstances surrounding Talley's arrest and the investigation belie any indication that the identification and lineup procedures were undertaken in good faith in an effort to identify the actual perpetrator. No other suspect – not even Lovelace – was ever placed in any live lineup. A photo of Lovelace was inexplicably never shown to any victim or witness, nor was any voice exemplar obtained from Lovelace.

229.    Talley's prosecution was premised upon the above-referenced false inculpatory identifications and resulted in Talley serving more than 39 years in prison for crimes he did not commit.

230.    Any reasonable law enforcement officer in 1981 would have known – and Olinger did know – that the tactics used to create these false inculpatory identifications were improper. No reasonable officer would have believed that the lineups and identification procedures employed were proper or that this conduct was lawful.

231.    The misconduct described herein was objectively unreasonable and was undertaken willfully, intentionally, and/or in reckless disregard for Talley's clearly established constitutional rights.

232.    Absent the misconduct of Olinger, Price, and Furgerson, the arrest and prosecution of Talley could not and would not have been pursued, and Talley would not have been convicted.

233.    The arrest, prosecution, conviction, and confinement of Talley were deliberately and purposefully and/or recklessly brought about by Olinger, Price, and Furgerson, and was the obvious and intended result of their manipulative identification procedures.

234.     All of the foregoing acts and omissions were committed under color of state law and violated clearly established law of which any reasonable law enforcement officer would have known.

235.     Olinger's conduct in creating false identifications directly and proximately caused Talley's wrongful arrest, conviction, and deprivation of liberty without due process of law for over 39 years, as well as the physical, emotional, and pecuniary injuries described in this Complaint and to be proved through discovery and at trial.

## COUNT II:

### 42 U.S.C. § 1983 Claim for Fourteenth Amendment Procedural and Substantive Due Process Violations: Concealment of Exculpatory and Impeachment Evidence

(Against Olinger in his Individual Capacity)

236.     Plaintiff hereby incorporates all the foregoing paragraphs as if fully restated herein and further alleges as follows:

237.     Olinger, Price, and Furgerson deliberately, intentionally, and/or recklessly failed to disclose exculpatory and impeachment evidence to the DA's Office as required by *Brady v. Maryland,* 373 U.S. 83 (1963), and its progeny.

238.     Olinger, Price, and Furgerson deprived Talley of his clearly established constitutional right to due process of law and fair criminal proceedings by deliberately, intentionally and/or recklessly failing to disclose exculpatory and impeachment evidence to the District Attorney, including but not limited to the following:

(a)     MK's extreme intoxication and the fact that she had previously identified someone other than Talley as her assailant.

(b)     The fact that GBI had compared Talley's fingerprints to the latent lifts from the "You're next" note and knew that Talley had not left the note in an incident believed to be connected to the serial rapist who was sought.

(c)     The fact that numerous victims and witnesses had identified individuals other than Talley, including but not limited to Lovelace, as the perpetrator of the rapes and assaults in question and that the purported identifications of Talley were accomplished through improper and suggestive means.

(d)     The fact that ES and witness Bobbie Spence had identified a black male named Ike Ikegwuonu as the assailant and referenced this individual having a cream-colored or white bike. Talley's bicycle was red.

(e)     The fact that Lovelace was considered an "unofficial" suspect in the series of rapes, assaults, and incidents.

(f)     All evidence of misconduct on Lovelace's part, as well as his termination from the LGPD for "reprehensible" conduct that had evoked fear among female students at LaGrange College.

(g)     Other exculpatory and impeachment evidence to be developed through discovery and at trial.

239.    Olinger, Price, and Furgerson's failure to document and disclose exculpatory and impeachment evidence to the DA's Office was intentional, deliberate, and/or reckless.

240.    Any reasonable law enforcement officer in 1981 would have known, and Olinger, Price, and Furgerson did know, that the exculpatory and impeachment evidence described in this Complaint had to be documented and disclosed to the DA's Office. No reasonable officer would have believed that the misconduct described herein was lawful.

