IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

TERRY LAMAR TALLEY,                    *

        Plaintiff,                     *

vs.                                    *

JAMES G. BAKER, *as*                   *        CASE NO. 4:23-CV-32 (CDL)
*administrator of the Estate of*
*Roy Lee Olinger, Jr.*, and BENNY      *
BLANKENSHIP,
                                       *
        Defendants.
                                       *
_____ *

O R D E R

Terry Lamar Talley was convicted of multiple rapes and assaults in 1981. He spent nearly forty years in prison before four of his six convictions were vacated and he was released from prison. Talley alleges that his convictions were the product of police misconduct, including fabrication of inculpatory evidence, failure to disclose exculpatory evidence, and destruction of evidence. He brought his action against two former Georgia Bureau of Investigations employees, Roy Olinger and Benny Blankenship ("Defendants").[1] Presently pending before the Court is Defendants'

_____

[1] Talley initially asserted claims against the City of LaGrange, and those claims were settled. Talley also asserted claims against four LaGrange police investigators, but those claims were dismissed because the police investigators all died before Talley filed this action and his claims against their estates were barred by the statute of repose. *See* Order (Nov. 22, 2023), ECF No. 65. After Talley filed this action, Olinger died, and the administrator of his estate was substituted as a defendant in this action. For the sake of simplicity, the Court continues to refer to those claims as being against Olinger.

summary judgment motion.  For the reasons explained below, the
Court denies the motion (ECF No. 100) as to Talley's claims against
Olinger for concealment of exculpatory evidence and § 1983
conspiracy, but the Court grants the motion as to Talley's claims
against Olinger for fabrication of evidence and malicious
prosecution, as well as his § 1983 conspiracy claim against
Blankenship.

SUMMARY JUDGMENT STANDARD

Summary judgment may be granted only "if the movant shows
that there is no genuine dispute as to any material fact and the
movant is entitled to judgment as a matter of law."  Fed. R. Civ.
P. 56(a).  In determining whether a *genuine* dispute of *material*
fact exists to defeat a motion for summary judgment, the evidence
is viewed in the light most favorable to the party opposing summary
judgment, drawing all justifiable inferences in the opposing
party's favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255
(1986).  A fact is *material* if it is relevant or necessary to the
outcome of the suit.  *Id.* at 248.  A factual dispute is *genuine* if
the evidence would allow a reasonable jury to return a verdict for
the nonmoving party.  *Id.*

The Court notes that Talley's statement of material facts
refers to exhibits that he cites as "Talley ###."  Talley submitted
a few exhibits marked with Bates numbers "Talley - ###."  Talley
Resp. Ex. 34, Indictments (Talley – 000001 to Talley – 000010),

ECF No. 121-37; Maxwell Decl. Ex. D, Supplemental Reports (Talley – 000387 & Talley – 000411); Gilbert Aff. Ex. B, Supplemental Reports (Talley – 000387 & Talley – 000411).  Based on the Court's review of Talley's nearly 1,700 pages of exhibits, Talley did not attach any other exhibits with "Talley - ###" Bates numbers.  His index of exhibits does not list any documents with these Bates ranges, and Talley did not supplement the record after Defendants pointed out multiple times in their reply that these exhibits are not in the record.  Obviously, exhibits that are not in the record cannot create genuine fact disputes.

FACTUAL BACKGROUND

The Court carefully considered the parties' extensive fact statements and responses, along with the voluminous evidence the parties cited.  The Court finds that many of the facts listed in the parties' fact statements are not material to the present issues the Court must decide. The Court thus focuses its factual background section on the material facts that are supported by the parties' citations to the present record.

## I.   The 1981 LaGrange Attacks

In the first half of 1981, a series of rapes and assaults occurred in LaGrange, Georgia.  Those rapes and assaults included (1) the assault of LaGrange College student KW in her dorm room on February 7, 1981; (2) the attack and rape of LaGrange College student EB in her dorm room on February 21, 1981; (3) a note

stating "You're Next" was left on the windshield of another female LaGrange College student in late February 1981; (4) assault of YS on April 10, 1981; (5) rape and assault of MK, a 64-year-old woman, at her home on April 19, 1981; (6) rape and assault of EM at Southwest LaGrange Baptist Church on June 24, 1981; and (7) assault and attempted rape of ES at West Georgia Medical Center on June 30, 1981. The LaGrange Police Department investigated these incidents but did not make any arrests.

## II. The GBI's Involvement In the Investigation

### A. Physical Evidence From the Crime Scenes

Soon after each attack, LaGrange detectives sent physical evidence to be examined at the GBI crime lab in Columbus, Georgia. Benny Blankenship, a GBI forensic microscopy analyst who worked in the GBI's Columbus crime lab, received and analyzed physical evidence from the EM crime scene. The parties did not clearly point to evidence that Blankenship examined evidence from the EB or MK crime scenes in 1981.[2] Blankenship did not interview witnesses, investigate subjects, or make arrests. Blankenship

---

[2] In Talley's statement of material facts and briefing, Talley's counsel asserts that LaGrange detectives took evidence from the EB crime scene, including a pair of black gloves that were found at the scene, to Blankenship for testing. But counsel did not submit the exhibits they cite in support of this assertion, so those fact statements are unsupported, and the Court may not consider them. It is undisputed that the GBI has no record of any files related to the examination of physical evidence in the EB case. Regarding the MK case, Talley's counsel pointed to evidence that in 1983, Blankenship destroyed several pieces of evidence from the MK crime scene, but counsel did not clearly point to evidence that Blankenship examined that evidence in 1981.