241.    The deliberate, intentional, and/or reckless failure of Olinger, Price, and Furgerson, to document and to produce to the DA's Office the exculpatory and impeachment information described above deprived Talley of his right to a fair criminal process and violated his constitutional right to due process under the Fourteenth Amendment.

242.    Olinger's deliberate, intentional, and/or reckless concealment of exculpatory and impeachment evidence directly and proximately caused Talley's wrongful conviction and deprivation of liberty without due process of law during his 39-year wrongful incarceration, as well as the other injuries and damages set forth in this Complaint.

## COUNT III:

### 42 U.S.C. § 1983 Claim for Fourth and Fourteenth Amendment Violations: Malicious Prosecution

(Against Olinger in his Individual Capacity)

243. Plaintiff hereby incorporates all the foregoing paragraphs as if fully restated herein and further alleges as follows:

244. As described more fully above, Olinger, Price, and Furgerson, instituted and continued a criminal proceeding for rape against Talley, despite his actual innocence. The prosecution was initiated by Olinger, Price, and Furgerson, and continued by them without probable cause to believe that Talley had committed the crimes with which he was charged.

245. Olinger, Price, and Furgerson, acting individually and in concert with each other, under color of state law and within the scope of their employment, caused, instituted, or participated in the initiation of a criminal proceeding against Talley for a series of rapes and sexual assaults, and thereafter caused these proceedings to continue until January 2021.

246. The criminal proceedings against Talley were based solely upon false identifications fabricated by Olinger, Price, and Furgerson's conduct and was therefore not supported by probable cause. No physical evidence linked Talley to the victims or their rapes. The prosecutions were based on the suggestive and improper identification procedures orchestrated by Olinger, Price, and Furgerson.

247. The criminal proceedings described herein were instituted and continued by Olinger, Price, and Furgerson with malice.

248. Talley was seized as a result of the initiation of the criminal proceedings, and the proceedings terminated in his favor.

249.    The deleterious effect of these faulty identifications on the fairness of proceedings against Talley was compounded by Olinger, Price, and Furgerson's deliberate withholding of all exculpatory and impeachment evidence, including but not limited to evidence which completely undermined the reliability of these identifications.

250.    As a direct and foreseeable consequence of Olinger's misconduct, Plaintiff was unreasonably and unlawfully subjected to criminal prosecution and more than 39 years of wrongful incarceration.

251.    As a direct and foreseeable consequence of being arrested, prosecuted, and wrongfully imprisoned for 39 years, Talley suffered physical, emotional, and pecuniary injuries as described in this Complaint and to be proved through discovery and at trial.

**COUNT IV:**

**42 U.S.C. § 1983 Claim for Fourteenth Amendment Procedural and Substantive Due Process Violations – *Brady* Violation by Means of Destruction of Evidence**

(Against Olinger in his Individual Capacity)

252.    Plaintiff hereby incorporates all the foregoing paragraphs as if fully restated herein and further alleges as follows:

253.    The individual who assaulted EB during the early morning hours of February 21, 1981, left a pair of black gloves in his haste to flee the scene. The evidentiary value of the gloves was obvious: they unquestionably had been left by the person who assaulted EB with the intent of raping her.

254.    The gloves were taken into evidence. A LGPD officer, Sergeant Cox, noted that the gloves left by the perpetrator and collected at the crime-scene were the "same as worn by [Jack] Lovelace," who was on duty that night at the dormitory where the rape occurred, and who accosted a female student outside the dorm where the rape occurred within the same hour as the assault.

255.    There was reason to suspect that the perpetrator of the assault of EB on February 21 was the same man who had raped KW on campus two weeks prior, on February 7, 1981. The evidentiary value of the gloves would only increase as more assaults and rapes occurred and investigators recognized that a serial rapist was on the loose and had access to the LaGrange College dorms.

256.    According to police reports that were first discovered by the GIP many years after Talley's wrongful conviction, Price and Furgerson drove the gloves to the GBI Crime Lab in Columbus, Georgia ("GBI Columbus") on March 6, 1981. There, they met with GBI forensic analyst Blankenship, who purportedly performed only a visual inspection of the gloves.