Decl. ¶ 6, ECF No. 100-6.[3]  He did not prepare or maintain any GBI investigative files, and he had no knowledge of the contents of the GBI's investigative files or the LaGrange police department's investigative files regarding the 1981 attacks at issue in this action.  *Id.* ¶¶ 7-8.  Blankenship also did not know what evidence or information the investigators provided to the prosecutor or Talley's defense counsel.  *Id.* ¶ 10.

        B.  Olinger's Investigation

    In early July 1981, LaGrange's police chief asked the Georgia Bureau of Investigation for assistance with the investigation of the attacks.  GBI Special Agent Roy Olinger was assigned to assist the LaGrange police department with its investigation.  Olinger interviewed LaGrange detectives about their investigation, and he documented what he learned in typed official summaries and handwritten notes that were preserved in a GBI investigative file.  Olinger then continued the investigation along with LaGrange detectives. He learned the following information.

- ◆ EB reported that she was raped in her dorm room at LaGrange College around 3:00 a.m. on February 21, 1981.  She stated that her attacker was a black man in dark clothing.  Pl.'s Resp. to Defs.' Mot. Summ. J. Ex. 7, GBI Investigative File at DEF OLINGER AND BLANKENSHIP 0093, ECF No. 121-10 at 93.

    - o EB's clothing and sheets, along with a shoestring that was used to tie EB and a pair of black gloves found in her room, were transported to the Georgia State Crime Lab, though LaGrange detectives did not receive a report

---

[3] The Court previously granted Talley's motion to strike paragraphs 11 and 12 of Blankenship's declaration but denied the motion to strike the remaining paragraphs.  Order (May 5, 2025), ECF No. 127.

on the forensic analysis of those items by the time Olinger became involved in the case. Olinger noted that a police sergeant who responded to the scene of the EB attack identified the gloves "as same as worn by" JL, a black LaGrange police officer.

o A woman who lived in EB's dorm reported that a black male had opened her door at around 2:30 a.m. and said he was looking for someone else; that man was identified possibly being a man with the initials MP. *Id.*

o Several witnesses reported seeing a black LaGrange police officer with initials JL in the area shortly before the attack on EB. One witness stated that JL approached her soon before the attack on EB and "wanted to rub her hair." *Id.* at DEF OLINGER AND BLANKENSHIP 0094, ECF No. 121-10 at 94. Another witness said that JL had told her that he "wanted her sugar & for her to be quiet or he would have to gag her." *Id.*

o In his handwritten notes, Olinger wrote that a man with initials IPI was a suspect in the attack on EB.

♦ Shortly after the attack on EB, another female LaGrange College student received a note on her windshield that said "You're Next." *Id.* at DEF OLINGER AND BLANKENSHIP 0009, ECF No. 121-10 at 9.

o The state crime lab obtained latent fingerprints from the note.

o After Talley was arrested, a GBI latent print examiner compared Talley's fingerprints to the latent fingerprints that had been found on the "You're Next" note. They did not match. *Id.* at DEF OLINGER AND BLANKENSHIP 0002-0003, ECF No. 121-10 at 2-3.

o Olinger did not ask the latent print examiner to compare the latent prints from the note to JL's fingerprints.

♦ On April 19, 1981, 64-year-old MK reported to LaGrange police officers that she had been raped in her home.

o MK stated that a black male had knocked on her door at 5:30 p.m., and she opened the door because she thought it was her son based on his voice. MK stated that the man was around 30 years old, about 5'9", clean shaven, with a medium afro, wearing dark sunglasses and dark

clothes.  MK said she recognized the man as someone who came to her house earlier in the week wanting to cut the grass.[4]

o LaGrange police detective Barbara Price reported that MK was "drinking quite heavily" at the time of the incident and that her blood alcohol content was .34.  Savage Decl. Attach. 3, Interview Summary (July 16, 1981), ECF No. 100-3 at 13.

o MK's clothing and sheets, along with a shoestring that was used to tie MK, were transported to the Georgia State Crime Lab, although LaGrange detectives did not receive a report on the forensic analysis of those items by the time Olinger became involved in the case.

o At some point, MK went to the Columbus Police Department, where a composite sketch was made based on her description of the man who attacked her.

o MK later identified a photograph of IPI—who had also been identified as a suspect in the EB attack—"as possibly being the man who raped her."  *Id.* at 14.