257.    Price and Furgerson then returned to LGPD with the gloves. Upon information and belief, Defendant Olinger, who worked closely with LGPD investigators from the point LGPD requested GBI's assistance with the investigation, was also aware of both the collection of the gloves and their transport to and from GBI Columbus.

258.    The gloves – unquestionably left by the assailant and identified as belonging to Jack Lovelace – went "missing" after being returned to the LGPD and remain unaccounted for. When GIP began work on Talley's case, GIP sought access to any existent physical evidence, including the gloves. No court order authorized the destruction of the gloves and there is no record of their disposition after they were returned to LGPD.

259.    Upon information and belief, investigators destroyed or otherwise disposed of the gloves in an effort to protect Lovelace and the LGPD from any scrutiny or liability for the attacks committed while he was serving as a LGPD Rape Prevention Officer with access to the LaGrange College dorms.

260.     Officials and personnel of the LGPD and the GBI never disclosed to the prosecutor the substantial evidence implicating Lovelace in the series of rapes, assaults, and incidents that occurred at and around LaGrange College. Officials and personnel of the LGPD and the GBI, however, were aware of that evidence and believed that Lovelace was the perpetrator.

261.     In furtherance of their effort to deflect attention away from a fellow officer (Lovelace) and the LGPD, investigators with the LGPD and the GBI not only hid all exculpatory and impeachment evidence they had uncovered in their investigation, but also destroyed any evidence which would implicate Lovelace.

262.     Upon information and belief, investigators destroyed the gloves because they believed they belonged to Lovelace. The "You're next" note and the latent lifts obtained from it, upon information and belief, were also destroyed by investigators once GBI determined that the prints were not Talley's. LGPD and GBI investigators conspicuously made no attempt to check Lovelace's fingerprints against the latent lifts from the note at any point in time.

263.     The intentional destruction of evidence, at the hands of Olinger and LGPD investigators, was done in bad faith, with malice, and with knowledge of both its exculpatory and evidentiary value. The destruction of evidence was objectively unreasonable and was undertaken intentionally and/or recklessly and with deliberate indifference to Talley's constitutional rights.

264.     Olinger knew, or reasonably should have known, that the bad faith destruction of evidence was likely to lead to the conviction of Talley for the rapes and assaults under investigation, despite his actual innocence. These actions were committed under color of state law and violated clearly established law of which any reasonable law enforcement officer would have known.

265.    Olinger not only deprived Talley of evidence which would have prevented his wrongful conviction, he also denied Talley the ability to prove his innocence through post-conviction remedies. Just as the rape kit evidence kept secure by the Clerk of Court for Troup County was tested and proved Talley's innocence in the case involving EM, the evidence that was wrongfully destroyed by Defendants could have been used to demonstrate Talley's innocence in the other cases in which physical or biological evidence was originally obtained.

266.    As a direct and proximate result of Olinger's concealment and destruction of evidence, including but not limited to the gloves, the note left for BH, and the latent lifts from that note, Talley was deprived of his Fourteenth Amendment rights to a fair trial and due process of law.

267.    As a result of Olinger's misconduct, Talley was wrongfully convicted and subjected to 39 years of wrongful incarceration and suffered physical, emotional, and pecuniary damages as described in this Complaint and to be proved through discovery and at trial.

**COUNT V:**

**42 U.S.C. § 1983 Claim for Deprivation of Due Process
and Meaningful Access to the Courts**

(Against Olinger in his Individual Capacity)

268.    Plaintiff hereby incorporates all the foregoing paragraphs as if fully set forth herein and further alleges as follows:

269.    Olinger deprived Talley of his constitutional right to due process of law and meaningful access to the courts (a) by initially covering up and concealing from Talley, the prosecutor, and the court, evidence that demonstrated Talley's innocence, and (b) by continuing to conceal evidence and records with which Talley could have proved his innocence and secured release from prison.