♦ On June 24, 1981, 28-year-old EM reported to LaGrange police officers that she was raped that morning while working in the office at Southwest LaGrange Baptist Church.

o EM stated that her attacker approached her from behind, blindfolded her, and choked her with a rope.  EM did not see the assailant, but she felt his hair, which was "very soft and tight."  *Id.* at 17.

o LaGrange detectives interviewed several witnesses who saw black men in the general area of Southwest LaGrange Baptist Church on June 24, 1981; those men were between 5'9" and 6'0", weighed between 170 and 185 pounds, had 1" to 1.5" afros, and either had a trimmed mustache or were clean shaven.[5]

---

[4] Later in the investigation, Talley acknowledged that he went to MK's house to ask her about yard work.  He said that she agreed to hire him but could not pay him until she received her Social Security check, and he did not go back to her house after that.

[5] Later in the investigation, Talley stated that he had gone inside Southwest LaGrange Baptist Church once.  He asked a young girl if she had any yards he could rake but left when she said no.

- o IPI "became a possible suspect" in the rapes of EM and MK when LaGrange detectives discovered that he owned an ice cream truck that he parked in a parking lot next to Southwest LaGrange Baptist Church and that he lived within walking distance of the church, MK's house, and West Georgia Medical Center. *Id.* at 14, 19.

- o Olinger interviewed a witness who saw a black male near the scene of the EM attack. After the witness described the man she saw, Olinger had her review a series of photographs, and the witness identified IPI "as looking like the man she saw." *Id.* at DEF OLINGER AND BLANKENSHIP 0015, ECF No. 121-10 at 15.

♦ On July 21, 1981, a woman named YS reported to LaGrange detectives that a black man named Terry Talley had assaulted her at her residence approximately three months earlier, in April 1981.

- o YS reported that Talley offered her money for sex. YS stated that when she tried to close the door, Talley twisted her arm and attempted to force her into her house.

- o Talley admits that he offered YS money for sex because he believed she was a prostitute. He asserts that they had a miscommunication, that YS's child started grabbing his leg, that he "pushed [YS] back" into her house, and that he and YS "touched arms" as he tried to "break loose" from her. Talley Dep. 21:21-22:9, ECF No. 100-7. YS did not call the police at that time. In July, YS believed that Talley had returned to her house; she called the police to report the April incident.

♦ On July 23, 1981, Olinger and Price interviewed ES, who had previously reported to police that a black male attempted to rape her on June 30, 1981.

- o ES stated that on June 30, 1981, she was working at West Georgia Medical Center. Around 7:30 p.m., ES walked from one building to another and saw a black male wearing a white tee shirt and cut-off jeans, and he had a cream-colored bike. *See* Savage Decl. Attach. 5, Interview Summary (July 23, 1981), ECF No. 100-3 at 22. It is undisputed that Talley's bike was red, not cream.

- o About an hour later, ES went into a bathroom when a man turned off the lights, grabbed her from behind, and attempted to remove her pants before fleeing the scene.

- o ES believed that the man was the same person she saw earlier, although he had on a light green tank top instead of a white tee shirt.

- o In his handwritten notes about the attack on ES, Olinger identified IPI as a suspect. Pl.'s Resp. to Defs.' Mot. Summ. J. Ex. 7, GBI Investigative File at DEF OLINGER AND BLANKENSHIP 0097, ECF No. 121-10 at 97.

After Olinger reviewed the LaGrange investigative file, interviewed LaGrange detectives, and interviewed witnesses, Olinger and Price held an in-person lineup at the LaGrange Police Department on July 23, 1981. Talley, who had not been informed that he was a serial rape suspect, signed a waiver of his right to an attorney prior to the lineup. The lineup included Talley and seven other black men. The parties did not point to evidence of the ages, heights, and weights of the lineup participants, but Defendant did point to photographs of the lineup participants. Those photographs are poor quality, but they generally show trim black men with similar complexions and afros of varying lengths. Savage Decl. Attach. 10, Lineup Photographs, ECF No. 100-3 at 55-63. The height of the men varies, as does the camera perspective, which affects how tall each man appears; some men appear a bit taller than Talley and others appear a bit shorter. Any significant disparity in the ages of the men is not readily apparent from the photographs. IPI and JL were not in the lineup,

and Olinger did not show any of the witnesses a photograph of JL before the lineup.

During the lineup, six witnesses identified Talley as the person they saw or heard; three of those witnesses had previously identified a photograph of IPI as resembling the person they saw. MK and EM both identified Talley as their attackers, although neither of them could identify him by sight and could only identify him by voice. ES also identified Talley as her attacker. Three witnesses who saw a black man near Southwest LaGrange Baptist church shortly before the attack on EM identified Talley as the man they saw, although one of the witnesses was not sure about the identification. Based on the July 23 lineup identifications, LaGrange detectives swore out arrest warrants against Talley for the attacks on MK, EM, and ES. A LaGrange police officer also swore out an arrest warrant against Talley for the attempted rape of KW, a LaGrange College student who had previously reported that on February 7, 1981, a black man entered her dorm room and strangled her until she became unconscious.