270.    As a result of Olinger's acts and omissions before and subsequent to Talley's convictions in 1981, Talley was deprived of evidence that would have allowed him to successfully challenge his convictions through post-conviction remedies that were available to him, including but not limited to an emergency motion for new trial and pursuit of post-conviction DNA testing. Such efforts, based on evidence which Olinger hid and/or destroyed, would have been successful and would have exonerated Talley and freed him from prison.

271.    Olinger was, at all relevant times, aware of Talley's persistent and truthful denial of any involvement in the rapes and assaults with which he was charged. Olinger was also aware of efforts on behalf of Talley and others acting on his behalf to uncover evidence necessary to prove Talley's innocence. Olinger willfully and/or recklessly interfered with Talley's constitutional rights by continuing to deny him and those acting on his behalf access to evidence which would exonerate Talley.

272.    Evidence that Olinger obtained that could have been used to prove Talley's innocence in post-trial proceedings and potentially identify the actual perpetrator of the rapes and assaults in question, can no longer be accounted for, but much of it was last under the custody and control of LGPD. Other such evidence was last under the custody and control of GBI.

273.    Olinger had in his possession evidence that would have proved Talley's innocence of the heinous crimes for which he was convicted and wrongfully imprisoned. Talley, through post-conviction counsel, repeatedly requested access to the evidence, so that he could properly prove his innocence and end his wrongful incarceration. Such requests were regularly and routinely made by GIP personnel to the LGPD and the GBI from the time they accepted Talley's case in 2004 through the date of his exoneration in 2021.

274.    Olinger, through neglect, misconduct, and/or recklessness and adherence to unconstitutional policies, customs, and practices, as set forth *infra*, was unable to account for evidence and records that should have been made available, and thereby prevented Talley from having access to evidence that would have exonerated him.

275.    Because of Olinger's misconduct, Talley could not file properly supported post-conviction motions based on new evidence or otherwise obtain meaningful access to the courts and prove his innocence.

276.    The wrongful acts and omissions that caused Talley's initial and continued wrongful conviction and incarceration were carried out pursuant to the municipal defendant's policies, customs, patterns or practices as described in Count VII brought pursuant to *Monell*. Those municipal policies, customs or patterns and practices of the City of LaGrange were the moving force and proximately, directly and foreseeably caused Talley's continued wrongful incarceration by systematically denying him and his representatives of evidence needed to prove his innocence.

277.    Olinger's actions and omissions foreseeably, directly and proximately deprived Talley of his rights under the First and Fourteenth Amendments by unlawfully interfering with his right of meaningful access to the courts and needlessly extended his wrongful incarceration. As a result of Olinger's misconduct, Talley was wrongfully imprisoned for 39 years, and suffered physical, emotional, and pecuniary injuries as described in this Complaint and to be proved through discovery and at trial.

## COUNT VI:

### 42 U.S.C. § 1983 Claim for Fourteenth Amendment Procedural and Substantive Due Process Violations: Civil Conspiracy to Deprive Plaintiff of his Constitutional Rights

(Against Defendants Olinger and Blankenship in their Individual Capacities)

278.    Plaintiff hereby incorporates all the foregoing paragraphs as if fully set forth herein and further alleges as follows:

279.    During the investigation of the series of rapes, assaults, and incidents that occurred in LaGrange in 1981, Olinger, Blankenship, Price, and Furgerson knowingly conspired, reached a mutual understanding, and acted in concert to violate Talley's constitutional rights, including his Fourteenth Amendment rights to a fair trial and due process of law. These parties reached an agreement amongst themselves to create false inculpatory evidence against Talley, and to conceal from the prosecutor evidence of the Lovelace's guilt, in order to protect former LGPD Officer Lovelace and the reputation and liability of the LGPD for his actions while serving as Rape Prevention Officer at LaGrange College, despite Talley's actual innocence and Defendants' knowledge that Talley was, in fact, innocent.