On July 29, 1981, Olinger and Price held another in-person lineup. The lineup included Talley and five other black men. IPI and JL were not in the lineup. EB, the victim of the February 21 rape, identified Talley as her attacker, and a LaGrange police detective swore out an arrest warrant against Talley for the rape and assault of EB.

## III. The Pretrial Hearing, Trials, and Guilty Pleas

### A.    The Pretrial Hearing

Talley obtained counsel, who filed a pretrial discovery motion.  During a pretrial hearing, the prosecutor represented that he gave a copy of the "entire file" that he had to Talley's attorney.  Hr'g Tr. 9 (Nov. 6, 1981), ECF No. 100-9 at 10.  At the time, the prosecutor's office had no investigators, and the three prosecutors relied on the files provided to them by the law enforcement officers.  The prosecutor had a practice of "open file" discovery; he testified that if the law enforcement officers provided him with potentially exculpatory material, it would have been included in the documents that were produced to Talley's counsel.  Mallory Aff. ¶¶ 5-10, ECF No. 121-4.[6]

### B.    The MK Trial

On November 9, 1981, Talley was tried for the rape and assault of MK.  MK testified about her prior identification of Talley during the July 23, 1981, in-person lineup.  Talley's lawyer did not ask MK about her previous identification of IPI as possibly being her attacker or about MK's inability to identify her attacker by sight during the in-person line-up.  He also did not ask MK

---

[6] Defendants pointed to evidence from which a reasonable juror could conclude that the prosecutor did not follow an "open file" approach to discovery in Talley's case, so there is a fact dispute on this issue. But if the jury believes the prosecutor's testimony, it could conclude that anything in the prosecutor's file that had been produced by law enforcement officers would have been produced to Talley's lawyer.

whether anything, including heavy drinking, affected her ability to recognize her attacker.

Price also testified at the MK trial. On direct examination, Price testified that she showed MK photographs of 141 black men, that MK did not identify any of the individuals as her attacker, and that MK had never identified a picture as being of her attacker. Price also testified that MK first identified her attacker during the in-person lineup on July 23, 1981. Price further testified that MK identified Talley during the in-person lineup by viewing him and by voice identification. Finally, Price testified that based on what she observed immediately after MK's attack, Price had no reason to think that MK could not make a correct identification of her attacker. But, as discussed above, MK identified IPI as her possible attacker during a pictorial lineup on July 1, 1981, and MK was unable to identify her attacker by sight during the in-person lineup. And Price knew that MK had been drinking heavily at the time of the incident and that her blood alcohol level was .34. Thus, a reasonable juror could conclude that Price's responses to the prosecutor were untruthful.

Olinger was present at the MK trial but did not testify. After Price testified, the evidence closed. The jury returned guilty verdicts against Talley for rape and aggravated assault. Talley was sentenced to life in prison for the rape charge,

followed by ten years in prison for the aggravated assault charge. Talley's convictions on the MK charges were later vacated.

### C.    The EM Trial

On November 10, 1981, Talley was tried for the rape and assault of EM.  Olinger was present at the EM trial but did not testify.  Blankenship did testify, and he stated that none of the physical evidence he personally examined connected Talley to the attack on EM.  The jury returned guilty verdicts against Talley for the rape and aggravated assault of EM.  Talley was sentenced to life in prison plus ten years, to be served concurrently with this sentence for the MK case.  Talley's convictions on the EM charges were later vacated.

### D.    The Guilty Pleas

After the first two trials, Talley believed his situation was hopeless even though there was no physical evidence connecting him to any of the attacks, including the attacks for which the trials had not yet been held.  Thus, on November 11, 1981, Talley pleaded guilty to the remaining charges: aggravated assault of ES, aggravated assault of YS, aggravated assault of KW, and rape and aggravated sodomy of EB.  Talley was sentenced to ten years for the KW case, two life sentences for the EB case, ten years for the ES case, and ten years for the YS case.  All of the sentences were to run concurrently with the sentence for the MK case.  Talley's

convictions on the EB and KW charges were later vacated. Talley's convictions for the assaults of ES and YS have not been vacated.

## IV.  After the Trials and Pleas

On July 26, 1983, Blankenship destroyed some of the evidence that detectives had collected from the MK scene even though there was no documentation or court order authorizing destruction of that evidence.  Maxwell Decl. ¶¶ 14-15 & Ex. C, ECF No. 121-6 at 15-17(logbook entry stating that for C81-1132, "1b, 1c, 1d, 2, 3A, 3b, 3C, 4, 5 & 6" were destroyed by Blankenship on July 26, 1983).

In 1988, while Talley was serving his prison sentence, he pleaded guilty to obstruction of a correctional officer even though he maintains he was not guilty of the charge.  At the time, Talley believed that he would never get out of prison and did not see the point of contesting the charge.  He received a three-year sentence, to run consecutive with any other sentence he had.  Talley did not point to evidence that this conviction was vacated.