280.    In furtherance of the conspiracy, Olinger, Blankenship, Price, and Furgerson each undertook overt acts, including without limitation:

(a)    Olinger, Blankenship, Price, and Furgerson deliberately concealed all evidence implicating Jack Lovelace in the rapes, assaults, and incidents under investigation with the intent to implicate Talley in crimes they knew or reasonably should have known that Talley did not commit, and for which there was substantial evidence of Lovelace's culpability.

(b)    Olinger, Blankenship, Price, and Furgerson orchestrated manipulative, unduly suggestive lineups so as to create evidence that Talley was the perpetrator when they knew or reasonably should have known that he had truthfully denied any involvement in the rapes and assaults under investigation and that no evidence suggested his culpability for those offenses.

(c)      Olinger, Blankenship, Price, and Furgerson concealed all evidence that would have cast doubt on the accuracy of the purported victim and witness identifications of Talley as the perpetrator, including prior identifications of other suspects.

(d)      Olinger, Blankenship, Price, and Furgerson withheld and concealed all evidence that could not be linked to Talley and which was affirmatively linked to other suspects, including but not limited to Lovelace's gloves left at the site of the EB assault and the note left on BH's car.

(e)      Olinger, Blankenship, Price, and Furgerson intentionally steered the investigation away from Jack Lovelace so as to shield a fellow officer and the LGPD from any scrutiny and possible liability for his actions. They built a case implicating Talley even though they knew or reasonably should have known he was innocent and that no legitimate evidence supported his involvement in the subject rapes or assaults.

(f)      Olinger, Blankenship, Price, and Furgerson destroyed evidence and records or otherwise caused them to be unavailable in an effort to ensure that Talley was convicted and that Lovelace evaded scrutiny. Critical pieces of evidence, such as the gloves linked to Lovelace and retrieved at the site of the EB rape, and other items of evidence and records are unaccounted for but were last under the custody of Defendants.

(g)      Olinger, Blankenship, Price, and Furgerson engaged in other overt acts in furtherance of their conspiracy to be developed through discovery and at trial.

281.    Following Talley's convictions, Olinger and Blankenship deprived Talley of exculpatory materials to which he was lawfully entitled, and which would have proved his innocence and led to his earlier exoneration.

282.    Olinger's and Blankenship's conspiracy directly and proximately deprived Talley of his rights under the Fourteenth Amendment and caused his unfair trials, wrongful conviction, and 39 years of wrongful incarceration. As a direct and foreseeable consequence of said Defendants' conspiracy, Talley suffered physical, emotional, and pecuniary injuries as described in this Complaint and to be proved through discovery and at trial.

## COUNT VII:

### 42 U.S.C. § 1983 Municipal Liability Claim For Deprivation of Constitutional Rights Under *Monell v. Dep't of Social Servs. of the City of New York* 436 U.S. 658 (1978)

(Against Defendant City of LaGrange)

283.    Plaintiff hereby incorporates all the foregoing paragraphs as if fully restated herein and further alleges as follows:

284.    The LaGrange Police Department was at all times relevant to this Complaint an entity controlled and funded by the City of LaGrange.

285.    Upon information and belief, the Chief of the LaGrange Police Department was at all times relevant to this Complaint selected by officials of the City of LaGrange.

286.    Upon information and belief, the City of LaGrange delegated the rules, procedures and training that applied to officers employed by the LaGrange Police Department to the Chief of Police.

287.    The Chief of Police of LGPD, and/or his designee, during the relevant time period was a final policymaker for the City of LaGrange with regard to all investigative and policing activities within the City of LaGrange.

288.    The acts and omissions of the Chief of Police and/or his designee, during the time relevant to this Complaint, constituted the policy, custom, or pattern and practice of the City of LaGrange.