In 2004, Talley applied for assistance from the Georgia Innocence Project.  In 2005, the district attorney for the Coweta Judicial Circuit searched for the prosecutor's 1981 case files for Talley but found that the files had not been saved.  Likewise, it was discovered that Talley's 1981 defense attorney had died in 2001 and that his case file could not be located.  In 2009, a forensic DNA analyst tested the DNA from EM's sexual assault evidence kit.  That test excluded Talley as the source of the DNA.

In February 2021, Talley's convictions for the rapes and assaults of KW, EB, EM, and MW were vacated.  The convictions for the assaults on ES and YS have not been vacated.

DISCUSSION

Talley asserts claims against Olinger under 42 U.S.C. § 1983 for (1) fabrication of evidence, (2) concealment of exculpatory evidence, and (3) malicious prosecution.  He asserts a conspiracy claim against both Olinger and Blankenship.  All of these claims arise out of Talley's convictions for the rapes and assaults of KW, EB, EM, and MW.  Talley does not assert any § 1983 claims arising out of the two convictions that have not been vacated.

Defendants contend that they are entitled to qualified immunity on all of Talley's claims against them.  "Qualified immunity shields public officials from liability for civil damages when their conduct does not violate a constitutional right that was clearly established at the time of the challenged action." *Williams v. Aguirre*, 965 F.3d 1147, 1156 (11th Cir. 2020) (quoting *Echols v. Lawton*, 913 F.3d 1313, 1319 (11th Cir. 2019)).  Where, as here, it is undisputed that an officer was acting within his discretionary authority at the time of the challenged actions, the plaintiff must show that "qualified immunity is not appropriate." *Paez v. Mulvey*, 915 F.3d 1276, 1284 (11th Cir. 2019).  Officers are "entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the

unlawfulness of their conduct was 'clearly established at the time.'" *Williams*, 965 F.3d at 1156 (quoting *Dist. of Columbia v. Wesby*, 583 U.S. 48, 62-63 (2018)).  In determining whether the constitutional right at issue was clearly established when the officer acted, courts ask whether "the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." *Id.* at 1168 (quoting *Wesby*, 583 U.S. at 63). The Court will examine each of Talley's claims in turn.

## I.    Fabrication of Evidence Claim Against Olinger

Talley asserts that Olinger fabricated evidence to obtain his conviction because Olinger orchestrated lineups that resulted in witness identifications of Talley, using procedures that Olinger should have known might result in false identifications.  It has long been clearly established that the Fourteenth Amendment's due process clause prohibits a State and its representatives from knowingly using false evidence to obtain a tainted conviction. The rule originated in cases where a prosecutor knowingly elicited false testimony, or a police officer planted evidence at a crime scene.  *See Napue v. Illinois*, 360 U.S. 264, 269, 272 (1959) (reversing conviction where prosecutor procured conviction with testimony that he knew was false); *Jones v. Cannon*, 174 F.3d 1271, 1289 (11th Cir. 1999) (concluding an officer was not entitled to qualified immunity where there was evidence that he fabricated a boot print at the crime scene); *Riley v. City of Montgomery*, 104

F.3d 1247, 1253 (11th Cir. 1997) (finding that an officer was not entitled to summary judgment on a § 1983 claim where there was evidence that he planted cocaine in the suspect's car).  Here, Talley did not point to evidence that Olinger planted evidence or falsified the lineup results by telling the witnesses to identify Talley.  Rather, Talley contends that Olinger's lineups deviated so far from accepted practices that he should have known they resulted in false identifications of Talley as the attacker.

It was clearly established by July of 1981 that "the conduct of identification procedures may be 'so unnecessarily suggestive and conducive to irreparable mistaken identification' as to be a denial of due process of law."  *Foster v. California*, 394 U.S. 440, 442 (1969).  Under such circumstances, the identification is inadmissible at trial.  This rule "is aimed not at deterring unfair police practices but at the reliability vel non of the truth-finding process."  *Caver v. State of Ala.*, 537 F.2d 1333, 1335 (5th Cir. 1976).[7]

By July of 1981, it was also clearly established in this Circuit that a lineup is unduly suggestive "when it is virtually inevitable that the witness will select the individual whom the

---

[7] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

police have singled out." *Id.* Examples of unduly suggestive lineups include:

- All individuals "in the lineup but the suspect were known to the identifying witness." *United States v. Wade*, 388 U.S. 218, 233 (1967).

- The lineup's other participants "were grossly dissimilar in appearance to the suspect." *Id.*

- The suspect was the only person who "was required to wear distinctive clothing which the culprit allegedly wore." *Id.*

- The suspect was "pointed out before or during a lineup." *Id.*

- The lineup participants "are asked to try on an article of clothing which fits only the suspect." *Id.*

- The suspect was considerably older than the other individuals in the lineup. *Swicegood v. Alabama*, 577 F.2d 1322, 1327 (5th Cir. 1978).

- The officer shows the witness only "the picture of a single individual who generally resembles the person he saw." *Simmons v. United States*, 390 U.S. 377, 383 (1968).