289.    Upon information and belief, the City of LaGrange, by and through its final policymaker(s), with deliberate indifference, created, promulgated, and maintained the following policies, customs, or patterns which deprived Talley of his constitutional rights, including but not limited to his rights not to be arrested or seized without probable cause, not to be deprived of his

liberty without due process of law, to a fair criminal proceeding, and to meaningful access to the courts by:

(a)    Failing to properly train, supervise and/or discipline LGPD investigators and officers with regard to their constitutional duties not to (i) cause the fabrication evidence; (ii) engage in suggestive identification procedures; (iii) conceal exculpatory and impeachment evidence; (iv) destroy exculpatory evidence; (v) intentionally or recklessly fail to conduct an investigation to determine the true facts of a crime; and (vi) ignore or conceal evidence that points to the innocence of a person under criminal investigation, prosecution, or serving a sentence for a crime he did not commit.

(b)    Encouraging, promoting, and condoning LGPD investigators and officers to (i) cause the fabrication evidence; (ii) engage in suggestive identification procedures; (iii) conceal exculpatory and impeachment evidence; (iv) destroy exculpatory evidence; (v) intentionally or recklessly fail to conduct an investigation to determine the true facts of a crime; and (vi) fail to properly record details relating to activities undertaken in a criminal investigation and to preserve and maintain those records and items of evidence collected.

(c)    Creating, promulgating, and maintaining a policy, custom, or pattern and practice of failing to properly safeguard, organize or inventory evidence seized or obtained in connection with criminal investigations, and of failing to require that all evidence collected or received be immediately turned in to a locked and secure property office, be logged in to that office, and not be released except to an officer with authority in the investigation, and then only upon a signed, dated and timed receipt signed by that officer in the presence of the property control officer.

(d)    Creating, promulgating, and maintaining a policy, custom, or pattern and practice of failing to ensure that records of criminal investigations and evidence received were properly kept, maintained, stored, and preserved and not transferred, released, destroyed, or disposed of except upon proper and lawful authority with all records of disposition properly maintained and preserved.

(e)    In other respects to be proved through discovery and at trial.

290.    The acts and omissions that caused Talley's wrongful arrest, prosecution, convictions, and incarceration were carried out pursuant to the municipal defendant's policies, customs, patterns, or practices. The municipal policies, customs, or patterns and practices of the City of LaGrange were the moving force of and proximately and directly caused Talley's wrongful arrest, prosecution, convictions, and incarceration.

291.    It would have been plainly obvious and foreseeable to a reasonable policymaker that failing to enact adequate policies or procedures that investigators and LGPD officers and personnel were required to follow with respect to the matters referenced immediately above would lead to deprivations of individuals' constitutional rights.

292.    The Chief of Police and/or his designees knew or reasonably should have known that LGPD had no adequate policies or procedures regarding the conduct of criminal investigations, disclosure of exculpatory or impeachment evidence, record-keeping, and the maintenance, storage, and safekeeping of crime-scene evidence and records of criminal investigations.

293.    The failures of the Chief of Police, and his designees, to train and supervise investigators, as described in this Count, amounted to deliberate indifference and intentional misconduct, was the moving force of and directly caused the violations of Talley's constitutional rights and his nearly four-decade wrongful incarceration.

294.    The municipal policies, customs, or patterns and practices of the City of LaGrange proximately and directly caused Talley's wrongful prosecution and convictions and, thereafter, the failure to properly maintain and safekeep records and evidence unnecessarily extended the term of Talley's wrongful incarceration.

295.    Defendant City of LaGrange is liable for the deprivation of Talley's constitutional rights caused by the policies, practices, and customs agreed to, approved, condoned, and/or ratified by the Chief of Police as described above.

296.    As a direct and proximate result of the above-described wrongful conduct of Defendant City of LaGrange, Talley suffered the grievous and permanent injuries and damages as described in this Complaint and to be proved through discovery and at trial.

## COUNT VIII:

### 42 U.S.C. § 1983 Claim for Suppression of Exculpatory Evidence in Post-Conviction Years and Deprivation of Access to Courts in Violation of the First and Fourteenth Amendments

(Against Defendant City)

297.    Plaintiff hereby incorporates all the foregoing paragraphs as if fully restated herein and further alleges as follows:

298.    Defendant City deprived Talley of his constitutional right to due process of law and meaningful access to the courts by concealing from him and those acting on his behalf evidence that demonstrated his innocence and the wrongfulness of his convictions.