- The officer somehow emphasizes the suspect during a lineup. *Id.*

- The officer's suspect was significantly taller than the other men in the lineup and was the only one wearing a jacket like the assailant's—and even then was not positively identified until a later lineup where the suspect was the only person who had also been in the first lineup. *Foster*, 394 U.S. at 443.

- The officer obtained a witness identification from a manipulated photograph after repeatedly altering the camera's light settings until his suspect's photograph looked more like the witness's prior description of her attacker. *Good v. Curtis*, 601 F.3d 393, 398 (5th Cir. 2010).

Unlike the examples cited above, Talley has not pointed the Court to any binding authority clearly establishing that Olinger's procedures for the July 1981 lineups were impermissibly suggestive. Talley emphasizes that the lineups included men with different builds and heights, but he did not point to evidence from which a factfinder could conclude that the other participants were all so unlike him that the lineup was engineered to single out Talley as the culprit. *See Swicegood*, 577 F.2d at 1327 ("Police stations are not theatrical casting offices; a reasonable effort to harmonize the lineup is normally all that is required.") (quoting *United States v. Lewis*, 547 F.2d 1030, 1035 (8th Cir. 1976)).[8] Talley also argues that witnesses were made to try again until they identified Talley, but he did not point to evidence that any witness for the in-person lineups first identified one of the other participants but was told by Olinger to reconsider their answer until they identified Talley. Rather, Talley's contention seems to be that several witnesses identified IPI during a photographic lineup, then later identified Talley in an in-person lineup that did not include IPI.

Talley's law enforcement experts opine that Olinger failed to follow accepted lineup procedures and that he should have known

---

[8] In the response brief, Talley's counsel asserts—without citing any evidence—that Talley was one of only three individuals who was asked to wear sunglasses during one of the in-person lineups. Even if Talley and his counsel had pointed to evidence to support this fact statement, it would still not establish that the lineup was impermissibly suggestive.

that the witness identifications of Talley from the lineups were unreliable, in part because Olinger did not include JL or IPI in the lineups.  For purposes of the fabrication of evidence claim, though, the question is whether the lineups improperly *singled out Talley* as the suspect.  Talley did not point to evidence or authority clearly establishing that by failing to include IPI or JL in the lineups, Olinger unlawfully influenced the witnesses *to select Talley* and thus violated his constitutional right against fabricated evidence.  For all these reasons, Olinger is entitled to qualified immunity on the fabricated evidence claim.

## II.  Concealment of Exculpatory Evidence Claim Against Olinger

Talley's next claim is that Olinger concealed exculpatory evidence from him.  That evidence included: (1) the list of alternative suspects, including IPI and JL, who were identified by witnesses and victims before Talley's arrest, (2) the fact that MK initially identified IPI as possibly being her assailant, and (3) the fact that MK was heavily intoxicated at the time of the assault.  Talley contends that this failure to disclose exculpatory evidence violated *Brady v. Maryland*, 373 U.S. 83 (1963) and caused him to be convicted at trial.  Talley further asserts that this failure to disclose exculpatory evidence deprived him of access to

the courts to appeal his conviction or pursue other post-conviction relief.[9]

As the Court previously explained, it was clearly established by 1981 that "an accused's due process rights are violated when the police conceal exculpatory or impeachment evidence." *Talley v. City of LaGrange*, No. 4:23-CV-32 (CDL), 2023 WL 8114369, at *8 (M.D. Ga. Nov. 22, 2023) (quoting *McMillian v. Johnson*, 88 F.3d 1554, 1567 (11th Cir. 1996), which in turn relies on *Freeman v. Georgia*, 599 F.2d 65, 69 (5th Cir. 1979)). There is no dispute that an investigator satisfies his obligation to produce exculpatory evidence when he turns such evidence over to the prosecutor. *Id.*

Defendants argue that Talley cannot prove that Olinger failed to turn exculpatory evidence over to the prosecutor because the prosecutor's files and the files of Talley's counsel could not be found. It is true that by the time this action was filed more than four decades after the trials, neither the prosecutor's case file nor the case file maintained by Talley's defense counsel could be located. During discovery in this action, Olinger could not

---

[9] Talley also contends that Olinger and Blankenship deprived him of meaningful access to the courts because they failed "to create required documentation that would have demonstrated his innocence." Pl.'s Resp. Br. 28, ECF No. 121. Presumably, the documentation Talley contends should have been created is a forensic analyst report regarding the physical evidence from the EB crime scene. But, as discussed above, Talley did not point to evidence that Blankenship examined evidence from the EB crime scene, so the present record does not establish that Blankenship was required to create documentation but failed to do so.

recall any specific information about the cases against Talley or what information he provided to the prosecutor. And, if Olinger had standard practices in 1981 regarding which portions of his investigative file he provided to the prosecutor (which then would have been disclosed to Talley's attorney via the prosecutor's "open file" discovery), Defendants did not point to any evidence of those practices. Accordingly, there is no direct evidence on what information Olinger disclosed to the prosecutor or Talley's attorney.