299.    As a result of Defendant City's acts and omissions, Talley was deprived of evidence that would have allowed him to successfully challenge his wrongful convictions through post-conviction remedies that were available to him, including but not limited to an Extraordinary Motion for New Trial ("EMNT") or Petition for a Writ of Habeas Corpus ("Habeas Petition"). But for the evidence which was concealed during post-conviction proceedings, Talley's attempts to establish his innocence would have been successful and would have resulted in Talley's exoneration and release from prison.

300.    Defendant City and its agents were, at all relevant times, aware of Talley's persistent and truthful denial of guilt with respect to the series of rapes and attempted rapes with which he was charged. Those responsible for Talley's wrongful prosecution were also aware of efforts by and on behalf of Talley to uncover evidence necessary to prove Talley's innocence. Nonetheless, Defendant City and its agents obstructed Talley's constitutional rights by denying him and those acting on his behalf access to evidence which would demonstrate his innocence and the wrongfulness of his convictions.

301.    Defendant City of LaGrange's failure to adopt a system to maintain proper police records, preserve their condition, and ensure the records were capable of being produced deprived Talley of his constitutional right of due process and access to the courts. The failure to create required documentation led to delays and difficulties with exoneration efforts because records that should have existed either could not be found or were never created.

302.    Defendant City failed to implement proper systems or controls to ensure that crime-scene evidence and records of criminal investigations were maintained. As a direct and proximate result of these systemic failures, which had the force of municipal policy or custom, the City flouted proper requests for production of records and evidence, from 2004 through Talley's exoneration in 2021, and failed to produce exculpatory evidence within its custody and control. Those failures deprived Talley of evidence needed to demonstrate his innocence and unnecessarily extended his period of wrongful imprisonment.

303.    Defendant City and its agents had in their possession evidence, documents, and information that would have proved the wrongfulness of Talley's convictions and helped him establish his factual innocence and secure his release from prison. Talley and those working on his behalf repeatedly requested that they be provided access to said evidence, documents, and information, so that he could prove his innocence and wrongful incarceration. Repeatedly, through wrongful acts and the City's adherence to unconstitutional policies, customs, and practices, Talley and those working on his behalf were provided deficient, incomplete, and untimely responses with the result that Talley was denied access to evidence that would have exonerated him.

304.    Furthermore, Defendant City unreasonably refused to take any ameliorative action to afford Talley relief and/or to intervene in his post-conviction efforts when it had the opportunity and obligation to do so. Said obligation grew more acute as the years dragged on with Talley

languishing in prison and as Defendant City, as well as the leadership at the LGPD, came to understand the following: (i) the LGPD and the GBI were, in contravention of prevailing legal obligations and law enforcement standards, unable to account for the evidence Talley needed to prove his innocence; (ii) the information that the LGPD and the GBI did still possess supported Talley's innocence claim and established probable cause that found LGPD rape prevention officer Jack Lovelace committed the series of rapes and attempted rapes for which Talley had been wrongfully convicted; and (iii) though Talley had been convicted of a series of connected rapes and attempted rapes, DNA evidence in the one case in which biological evidence still existed proved both his innocence and that the victim's supposed ID of Talley as the perpetrator was wrong.

305.    From 2004, Defendant City and its officers breached its obligations to provide post-conviction access to exculpatory evidence or to otherwise take any action to remedy their prior wrongful acts which resulted in Talley's wrongful incarceration.

306.    These post-conviction failures by Defendant City constitute wrongful acts which caused additional damages. As alleged herein, Defendant City deprived Talley of his rights under the First and Fourteenth Amendments by unlawfully interfering with Talley's rights to due process and access to the courts, and needlessly extended Talley's wrongful imprisonment.

307.    Defendant City's violation of Talley's rights as alleged in this Count caused Talley additional damages as his ultimate exoneration and release from prison was needlessly delayed. Talley suffered additional separate physical injuries, as well as mental anguish, embarrassment, humiliation, and emotional distress, as his efforts to secure his release were rejected and he continued to languish in prison despite his innocence.