But there is circumstantial evidence from which a jury could conclude that Olinger did not satisfy his *Brady* obligations. As discussed above, during the MK trial, the prosecutor elicited testimony from Price about whether MK identified any other suspects and whether Price had any reason to think MK could not accurately identify her attacker. A juror could find that Price falsely testified that MK had never identified another suspect even though she identified IPI as her possible attacker during a pictorial lineup. A juror could also find that Price knew that MK had been drinking heavily at the time of the attack and that her blood alcohol level was .34—which could affect her ability to identify her attacker. Thus, a reasonable juror could conclude that Price's responses to the prosecutor were untruthful and that she testified falsely at the MK trial. The prosecutor stated that he never knowingly elicited false testimony in any case and that if a law

enforcement officer testified falsely at Talley's trials, they did so without his knowledge. Mallory Aff. ¶ 9. From this evidence, a reasonable juror could conclude that Olinger did not disclose these exculpatory facts to the prosecutor and that Olinger thus failed to meet his *Brady* obligations.[10] Thus, a genuine factual dispute exists as to whether Olinger ever disclosed this exculpatory evidence to the prosecutor. Accordingly, Olinger is not entitled to summary judgment on his qualified immunity defense to this claim.[11]

## III. Malicious Prosecution Claim Against Olinger

Talley's next claim is a Fourth Amendment malicious prosecution claim against Olinger. To establish this claim, Talley must prove the elements of the common-law tort of malicious prosecution and a violation of his Fourth Amendment right to be free from unreasonable seizures. *Gervin v. Florence*, 139 F.4th

---

[10] Defendants suggest that if exculpatory evidence did not get disclosed to Talley's lawyer, it was the prosecutor's fault—and Talley cannot establish that Olinger's conduct was the problem. The prosecutor, though, testified that he had an open file policy and would have produced exculpatory information to opposing counsel. Defendants contend that the Court should not consider this testimony because there is evidence from which a jury could conclude that the prosecutor delayed producing discovery to Talley's counsel. But at this stage in the litigation, the Court must view the evidence in the light most favorable to Talley, and the Court may not make credibility determinations.

[11] Talley seeks to pursue two separate claims based on the failure to disclose exculpatory evidence: a § 1983 due process claim based on alleged *Brady* violations and a § 1983 "right of access" claim based on the same alleged failure to disclose exculpatory evidence. While it might have been appropriate to plead the claims separately in a complaint, it now appears that the conduct underlying the two claims is the same, as is the remedy sought. Thus, the Court is not convinced that they are truly separate claims for purposes of a trial.

1236, 1248 (11th Cir. 2025).  So, Talley must establish that: (1) he "was seized under legal process; (2) the legal process justifying [his] seizure was constitutionally infirm; (3) the suit or proceeding terminated in [Talley's] favor; and (4) the seizure would not otherwise be justified without legal process."  *Id.*

Defendants argue that Talley's malicious prosecution claim against Olinger fails for several reasons, including because it was not clearly established by 1981 that Olinger's investigation was constitutionally deficient.  Defendants do not dispute that recent binding caselaw establishes that an officer violates the Fourth Amendment if he has information "giving rise to an exculpatory inference" but does nothing to examine easily discoverable facts that could confirm the exculpatory inference and reveal that the arrest was factually unsupportable.  *Id.* at 1249.  And Defendants acknowledge precedent establishing that an officer's investigation may be constitutionally insufficient if he elects "not to obtain easily discoverable facts" relevant to the probable cause determination.  *Kingsland v. City of Miami*, 382 F.3d 1220, 1229 (11th Cir. 2004) (finding that officers' investigation was constitutionally insufficient because they "consciously and deliberately did not make an effort to uncover reasonably discoverable, material information" which would have shown that the driver they arrested for DUI was not under the influence of drugs or alcohol)., *abrogated on other grounds as*

*recognized in Williams v. Aguirre*, 965 F.3d 1147, 1159 (11th Cir. 2020).

Defendants do contend that Talley failed to point to authority clearly establishing by 1981 that Olinger's investigation was constitutionally deficient.  The Court agrees.  For a rule to be clearly established, it must "clearly prohibit the officer's conduct in the particular circumstances before him."  *Wesby*, 583 U.S. at 63.  "The rule's contours must be so well defined that it is 'clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'"  *Id.* (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001).  There must be a high degree of specificity, and a "rule is too general if the unlawfulness of the officer's conduct 'does not follow immediately from the conclusion that [the rule] was firmly established.'"  *Id.* at 64 (alteration in original) (quoting *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)).