## STATE-LAW CLAIM

## COUNT IX:

## **Intentional Infliction of Emotional Distress**

(Against City of LaGrange)

308.    Plaintiff hereby incorporates all the foregoing paragraphs as if fully set forth herein and further alleges as follows:

309.    In the manner described more fully above, the City of LaGrange caused Talley to be prosecuted for crimes he did not commit and thereafter needlessly extended his term of wrongful incarceration. The City's conduct in doing so was extreme and outrageous and exceeds all bounds usually tolerated by a decent society.

310.    The misconduct committed by the City was undertaken intentionally and in deliberate disregard of a high probability that emotional distress would follow.

311.    As a result of the City's misconduct, Talley suffered severe and debilitating emotional distress and physical injuries.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Terry Lamar Talley respectfully requests that the Court award relief as follows:

1.    Compensatory damages in an amount to be determined at trial;

2.    Punitive damages against the individual Defendants, in an amount to be determined at trial, that will deter such conduct by Defendants in the future;

3.    Pre-judgment and post-judgment interest and recovery of his costs, including reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 and 42 U.S.C. § 1920; and

4.    All other and further relief to which he may be entitled.

Respectfully submitted this 14th day of March 2025.

| | |
|---|---|
| Henry C. Debardeleben IV, Esq. | */s/ G. Christopher Olson* |
| GA Bar No.: 111320 | G. Christopher Olson, Esq., NCBN: 21223 |
| **WEINBERG, WHEELER,** | **OLSON LAW, PLLC** |
| **HUDGINS, GUNN & DIAL, LLC** | 514 Daniels Street, #136 |
| 3344 Peachtree Road, N.E., Suite 2400 | Raleigh, NC 27605 |
| Atlanta, GA 30326 | Telephone: (919) 624-3718 |
| Telephone: (404) 876-2400 | Fax: (919) 328-5355 |
| Fax: (404) 875-9433 | chris@olsonlaw-pllc.com |
| HDebardelebenIV@wwhgd.com | |

David S. Rudolf, Esq., NCBN: 8587
Sonya Pfeiffer, Esq., NCBN: 37300
Phillip Lewis, Esq., NCBN: 27944
**PFEIFFER RUDOLF**
2137 South Boulevard, Suite 300
Charlotte, NC 28203
Telephone: (704) 333-9945
Fax: (704) 335-0224
dsr@pr-lawfirm.com
spf@pr-lawfirm.com
pel@pr-lawfirm.com
ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF SERVICE

I certify that I served the foregoing **SECOND AMENDED COMPLAINT** by electronic

filing with the United States District Court for the Middle District of Georgia by using the CM/ECF

system which contemporaneously served the following counsel of record:

| | |
|---|---|
| Jacob E. Daly<br>Sun S. Choy<br>Wesley C. Jackson<br>FREEMAN MATHIS & GARY, LLP<br>100 Galleria Parkway, Suite 1600<br>Atlanta, GA 30339-5948<br>**Attorneys for Defendant City of LaGrange** | William W. Peters, Esq.<br>STATE OF GEORGIA<br>DEPARTMENT OF LAW<br>40 Capitol Square, S.W.<br>Atlanta, GA 30334-1300<br>**Attorney for GBI Defendants** |
| Jeffrey Todd<br>City of LaGrange<br>200 Ridley Ave.<br>LaGrange, GA 30240<br>**Attorney for Defendant City of LaGrange** | Emma Wingfield<br>Teague Campbell Dennis & Gorham LLP<br>P.O. Box 19207<br>Raleigh, NC 27619-9207<br>**Attorney for Defendant City of LaGrange** |
| Michael T. Medford<br>Manning Fulton & Skinner P.A.<br>3605 Glenwood Ave., Suite 500<br>Raleigh, NC 27612<br>**Attorney for Defendant City of LaGrange** | |

This 14th day of March 2025.

/s/ G. Christopher Olson
G. Christopher Olson