The general rule Talley relies on is "that officers cannot unreasonably and knowingly disregard or ignore evidence or refuse to take an obvious investigative step that would readily establish that they lack probable cause to arrest a suspect."  *Harris v. Hixon*, 102 F.4th 1120, 1129 (11th Cir. 2024).  But to date under binding precedent, the contours of that rule appear to limit its application to cases where the evidence that the officers "should have considered was not speculative and the possibility of gathering it was not aspirational"—it was concrete evidence that

"obviously and definitively rule[d] out probable cause." *Id.* For example, constitutionally inadequate investigations occurred when the officers (1) arrested a suspect with no tattoos even though crime scene photos showed that the perpetrator had multiple visible tattoos, (2) arrested individuals for criminal trespass despite documents showing authorization to be on the property, and (3) arrested a forty-something woman for selling drugs when the undercover officer stated that the seller was twenty-four and the undercover officer would have immediately ruled out the officer's suspect had he been asked to do so before the arrest. *Id.*

Here, Talley contends that Olinger should have obtained additional facts about other suspects and that the in-person lineups should have included those other suspects. Talley suggests that if the lineups had included those other suspects, then the witnesses might not have identified Talley, and if that happened, then probable cause would not have existed to arrest Talley for the attacks. But Talley did not point to any concrete, readily available evidence that obviously and definitively would have ruled out probable cause for his arrests. While Talley's evidence shows that Olinger's investigation was nowhere near perfect, Talley did not point to any authority clearly establishing by 1981 that Olinger's investigation was so inadequate that it was *unconstitutional*. For these reasons, Olinger is entitled to qualified immunity on Talley's malicious prosecution claim.

26

IV.  **Conspiracy Claim Against Olinger and Blankenship**

Talley's final claim is that Olinger and Blankenship conspired with the LaGrange investigators to conceal exculpatory evidence from Talley, initiate false charges against Talley, and pursue Talley's prosecution and resulting conviction.  "Conspiring to violate another person's constitutional rights violates section 1983." *Rowe v. City of Fort Lauderdale*, 279 F.3d 1271, 1283 (11th Cir. 2002) (citing *Dennis v. Sparks*, 449 U.S. 24, 27 (1980)).  To prevail on his § 1983 conspiracy claim, Talley "must show that an agreement between two or more people (at least one of whom is a state actor) to violate his constitutional rights resulted in an actual violation of those rights." *Am. Fed'n of Lab. & Cong. of Indus. Organizations v. City of Miami*, 637 F.3d 1178, 1191 (11th Cir. 2011).  The existence of a conspiracy may be proved by circumstantial evidence, and "an agreement may be inferred 'from the relationship of the parties, their overt acts and concert of action, and the totality of their conduct.'" *Id.* at 1192 (quoting *United States v. Schwartz*, 541 F.3d 1331, 1361 (11th Cir. 2008)).

The Court finds that the present record viewed in the light most favorable to Talley would support a finding that Olinger and Price came to an agreement to conceal exculpatory information from Talley.  Olinger and Price worked together on the investigation, including the in-person lineups that were the backbone of the prosecution's case against Talley.  They both knew that there were

several other suspects for the attacks, but a factfinder could conclude that neither of them disclosed that information or other exculpatory information to the prosecutor. And a factfinder could conclude that Olinger knew that Price, like him, did not disclose the exculpatory information to the prosecutor because Olinger was present for the MK trial, where Price falsely testified that (1) MK had never identified another suspect and (2) Price knew of no reason MK might have trouble identifying her attacker even though she did. Taking all of this evidence together, the present record supports an inference that Price and Olinger had an agreement to conceal exculpatory evidence from Talley. The Court thus denies Defendants' summary judgment motion as to the § 1983 conspiracy claim against Olinger.

As to the § 1983 conspiracy claim against Blankenship, Talley did not point to any evidence from which a reasonable juror could conclude that Blankenship had an agreement with anyone else to violate Talley's constitutional rights, such as evidence that Blankenship knew about any exculpatory evidence that was not disclosed to the prosecutor or knew the investigators failed to disclose such evidence. Talley argues that Blankenship received and examined evidence from several crime scenes but failed to log that evidence into GBI custody or create reports on it, but Talley did not cite any evidence that establishes either one of these

things.[12]  Talley's evidence does establish that a year and a half after Talley's convictions, Blankenship destroyed some of the evidence from the MK crime scene.  The Court previously concluded that no *Brady* claim for post-trial or post-plea destruction of evidence was clearly established by 1981, and this evidence does not give rise to an inference that Blankenship had an agreement with anyone else to violate Talley's constitutional rights. Accordingly, Blankenship is entitled to summary judgment on the conspiracy claim against him.

CONCLUSION

For the reasons explained above, the Court denies Defendants' summary judgment motion (ECF No. 100) as to Talley's claims against Olinger for concealment of exculpatory evidence and § 1983 conspiracy, but the Court grants the motion as to Talley's claims against Olinger for fabrication of evidence and malicious prosecution, as well as his § 1983 conspiracy claim against Blankenship.

IT IS SO ORDERED, this 26th day of September, 2025.

S/Clay D. Land
_____
CLAY D. LAND
U.S. DISTRICT COURT JUDGE
MIDDLE DISTRICT OF GEORGIA

---

[12] Again, in Talley's statement of material facts and briefing, Talley's counsel asserts that LaGrange detectives took evidence from the EB crime scene to Blankenship for testing.  But counsel did not submit the exhibits they cite in support of this assertion, so those fact statements are unsupported, and the Court may not consider them.